Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jacob A. Goldberg (*pro hac vice*)
THE ROSEN LAW FIRM, P.A.
101 Greenwood Avenue, Suite 203
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com

***Lead Counsel for Plaintiffs and the Class***

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| FRANCIS J. BONANNO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>vs.<br><br>CELLULAR BIOMEDICINE GROUP, INC., *et al.*,<br><br>Defendants. | CASE No.: 3:15-CV-01795-WHO<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff, Michelle Jackson ("Lead Plaintiff") and named plaintiffs Ervin D. Windom, Ding Liang and Beverly J. Nissenbaum ("Named Plaintiffs" and, together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants Cellular Biomedicine Group, Inc. ("Cellular Biomed," "CBMG" or "Company"), Wei "William" Cao ("Cao"), LifeTech Capital ("LifeTech"), Stephen M. Dunn ("Dunn"), Streetwise Reports, Institutional Analyst, Inc. ("IAI"),

Roland Rick Perry ("Perry"), Wide World of Stocks ("WWOS"), Damon Roberts ("Roberts") John McCamant ("McCamant"), SNN, Inc. ("SNN"), and Shelly Kraft ("Kraft"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cellular Biomedicine Group, Inc., ("CBMG" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired CBMG securities between December 10, 2014 and April 7, 2015, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2. Defendant Cellular Biomed was incorporated in 2001. Its shares trade on the NASDAQ exchange under the ticker symbol "CBMG." It began as a mobile entertainment company, shifted to investment consulting and ultimately was a virtual shell into which a new, Chinese Operating Company that claimed to focus on biotechnology merged. Cellular Biomed is the result of a reverse merger with a Chinese operating company of a similar name.

3. The Company claims to be developing cell-based therapies to treat serious chronic and degenerative diseases, such as cancer, osteoarthritis, tissue damage, various inflammatory diseases, and metabolic diseases. It claims to utilize proprietary cell based technologies,

including immune cell therapy for the treatment of a range of cancers; human adipose-derived mesenchymal progenitor cells for the treatment of joint and autoimmune diseases; and tumor cell specific dendritic cell therapy.

4. Cellular Biomed competes against vastly larger companies that are far better capitalized who partner with each other and with research institutions, spending billions on technology, technologists, research, development and clinical trials. The Company did not start off with technology or robust intellectual property of its own. Rather, its purported reason for existing is to leverage cell-therapy technology in the Chinese healthcare market. Except that stem cell therapies are not widgets. Whichever competitor successfully develops therapies will commercialize its intellectual property worldwide. Thus, unless Cellular Biomed intends to violate others' intellectual property, being in China seemingly offers it no discernable competitive advantage, especially given its vow to employ United States and European standards and protocols in the development and testing of its potential therapies. That said, Cellular Biomed projects itself as a stem cell China-play and once exposed to the market, Defendants knew, small retail investors were bound to be attracted once it achieved a certain recognition – recognition that due to its lackluster story was difficult to achieve.

5. By 2014, therefore, the Company's real reason for existing became raising enough money to purchase technology that may or may not ultimately produce a therapy and to conduct clinical trials on potential therapies. The Company needed large cash infusions both to purchase the technology and to run the clinical trials. In an effort to avoid the scrutiny of a registration of securities with the SEC, however, the Company chose private placements as its funding source of choice. It promised investors that it would file a registration statement, enabling them to trade their shares, as soon as reasonably practical. Thus, market price for the shares that already traded was critical.

6. Because the Company's story was uninspiring, by late 2014 it began paying purported "investor relations" firms to create positive spin through bespoke analyst coverage on the stock with the sole goal of raising Cellular Biomed's price. Under the guise of serious financial analysis, analysts write long, glossy reports or produce professional looking broadcasts, all to make it seem as if the company in question has attracted the attention of analysts whom investors should believe. Such paid promotions are legal, so long as they clearly disclose to otherwise unsuspecting potential investors that the issuer has bought and paid for the purported research.

7. By late November, 2014, the Company had entered into an agreement to pay Defendant Wide World of Stocks to promote Cellular Biomed. In mid-January, 2015, WWOS uploaded a half hour broadcast to various internet sites. The broadcast followed a tried and true format. A broadcast "anchor" first discussed the broad biotech market. He then introduced a purportedly independent analyst, Defendant John McCamant, who continued the discussion on the broad market, narrowing its focus to well-established companies within that market. They then introduced with glowing praise and interviewed an officer of the Company they were paid to promote, here, Defendant Cao, Cellular Biomed's CEO. At no point during the broadcast did the anchor, the purportedly independent Defendant McCamant or Defendant Cao disclose that the Company bought and paid for the broadcast. While clicking through several links gets you to an obtuse disclosure about the producer of the broadcast, it is insufficient on its face.

8. After WWOS produced its broadcast, other paid analysts began to produce research content that they uploaded to the internet for unsuspecting investors. These posts took the form of very professional looking research reports or interviews with the analysts who drafted them. For example, Defendant LifeTech produced a long and dense research report on Cellular Biomed with a wholly insufficient disclosure on the facts surrounding a payment from Cellular

Biomed to LifeTech and its analyst, Defendant Stephen Dunn. Defendant Institutional Analyst, Inc. then uploaded a press release, from LifeTech, summarizing Dunn's research opinion, but omitting all reference to the payment LifeTech and Dunn received. Dunn's bottom line appears, making it available to investors, but attenuating it from the initial report which was paid for by Cellular Biomed.

9. Just as WWOS had showcased Defendant McCamant as a purported independent analyst, another paid outlet, Defendant Streetwise Reports, then interviewed Dunn as an independent expert. As in WWOS's broadcast, Streetwise Reports interviewed Dunn about the broad biotech market and some well-established companies therein. Towards the end, Dunn promoted Cellular Biomed, seemingly as an afterthought. Streetwise Reports and Dunn both lacked independence and their disclosures about payment failed adequately to inform investors about the true nature of the paid promotion. The opinion from a purported expert like Dunn progresses from original research report to an interview that presents Dunn as an independent expert to all of that content being uploaded to a broad investor web-site like *SeekingAlpha.com*.[1] That progression – that daisy chain of posts that ultimately disassociates promotion from payment – whitewashes the fact that the Company paid for that tainted stream of promotion.

10. Unsuspecting investors were duped. Defendants' scheme was successful. Though there was relatively insignificant news from the Company during the Class Period, the stock price soared in direct response to the promotions, from a January 2, 2015 close of $13.79 per share to a high, Class Period close on March 23, 2015 of $47.06 per share. With the stock price inflated as a proximate result of the undisclosed paid promotion scheme, the Company issued shares of stock

[1] *SeekingAlpha.com* is a financial news and analysis website. It publishes third party reports, analysis, and commentary as articles, and permits open discussion of the articles. As of February, 2014, *Seeking Alpha* had 3 million registered users, and as of August, 2013, received between 500,000 and 1 million unique visitors per day. It received *Forbes*' Best of the Web Award in 2007, and took first place in *Inc. Magazine*'s list of Essential Economic blogs.

in a private placement at $38 per share, raising $20 million.

11. On April 7, 2015, a blogger known as "Pump Stopper" uploaded a post to *SeekingAlpha.com*, titled "Cellular Biomedicine: Strong Sell on Patient Death, Fraud Ties and Stock Promotion, -94.6% Downside." Pump Stopper focused its analysis on Defendant LifeTech's and Defendant Dunn's paid promotion of Cellular Biomed stock, among other promotions for which the Company paid. "I do not suggest," Pump Stopper wrote, that "anyone, EVER, invest in any company that pays to promote their stock. Time and time again we have seen how these end and with 10k+ stocks in the US alone, there is no reason I can see to invest in any company of this poor quality." Defendants' promotional scheme was exposed.

12. On this news, CBMG securities declined $7.00 per share, or over 21.7%, to close at $25.22 per share on April 7, 2015. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

13. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

14. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

15. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred. Defendant Cellular Biomed maintains its headquarters and conducts business in this District.

16. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

17. Lead Plaintiff, Michelle Jackson purchased the common stock of Cellular Biomed during the Class Period as set forth in the certification presented to the Court in her motion for appointment as lead plaintiff, incorporated by reference herein, and has been damaged thereby.

18. Named Plaintiff Ervin D. Windom purchased the common stock of Cellular Biomed during the Class Period as set forth in the Certification filed herewith and incorporated herein by reference, and has been damaged thereby.

19. Named Plaintiff Ding Liang purchased the common stock of Cellular Biomed during the Class Period as set forth in the Certification filed herewith and incorporated herein by reference, and has been damaged thereby.

20. Named Plaintiff Beverly J. Nissenbaum purchased the common stock of Cellular Biomed during the Class Period as set forth in the Certification filed herewith and incorporated herein by reference, and has been damaged thereby.

21. Defendant Cellular Biomed is a Delaware corporation with its principal executive offices located at 530 University Avenue, Suite 17, Palo Alto, CA 94301. CBMG's common stock trades on the NASDAQ under the ticker symbol "CBMG."

22. Defendant Wei "William" Cao ("Cao") has served at all relevant times as the Company's Chief Executive Officer ("CEO").

23. Defendant Cao:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f) approved of or ratified these statements in violation of the federal securities laws.

24. As officer, director, and controlling person of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ and governed by the provisions of the federal securities laws, Defendant Cao had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue so as to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

25. Cellular Biomed is liable for the acts of Defendant Cao and the Promoter Defendants under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment and with authorization.

26. Defendants Cao's and other Company employees' and agents' scienter is similarly imputed to Cellular Biomed under *respondeat superior* and agency principles.

27. Defendant LifeTech Capital claims to be "a multi-disciplinary team of investment professionals specializing in serving the unique needs of the Biotech, MedTech and High-Tech industries and investor community." It boasts an institutional research team that purports to "provide[] exceptional industry insight into the complex analysis of determining the future value of drugs, devices and companies as well as access to leading key opinion leaders." It claims that "[w]ith international media exposure and public appearances at both scientific and financial events, our institutional research team assists companies and investors in unlocking the value of science." It also claims to have investment banking and capital markets teams. LifeTech claims access to "a broad base of accredited retail investors through both Newbridge Securities Corporation and investor syndicates."

28. Defendant Stephen M. Dunn ("Dunn") is the senior managing director of research for LifeTech. During the Class Period, Defendants Dunn and LifeTech prepared and disseminated research reports and participated in interviews and other forums without adequately disclosing that he was paid to create and distribute that content.

29. Defendant Streetwise Reports claims "to share promising investment ideas in a changing world." It provides what it calls "authoritative interviews with leading industry experts and analysts" that "provide a clear picture of the causes of macro-economic shifts and the strategies that will help you capitalize on these developing trends." The Company claims that it integrates its "valuable insight . . . with in-depth company information, summaries from the latest research and news that will help you make smart investment decisions." During the Class Period, Streetwise Reports prepared and disseminated research reports, interviews and other web content without adequately disclosing that it and its experts were paid to create and distribute that content.

30. Defendant Institutional Analyst, Inc. ("IAI") claims to be a privately held investment research firm. During the Class Period, IAI prepared and disseminated research reports in the "Biotech Stock Review" and web content, including through "Internet Stock Review," without adequately disclosing that it and its experts were paid to create and distribute that content.

31. Defendant Roland Rick Perry ("Perry") is the principal of IAI and principal draftsperson of the content it disseminates. During the Class Period, Perry prepared and disseminated research reports and other web content without adequately disclosing that IAI, he and its other experts were paid to create and distribute that content.

32. Defendant Wide World of Stocks ("WWOS"), a subsidiary of Valhalla Venture Group, LLC, claims to be "a print and digital content provider with multi-channel integration including television, radio, video, webcasts, podcasts and a magazine in both digital and print formats that delivers visibility to companies in the micro and small-cap sectors." According to WWOS, its "program has been seen in 100+ million homes, regionally and nationally on cable and major networks including CBS, NBC, ABC, and FOX." During the Class Period, WWOS prepared and disseminated broadcast and written content without adequately disclosing that it and its experts were compensated to create and distribute that content.

33. Defendant Damon Roberts ("Roberts") is the Director & Television Host of WWOS. During the Class Period, Roberts prepared and disseminated broadcast content without adequately disclosing that WWOS and its experts were compensated to create and distribute that content.

34. Defendant John McCamant ("McCamant") claims to be an expert in the biotech market who controls content on several different internet sites, including BioInvest. During the Class Period, McCamant prepared and disseminated broadcast and written content without

adequately disclosing that WWOS and he were compensated to create and distribute that content.

35. Defendant SNN, Inc. ("SNN") is bills itself as "a global multimedia financial news and publishing company that focuses on market awareness and investor visibility for public and private microcap companies. The company publishes the MicroCap Review magazine and StockNewsNow.com." During the Class Period, SNN prepared and disseminated broadcast and written content without adequately disclosing that it was compensated to create and distribute that content.

36. Defendant Shelly Kraft ("Kraft") is a presenter for SNN. During the Class Period, Kraft prepared and disseminated broadcast and written content without adequately disclosing that he and SNN were compensated to create and distribute that content.

37. Together, the Defendants listed in paragraphs 27-36 are hereafter designated as the "Promoter Defendants."

## SUBSTANTIVE ALLEGATIONS

***The Federal Securities Laws on Stock Promotion***

38. Section 17(b) of the Securities Act of 1933, 15 U.S.C. 77q(b), is commonly known as the "anti-touting" provision. It prohibits publicizing information about a security without "fully disclosing" any consideration received or to be received, directly or indirectly, from the issuer. *Id.*

39. Congress enacted the anti-touting provision in part to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for."[2]

40. In an "investor bulletin," the SEC has stated that "[s]ome microcap companies pay stock promoters to recommend or 'tout' the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows." The SEC

[2] *S.E.C. v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 376 (D.C. Cir. 1988) (*quoting* House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).

continued that any such publication must "disclose who paid them for the promotion, the amount, and the type of payment. ***But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice***." (Emphasis added).[3]

41. According to its Annual Report on Form 10-K for the year ended December 31, 2014, filed with the SEC on March 31, 2015 ("2014 10-K"), as of December 31, 2014, Cellular Biomed had 9,182,429 weighted average shares outstanding. As of that same date, the closing price was $12.91 per share, giving Cellular Biomed a market capitalization of just over $118.5 million. The SEC defines "microcap companies" as those with market capitalizations of less than $250 million and more than $50 million. As the class period began, Cellular Biomed was a microcap company.

42. On June 2, 2014, the SEC issued an "Investor Alert," titled "Investment Newsletters Used as Tools for Fraud."[4] In that Alert, the SEC urged investors to "read carefully" newsletters and other promotional materials for information about whether the issuer compensated the promoter for a favorable article. In particular, the SEC warned about promoters who disclosed not having received compensation or those that offer only vague disclosures – who fail specifically to disclose who paid them, the amount, and the type of payment. The SEC further warned of promoters' "disclosures [that] are difficult to find or appear in tiny, hard-to-read print. "Even if a newsletter makes specific disclosures about being compensated for promoting a stock," the SEC continued, "be aware that fraudsters may include such disclosures to create the false appearance that the newsletter is legitimate." Cellular Biomed and the Promoter Defendants engaged in just such a scheme.

---

[3] http://www.sec.gov/investor/pubs/microcapstock.htm.

[4] http://investor.gov/news-alerts/investor-alerts/investor-alert-investment-newsletters-used-tools-fraud.

***Background on the Company***

43. The biotech industry is fiercely competitive and well-populated by companies with very deep resources. In particular, the race is on to develop safe and effective therapies, using the body's own cells, to treat various cancers – the very space in which Cellular Biomed claims to operate. For example, in an April 1, 2015 article in The Scientist, titled "The Car-T Cell Race," author Vicki Brower wrote that in late 2014, Juno Therapeutics reported that its chimeric antigen receptor (CAR) T-cell therapy, successfully achieved remission in 24 of 27 adults with refractive acute lymphoblastic leukemia (ALL). Six of those patients remained in remission for more than a year. Founded in 2013, Juno boasts "four CD19-targeting CAR T-cell therapies in trials." According to Juno's founder, "CAR therapy is at the same time cell therapy, gene therapy, and immunotherapy. It represents a radical departure from all forms of medicine in existence until now." Juno is also in trials for a number of solid cancers too. According to Brower, Juno's success has increased its valuation to $4.7 billion.

44. More, Brower noted that the space in which Juno operates is crowded, "experiencing a frenzy of scientific activity, corporate partnering, and financing that took off in late 2013, continued throughout 2014, and moved straight into the new year with no sign of letting up." Importantly, she noted, "most major pharmaceutical companies have jumped into the CAR T-cell arena. In the past two years alone, at least half a dozen companies have made deals worth hundreds of millions of dollars up front, with much more expected in the future as products move through the pipeline." Dozens of clinical trials are already ongoing. Brower wrote of other major players in the CAR T race, commercial, non-commercial and collaborations among the two, including Kite Pharma, Bellicum Pharmaceuticals the MD Anderson Cancer Center in Houston, and the University of Pennsylvania/Novartis collaboration.

45. According to a recent report by EP Vantage, the editorial team at life science market intelligence firm Evaluate Ltd, however, Brower warned, "while investor enthusiasm for this sector is unlikely to diminish anytime soon, 'there may be hidden dangers' for those in it to make a big return." Brower quoted Jacob Plieth, author and biochemist as stating that while CAR T therapy is potentially revolutionary, "numerous risks are being lost in the hype. It is important to appreciate the risks as well as the opportunities to have a clear understanding of the market potential of these therapies and their developers." Brower concluded that given the many CAR T-cell trials in leukemia and lymphoma in progress or about to commence, "[s]cientists in this arena are energized by these and other results, and many see CAR T-cell therapies as the future of cancer treatment. Brower mentioned no micro-cap companies in her piece.

46. The Company recognized the fierce nature of the competition in its 2014 10-K, for the year ended December 31, 2014. "To date there are over thirty publicly listed and several private cellular biomedicine focused companies outside of China with varying phases of clinical trials addressing a variety of diseases," the Company wrote. "We compete with these companies in bringing cellular therapies to the market." While claiming to follow "international standards" for its trials and facilities – including numerous international and Chinese certifications, it claims that its "focus is to develop a core business in the China market. This difference in focus places us in a different competitive environment from other western companies with respect to fund raising, clinical trials, collaborative partnerships, and the markets in which we compete."

47. In the 2014 10-K, the Company noted the Chinese government's interest in enabling Chinese companies to compete in biotechnology, including funding from the "973 Program [which] has funded a number of stem cell research projects" in China. While Defendants named "two large stem cell companies in China," they conclude that "none of the Chinese companies are utilizing our proposed international manufacturing protocol and our

unique technologies in conducting what we believe will be full compliant CFDA-sanctioned clinical trials to commercialize cell therapies in China." Thus the Company bound itself to "western" standards and protocols, has received no funding from the Chinese government, and recognizes the fierce global competition. Yet somehow, it contends that it can compete with "western" companies and commercial-academic collaborations and overcome the head start of its competitors. "Our competitors worldwide," the Company wrote, "include pharmaceutical, biopharmaceutical and biotechnology companies, as well as numerous academic and research institutions and government agencies engaged in drug discovery activities or funding, in the U.S., Europe and Asia." It continued that "[m]any of these companies are well-established and possess technical, research and development, financial, and sales and marketing resources significantly greater than ours."

48. Even in China the Company foresaw that the future might bring "more fierce market competition." According to the Company, in 2015, "Eli Lilly and Company (NYSE:LLY) and Innovent Biologics, Inc. (Innovent) announced one of the largest biotech drug development collaborations in China to date between a multi-national and domestic company," a collaboration "to support the development and potential commercialization of at least three cancer treatments under the next decade." Notwithstanding that, the Company continued to tout its "strategic advantage over our competitors based on [its] ability meet CGMP regulatory requirements," unlike its peers in China. "Meeting exacting standards and achieving extremely high purity levels is crucial to success," yet somehow, the Company claimed an advantage over rivals in the Chinese market because of lower cost. This is the market that defendants chose to enter in 2013, without any company owned-or developed technology.

49. Indeed, on July 1, 2015, Bob Grant published an article in *The Scientist*, titled "CAR-T Therapies Get $1 Billion Boost – The biotech firm Celgene inks a huge collaboration

deal with Juno Therapeutics to develop and commercialize new cancer immunotherapies." In his article, Grant wrote that CAR T-cell cancer therapies "just got a big shot in the arm. Celgene, the global biopharmaceutical company headquartered in New Jersey, signed a $1 billion deal with Juno Therapeutics to develop CAR T-Cell immunotherapies for cancer." According to Celgene's CEO, "Juno has assembled world class experts and built impressive capabilities and technologies in the areas of T-cell biology and cellular therapy; we believe this long-term collaboration enhances the potential of both companies to deliver transformational therapies to patients with significant unmet medical needs." Importantly, while Juno would retain U.S. rights to commercialize its products, "Celgene will have options to commercialize Juno's programs outside North America."

50. The Company began operations as a manufacturer of mobile entertainment products. In 2005, it exited that market, dedicating "its activities to providing investment related services in Asia, with a strong focus on high GDP growth countries, such as China." On February 6, 2013, the Company claims, it merged into CBMG (BVI), changing the Company name to Cellular Biomedicine Group, Inc. The Company continued to operate its investment related business until June 23, 2014 when it discontinued those operations, instead "focusing its resources on becoming a biotechnology company bringing therapies to improve the health of patients in China." The Corporate structure is standard for a Chinese "reverse takeover." The Company owns a British Virgin Islands entity called Cellular Biomedicine Group, Ltd. (BVI) which, in turn, owns Cellular Biomedicine, Ltd. Hong Kong, which, in turn, owns Cellular Biomedicine Group (Wuxi), Ltd. ("Wuxi"). Wuxi has only a contractual interest in the purported products and research and development of Cellular Biomedicine Group, Ltd. (Shanghai). As such, the Company does not own its operating assets, but only has a commercial interest in them.

51. The Company claims to have founded its biomedicine operations in 2009 "as a newly formed specialty biomedicine company by a team of seasoned Chinese-American executives, scientists and doctors." The Company claims a "good manufacturing practices" ("GMP") facility in Wuxi, China and "a U.S. Food and Drug Administration ("FDA") GMP standard protocol-compliant manufacturing facility in Shanghai." According to the Company, its "focus has been to monetize the rapidly growing health care market in China by marketing and commercializing stem cell and immune cell therapeutics, related tools and products from our patent-protected homegrown and acquired cell technology, as well as by utilizing exclusively in-licensed and other acquired intellectual properties." The Company claims that its current focal points are on therapies for cancer and other degenerative diseases.

52. About its operations, in the 2014 10-K, the Company stated, "[t[he majority of our biomedicine business is in the development stage. We intend to concentrate our business on cell therapies and in the near-term, carrying our [knee osteo-arthritis ("KOA")] stem cell therapy and cancer immune cell therapies to commercialization." The Company's most advanced cell therapy "involves adipose-derived mesenchymal stem cells to treat KOA." The Company estimates that it will be able to commercialize its KOA therapy within the next three to five years.

53. With respect to technology and research and development, however, the Company has been dependent on purchasing existing companies and their technologies. In the context of Celgene's spend to buy into Juno, these expenditures are tiny and may portend that the technology Cellular Biomed is buying is worth what it pays for it – very little. It is, however, dependent on acquisitions and requires cash to fund those purchases.

54. For example, on September 26, 2014, the Company acquired all of the outstanding equity of Agreen Biotech Co. Ltd. ("Agreen") for aggregate consideration of $17,747,415, consisting of $3,240,000 in cash and the issuance of 753,522 shares of Cellular Biomed common

stock. According to Defendants, Agreen is a "biotech company with operations in China, engaged in the development of treatments for cancerous diseases utilizing proprietary cell technologies, which include preparation of subset T Cell and clonality assay platform technology for treatment of a broad range of cancers by AG's primary hospital partner, Jilin Hospital." Agreen became a wholly-owned subsidiary of the Company's Shanghai affiliate.

55. According to the 2014 10-K, the Agreen acquisition enabled the Company to "generate technical services revenue comprised of T Cells Receptor ("TCR") clonality analysis technology and T Central Memory Cell ("Tcm") and Dendritic Cell ("DC") preparation methodologies." Of the Company's Agreen acquisition, Defendants stated, "[w]e plan to integrate CBMG's state-of-the art infrastructure and clinical platform with the aforementioned acquired technologies to boost the Company's Immuno-Oncology presence, and pave the way for future partnerships." It continued, "[w]e plan to initiate certain cancer clinical trials in China upon receiving acceptance of the clinical trial designs with the principal investigator and obtaining the requisite approvals. We have yet to derive revenue from our CAR-T or anti-PD-1 technologies." In addition, in 2014, the Company reported pro forma results, including revenue of $1,762,791, $1,198,414 or 68% of which was revenue from Agreen.

56. The Agreen acquisition not only highlighted the Company's need to acquire new technologies and revenues, but also the importance of the market price of its common stock. As a factor in any valuation decision, the higher the market price of its common stock, the fewer shares the Company would be forced to issue as consideration for any merger. In turn, the higher the market price of the Company's stock, the lower the dilution of the then current shareholders' interests, including those of the senior officers, directors and founders of Cellular Biomed.

57. In the first two months of 2015 the Company made two further purchases. On January 9, 2015, it announced that it had acquired from a company called Persongen

Biotechnology, Ltd. "third generation CAR-T, anti-PD-1, CD19 and aAPC cancer immunotherapy technologies." Except for the Company's notice, little information about Persongen is available on the internet. Nor did the Company issue a press release, announcing either the acquisition or the price it paid. In the 2014 10-K, while the Company did disclose the acquisition, it did not disclose the price.

58. On February 9, 2015, the Company announced the technology acquisition on February 4, 2015 of "Chinese PLA General Hospital's ("PLAGH", Beijing, also known as "301 Hospital") Chimeric Antigen Receptor T cell ("CAR-T") therapy, its recombinant expression vector CD19, CD20, CD30 and Human Epidermal Growth Factor Receptor's (EGFR or HER1) Immuno-Oncology patents applications, and Phase I clinical data of the aforementioned therapies and manufacturing knowledge."

59. According to Defendants, "[t]he 301 Hospital team has conducted several preliminary clinical studies of various CAR-T constructs targeting CD19-positive acute lymphoblastic leukemia, CD20-positive lymphoma, CD30-positive Hodgkin's lymphoma and EGFR-HER1-positive advanced lung cancer." Without disclosing the cost of this transfer of technology to the Company, the 2014 10-K recounts that "PLAGH agreed to transfer to the Company all of its right, title and interest in and to certain technologies currently owned by PLAGH (including, without limitation, four technologies and their pending patent applications) that relate to genetic engineering of chimeric antigen receptor (CAR)-modified T cells and its applications (collectively, the "Technology")." While the Company took upon itself the funding of costs and expenses in connection with clinical trials, "PLAGH is responsible for obtaining governmental approval for the clinical trial related to the Technology."

60. As if these acquisition did not make it readily apparent, according to the 2014 10-K, financing was critical to the Company. While it completed a private placement in 2014,

raising over $19 million, its cash burn was significant and it needed to acquire technology to enable it to grow. As the Company stated in the 2014 10-K, "to finance our medium to long term plans, we intend to rely upon external financing. This financing may be in the form of equity and or debt, in private placements and/or public offerings, or arrangements with private lenders." The Company continued that "[d]ue to our short operating history and our early stage of development, particularly in our biomedicine business, we may find it challenging to raise capital on terms that are acceptable to us, or at all." The Company expressed that its "negotiating position in the capital raising process may worsen as we consume our existing resources. Investor interest in a company such as ours is dependent on a wide array of factors. . . ."

61. In discussing the issuance of additional equity, the Company enumerated certain risks, such as equity-holder dilution, and the potential failure of its stock price to "reach levels necessary to induce option or warrant exercises. If we are unable to raise the capital necessary to meet our medium- and long-term liquidity needs," the Company stated, "we may have to delay or discontinue certain clinical trials, the licensing, acquisition and/or development of cell therapy technologies, and/or the expansion of our biomedicine business; or we may have to raise funds on terms that we consider unfavorable."

62. If Cellular Biomed, an amoeba in a sea of well-capitalized, technologically advanced competitors, was to succeed, it would have to raise money to acquire technologies it had not developed on its own. In 2014, however, biotech stocks fell into brief disfavor. On November 16, 2014, "The Life Sciences Report," a publication of Streetwise Reports,[5] a stock promotion website, discussed more fully below, published a report on the biotech industry.[6] The Report stated that "[w]hen the biotechnology market hit a speed bump in early 2014, every stock in the sector was jolted. Large-cap biotech and big pharma have largely recovered, but small- and

---

[5] http://www.streetwisereports.com/.
[6] http://www.thelifesciencesreport.com/pub/na/16357.

micro-cap companies haven't yet entirely recouped the losses." The report continued that "[t]he performance of Streetwise Reports' Biotechnology Watchlist to date reflects this trend: The portfolio lingered in negative territory after the late-winter punch, and hovers near breakeven as of Nov. 3. To get a handle on the drivers of small-cap stock price volatility," the report stated, it sought analysis from "a pair of the analysts who selected companies for its 2014 Watchlist, John McCamant of the Medical Technology Stock Letter and George Zavoico of MLV & Co."

63. The analysts noted that in the wake of the decline the biotech indices experienced during early 2014, while "the major indices, such as the NASDAQ Biotechnology Index (IBB), which is up about 30% year-to-date, have since rallied," the small-cap and micro-cap stocks – "like those on the Watchlist" – did not recover. The report described McCamant's "thoughts on what might be behind the market volatility, and [] his reflections as noted in the September 2014 issue of his Medical Technology Stock Newsletter." McCamant described as "frustrating" the quick retreat and failure to recover of stocks on The Life Science Report's "Biotech Watchlist" "despite a slew of positive fundamental events." McCamant continued, observing that "[b]iotechnology stocks appear stuck in a trading range. . . . Based upon exceptional fundamentals and overwhelming catalyst calendar," however, McCamant "expected stock prices to hold steady."

64. This swoon in micro-cap and small-cap biotech stocks coincided with The Company's retreating from its investor relations push of 2013. According to the 2014 10-K, the Company reduced its investor relations expense in 2014 by $1,503,000 from 2013. This corresponded to a lackluster performance after the run-up of the price, related to the Company's listing on the NASDAQ. That is, Cellular Biomed's stock price increased to over $15 per share on the heels of the commencement of trading on the NASDAQ, reaching into the $30 per share range in the summer of 2014. By the fall of 2014, however, it had settled back down to $15-$16

per share – not high enough to reap the Company the proceeds it needed to pursue the acquisitions that it required to sustain any growth whatsoever. The Company turned back to purported investment relations professionals in the fall of 2014 to push the price of Cellular Biomed's stock higher, in turn enabling the Company to issue stock in a March, 2015, private placement at more than twice the November 6, 2014, $16 close,

## **FALSE AND MISLEADING STATEMENTS – SCHEME TO DEFRAUD**

***Cellular Biomed's Undisclosed, Paid Promotions***

65. On December 10, 2014, the Company filed with the SEC a Post-Effective Amendment No. 1 to Form S-8 Registration Statement under the Securities Act of 1933 ("S-8"). The S-8 included "an amended and restated Prospectus . . . that relates to the resale of up to 780,000 shares of Common Stock that have been or may be issued under Cellular Biomedicine Group, Inc. 2011 Incentive Option Plan to various selling stockholders." The S-8 continued that the "prospectus relates to the shares of our common stock that are being registered for reoffers and resale by selling stockholders who have acquired or may acquire shares pursuant to the Plan." Defendant Cao and other officers and a former director, including Wen Tao Liu, Executive Chairman, Andrew Chan SVP, Corporate Business Development, Bizuo (Tony) Liu CFO, Secretary and Director and Jianping Dai, Former Director, were the selling shareholders. After the S-8, they were entitled to "resell all, a portion or none of the shares of our common stock covered by this prospectus" onto the market.

66. In the S-8, the Company disclosed various risks of investing in its common stock. Included in those risks, the Company wrote, were wide fluctuations in stock price due in part to the Company's "status as a relatively unknown company with a small and thinly traded public float. The market for our common shares is characterized by significant price volatility when compared to seasoned issuers," the Company continued, "and we expect that our share price will

continue to be more volatile than a seasoned issuer for the indefinite future."

67. Among the factors the Company cited for such volatility in its share price was the sporadic and thin trading of its shares, leading to a "lack of liquidity." In turn, relatively small trades "may disproportionately influence the price of those shares in either direction." In addition, the Company stated, an investment in its stock was speculative, more risk prone, because of the Company's "limited operating history and lack of profits to date." This, the Company disclosed, may cause more risk-averse investors to abandon the stock more quickly in the face of negative news. "Many of these factors," Defendants wrote, "are beyond our control and may decrease the market price of our common shares, regardless of our operating performance."

68. In addition, Defendants cited SEC Release No. 34-29093, cautioning that "the market for penny stocks has suffered in recent years from patterns of fraud and abuse." Among the schemes Defendants discussed were concentrated control of the market for a stock by a broker-dealer affiliated with an issuer, manipulation of price by controlling trading volume or issuing false and misleading public statements, and "high-pressure sales tactics and unrealistic price projections by inexperienced sales persons." Defendants stated unequivocally, however, that "management is aware of the abuses that have occurred historically in the penny stock market." Defendants promised to "strive within the confines of practical limitations to prevent the described patterns from being established with respect to [the Company's] securities."

69. The foregoing risk disclosures were materially false and misleading. At the time of the S-8, Defendants knew or recklessly disregarded that the Company had entered an agreement with Wide World of Stocks ("WWOS") by which the Company paid WWOS many thousands of dollars to promote the Company and its stock to small, unsophisticated investors

through various internet outlets as more fully described below.[7] Defendants knew or were reckless in not knowing that the promotional campaign would appear to be independent by inadequately disclosing that the Company had bought and paid for the positive research.

***Wide World of Stocks Commences a Daisy Chain of Paid CBMG Promotions***

70. Upon the turn of the year, Cellular Biomed's paid shills began to push its stock publicly in a series of broadcasts and publications designed to attract investors and to convince them to purchase Cellular Biomed stock. The first was Wide World of Stocks ("WWOS"). WWOS bills itself as "a print and digital content provider with multi-channel integration including television, radio, video, webcasts, podcasts and a magazine in both digital and print formats that delivers visibility to companies in the micro and small-cap sectors."[8]

71. WWOS is a wholly owned subsidiary of Valhalla Venture Group ("VVG"), which bills itself as "[a] unique organization dedicated to building market value, investment profile and marketing power in small-cap companies."[9] VVG boasts "[a] fully integrated marketing approach leveraging a team of experts with over 30 years propelling some of the top brands in the world." VVG purports "to help companies at plateau or inflection point reach the next level." VVG claims to team investment advisory, investor relations, marketing, advertising, public affairs, securities law and accounting personnel "to create a holistic, cross-disciplinary approach to next-level consultancy and partnership." VVG claims to "generate integrated marketing and investor relations solutions fundamentally linked to financial milestones and opportunities," providing "access to a powerful network of investors, transactional partners and advisors." VVG concludes that it believes "in equity-based partnerships that thrive on mutual success [and] in

---

[7] http://wideworldofstocks.com/legal/.
[8] http://wideworldofstocks.com/about-us/.
[9] http://valhallaventuregroup.com/

integrity and transparency in all [its] dealings."[10] Simply stated, small and micro-cap issuers pay VVG and its affiliates to promote their stocks to greater market valuations and stock prices when the actual value story is weak.

72. Among the offerings of WWOS are broadcasts that, it states, "ha[ve] been seen in 100+ million homes, regionally and nationally on cable and major networks including CBS, NBC, ABC, and FOX." Each trading day, small, relatively unsophisticated investors "tune-in" to WWOS's broadcast on BizTV and Youtoo America. In addition, WWOS makes full episodes of its broadcast available on its YouTube Channel.[11]

73. BizTV, itself, lists WWOS as one of its shows,[12] stating that WWOS "showcases companies that are only being held back by their inability to gain visibility on Wall Street and Main Street."[13] On its website, BizTV includes no disclosure that WWOS is a paid stock-promotion shill. BizTV does state that WWOS is "[a] new kind of video content platform," showcasing issuers and disseminating their stories "for a huge network of interested investors." According to BizTV's disclosures, WWOS "is an incredibly effective way to get high-value exposure in the competitive micro and small cap marketplace," reaching millions of investors through "a broadcast video program covering, and uncovering new opportunities in the micro and small cap space – and doing so in a uniquely persuasive way." Claiming to reach 50 million households daily, BizTV relates that WWOS supplements its broadcasts "with investor-focused distribution on StockWatch Index and NYSE Post – and a growing wave of organically in-the-know, intra-network distribution on YouTube, Twitter, LinkedIn and Facebook." According to this disclosure, this affords issuers "critical mass distribution — and critical focus on a motivated, opportunity-hungry investor audience." The BizTV disclosure concludes, offering "unique

[10] http://valhallaventuregroup.com/about-us/.
[11] http://wideworldofstocks.com/watch-now/.
[12] http://www.biztv.com/shows
[13] http://www.biztv.com/shows/232-wide-world-of-stocks

opportunities for category exclusivity, co-branded sponsorships and industry-specific milestone programming, and opportunistic news-based broadcast slots" to deserving issuers.[14] It never states, however, that WWOS is nothing more than a paid shill for the issuers it touts. Neither do BizTV's disclosures about WWOS seem to contain any visible link to WWOS's disclaimer, described below. Thus, viewers of WWOS programming on BizTV likely do not know that the companies WWOS highlights pay for the promotion.

74. On January 15, 2015, the Company issued a press release, announcing "that the interview with Dr. William (Wei) Cao, Chief Executive Officer of Cellular Biomedicine Group, will be broadcast on Wide World of Stocks today, Thursday, January 15, at 5:00 p.m. and 6:00 p.m. EST into more than 50 million homes nationwide over BizTV, BizTV Radio, and Youtoo America Networks." About the interview, the Company continued, Defendant "Cao provides insight into the company's recent successes from" several of its knee osteoarthritis trials and "other clinical progress. Cao stated, "[i]t was a pleasure to present Cellular Biomedicine Group's compelling value proposition. We are looking forward to continued progress in our clinical trials and communicating this information to our shareholders and partners." The press release concluded with a list of internet links on which investors could view the broadcast, a blurb about Cellular Biomed, a PSLRA caution about forward looking statement, and a blurb about WWOS. Nowhere in the release did the Company disclose that it had paid WWOS to produce and to broadcast the WWOS content in question.[15]

75. On or around January 15, 2015, WWOS uploaded to YouTube and otherwise broadcast an episode of its show, titled "BioTech Blitz 2015 - Cellular Biomedicine Group

---

[14] http://wideworldofstocks.com/why-wwos/.
[15] http://www.cellbiomedgroup.com/newsroom/interview-with-ceo-dr-william-cao-on-wide-world-of-stocks-television/

(NASDAQ:CBMG)."[16] The WWOS broadcast appears very sophisticated, with high production values reminiscent of broadcasts on CNBC, Bloomberg TV and Fox Business Channel, complete with a professional set and scrolling content. WWOS host Damon Roberts ("Roberts") reported from the JP Morgan Healthcare Conference. In what is a familiar pattern with many promoters, Roberts began the broadcast with a summary of the recent market for healthcare generally and biotech in particular. He then stated that the goal of WWOS was "to provide investors with innovative, high quality investing ideas from the top minds in the biotech space and to focus on more investing insights, expanded company information and new expert perspectives." During the program, no participant ever discloses nor does any visible sign appear that Cellular Biomed paid WWOS to produce and distribute the content.

76. Roberts then introduced as his purported expert for the broadcast John McCamant ("McCamant"), editor of *The Medical Technology Stock Letter* ("MTSL"). McCamant claims 25 years as a biotech analyst and expert with extensive industry knowledge. McCamant first presented his general overview of the industry, mentioning two established, multi-billion dollar, global biotechnology companies, Gilead Sciences, Inc., a company with second quarter 2015 revenue of over $8 billion, and AbbVie, a company with over $5.4 billion in second quarter 2015 revenue. He intended this technique to establish his *bona fides* by seeming to have analyzed these well-established, well-capitalized companies and subtly drawing a comparison between them and the real subject of the program, Cellular Biomed.

77. Roberts then shifted the conversation to smaller companies within the biotech space, providing a segue for McCamant to begin the discussion of Cellular Biomed. Both Roberts and McCamant then interviewed Defendant Cao.

---

[16] https://www.youtube.com/watch?v=htl9qqqr_4E. The Youtube.com website indicates that WWOS "published" the content on January 14, 2015, but the

78. In response to questions, Cao stated that regenerative medicine – the Company's osteoarthritis treatment – was then a much larger part of the Company's business and far closer to commercialization. About the Company's immunotherapy cancer treatments, Cao acknowledged that the Company depended on technology acquisitions to fuel its product growth, stating, "we are acquiring new technology, putting all the pieces to the puzzle together to formulate a strategy to tackle the hematological cancers and solid tumors." Cao continued that the Company's strategy was "to build a platform for [the] China market and to attract mature, therapeutic technology and to put into clinical trials and commercialize them in the China market."

79. Later in the Interview, McCamant questioned Cao about the spate of recent fraud cases, involving elaborate accounting and business fraud schemes at Chinese RTOs and the possible effect of that on the Company. Cao responded that out of the thousands of over-the-counter traded companies, "we are probably the first one to jump out from OTC to NASDAQ. That tells all and our compliance and corporate governance and practice of business is all international standards and our board members are mixed with U.S. board members and European board members. So being uplisted from OTC and being the first one as a pure play biomedicine company out of all Asia, that tells all on these questions. So we were struggling last year, as we said, educating investors, but I think the fact. . . the results tells all that we are on the right track. We are in the best stage of the Company's development so we are ready to continue our corporate development strategy and rapidly [buy] other companies and build up more platforms to push out the product [to market]."

80. Roberts continued couching the tout in the form of questions, stating "it definitely seems like we're catching you at the start of a long term upswing in value for your investors that seems like it's being driven by your IP portfolio and the results of your clinical trials and smart business decisions, as you said, the management team has made." In his last question to

Defendant Cao, referring to "a lot of first time investors watching you tonight as we broadcast all across the Country," Roberts asked, "what's the most important thing you can tell an investor that we haven't covered yet on the show or something you'd like to reinforce?"

81. In response, Defendant Cao referred to the size of the Chinese market. "If [investors] can go personally to China and look at the China development, they'll be convinced the market is huge" and China's medical needs are substantially similar those in the United States with triple the size. Cao continued that "there is no therapy for certain diseases. . . and [] China is lacking in technology to make new medicines. CBMG," he claimed, "is so well positioned in the relatively insulated medical market and by translating the U.S. and European development technology into China and quickly push through the clinical trial based on international standards and then we commercialize them much faster than peers in the western world."

82. The foregoing content was false and misleading. Defendants knew or were reckless in not knowing that neither during the January 14, 2015 broadcast, nor on the YouTube nor BizTV websites did Defendants WWOS, Defendant McCamant or Defendant Cao disclose that Cellular Biomed compensated WWOS very well for the interview. On YouTube, beneath the video content, a message appears, stating, "Wide World of Stocks host Damon Roberts continues his 2015 Biotech Blitz with coverage of the JP Morgan Healthcare Conference along with special month-long guest John McCamant, editor of the Medical Technology Stock Letter (MTSL)."[17] It continues, "[t]oday's show features an in-depth interview with Dr. Wei CAO, CEO & Director of Cellular Biomedicine Group (NASDAQ: CBMG). The company is to present at the OneMedForum and BioTech."

83. Beneath that disclosure, it reads "show more." Investors who do not click what looks like a content summary have no way to know that Cellular Biomed bought and paid for the

[17] https://www.youtube.com/watch?v=htl9qqqr_4E.

content. Only by clicking "show more" does the page reveal more material, stating, "Showcase during San Francisco Biotech Week." It continues, describing Cellular Biomed and providing a brief summary of the interview with Defendant Cao. Only at the very bottom of that expanded content summary does it read "Please read the Wide World of Stocks disclaimer as it relates to all of our published materials: http://wideworldofstocks.com/legal/."

84. Upon clicking that link, as noted above, the reader arrives at WWOS's disclaimer page. Seven paragraphs down in a lengthy disclaimer, WWOS states that it has entered into an agreement with Cellular Biomed to provide marketing services to a company called the Alkaline Water Company, Inc. ("Alkaline").[18] The Disclaimer states, "WWOS and Cellular Biomedicine Group Inc. ("CBMG"), have entered into an Agreement pursuant to which ***WWOS has agreed to provide marketing services to WTER for 3 months starting December, 2014***." (Emphasis added). In consideration for providing such services, WWOS received ten thousand dollars." The disclaimer continues that "[t]his conflict of interest could affect the WWOS's objectivity in how the WWOS provides marketing services or chooses to feature CBMG on Electronic WWOS Content." The disclaimer concludes, "CBMG also from time to time may reimburse the Company for the cost of engaging third parties to provide services for the CBMG in connection with the WWOS's provision of marketing services."[19]

85. In a subsequent version of WWOS's disclaimer, for 2015, it stated, once again, that it had entered an agreement with Cellular Biomed to provide services to Alkaline for 12 months starting March, 2015 for which "WWOS received thirty-two thousand dollars." It reiterated that "[t]his conflict of interest could affect the WWOS's objectivity in how the WWOS provides marketing services or chooses to feature CBMG on Electronic WWOS Content."

[18] http://wideworldofstocks.com/legal/. Alkaline's ticker symbol is "WTER."
[19] http://wideworldofstocks.com/legal/.

86. Not only is WWOS's disclaimer wholly inadequate, but it omits any disclosure from McCamant about compensation he may have received or did not receive to appear on the January 14, 2015 broadcast or whether its purported "expert" is, in any other way, interested in promoting Cellular Biomed.

87. Among the "partners" WWOS lists on its website, however, is BioInvest.com, "the web portal" of McCamant's MTSL. In addition to providing convenient access to MTSL, BioInvest.com claims to offer "in-depth research and analysis of a unique portfolio of bio-pharmaceutical companies and [its] insights regarding relevant trends in the biotechnology industry."[20] While MTSL seeks to legitimize itself by charging for research, BioInvest.com seems not to charge investors for its "advice." "From time to time," BioInvest.com states, "independent contributors will provide added value for our subscribers to gain additional viewpoints on relevant topics (e.g., whitepapers) of interest for the current and future biotechnology industry."

88. BioInvest.com includes Cellular Biomed in its portfolio of stocks. But that is not all. The daisy chain extends further and overlaps until it is difficult to know who is paid for what and by whom. For example, McCamant is also an "expert" for Streetwise Reports. Upon clicking on the link to one of his reports on Streetwise Reports, you arrive at BioInvest.com. In turn, once again, BioInvest.com suggests a model portfolio that includes Cellular Biomed. Nowhere on BioInvest.com or on his link in Streetwise Reports does McCamant disclose that he was paid by the Company.

89. Thus, Defendants knew or recklessly disregarded that they omitted the interrelatedness of McCamant, BioInvest, Streetwise Reports and WWOS and their concerted, paid efforts to promote Cellular Biomed stock without disclosing the compensation that any one

[20] http://wideworldofstocks.com/partners.

or all received.

***Institutional Analyst, Inc. Touts Cellular Biomed***

90. Cellular Biomed also paid Institutional Analyst, Inc. ("IAI") to tout its stock through "analyst" reports from its principal, Roland Rick Perry ("Perry"). IAI bills itself as "a highly regarded investor and public relations firm specializing in creating market awareness programs for publicly-traded companies involved in thirteen distinct industries via industry specific financial web portals including the Internet, Biotech, Alternative Energy, Airlines and Private Equity."[21] According to the press release of one client, Trans-Pacific Aerospace, Chicago-based IAI "introduces small cap and micro-cap companies to professional investors including investment brokers, small cap mutual funds, private investment managers and hedge fund managers."[22] Among the newsletters IAI publishes is *The Biotech Stock Review*, which it distributes "free to industry and trade executives."[23]

91. Once a client hires it, IAI publishes research reports and other blog posts and analysis on the internet. For example, on May 4, 2011, *Internet Stock Review*, an IAI front, published an "IA's Special Situation Report," touting Trans-Pacific Aerospace. That Situation Report contained a "disclaimer,"[24] indicating that Trans-Pacific Aerospace had paid cash and shares for the article and reminding viewers that the decision to buy or sell a security was wholly theirs. It went on to describe how it got paid. "The Internet Stock Review," it wrote, "is owned by a Public Relations firm (Institutional Analyst Inc.) that specializes in getting (or creating) coverage for publicly traded companies. As such," it continued, "it is important to note ***that anytime we say anything about a company, it is because the company is a client of our parent company, or because we would like them to be a client of our parent company. In a nutshell,***

[21] http://tpacbearings.com/news/tpac-engages-institutional-analyst-inc
[22] *Id.*
[23] *Id.*
[24] http://internetstockreview.ning.com/profiles/blogs/ia-transpacific-aerospace-tpac.

***you can throw out any thoughts of us being even a little bit impartial. It just ain't gonna happen. We love everyone***." (Emphasis added).

92. On January 16, 2015, IAI published an edition of "The Biotech Stock Review," which appeared on IAI's own blog and was republished on *SeekingAlpha.com*. In it, Perry opined that with the stock trading at approximately $16.50 per share, mid-January, 2015 was an "Excellent Entry Point." His target price was $25.00 per share. IAI posted this glowing report about Cellular Biomed on The Internet Stock Review.[25]

93. According to IAI's disclaimer, "Readers should consult their own financial advisors with respect to investment in this or any company covered by the Reviews. An independent financial analyst should verify all of the information contained in this profile with the profiled company. Institutional Analyst, Inc., the parent company of the Biotech Stock Review," IAI continued, "is an investment research and public relations firm, which has not been compensated by CBMG or any other entity for investor and public relations services including but not limited to this report."

94. The foregoing Biotech Stock Review analysis of the Company was false and misleading. Defendants knew or recklessly disregarded that the disclaimer omitted that Cellular Biomed paid for this research report without disclosing that to investors.

***LifeTech Capital Touts Cellular Biomed***

95. On February 2, 2015, Defendant LifeTech, a purported research-focused biotechnology and medical technology investment bank, initiated research coverage of Cellular Biomed with a "strong speculative buy" rating and a price target of $23.75. The 25 page report, authored by Defendant Dunn, discussed Cellular Biomed's latest acquisitions and new market valuation. In the report Dunn states, "With 4 human clinical and 2 preclinical programs in

[25] http://internetstockreview.ning.com/main/search/search?q=cellular+biomedicine.

immuno-oncology, CBMG is now the leader in China for this promising cancer technology. We expect CBMG to continue their aggressive acquisition strategy for immuno-oncology drugs in China as well as sign development partnerships with western pharma companies for the Chinese market."

96. On that same day, LifeTech issued a press release, summarizing Dunn's purported opinion and publicizing his price target. The press release contained no disclosure concerning any payment LifeTech and Dunn received from Cellular Biomed.

97. According to Dunn, LifeTech provided Cellular Biomed with "strategic consulting services from October 1, 2014 to November 30, 2014 with a portion of the fee received by the analyst as compensation for work performed." Dunn also disclosed that in the previous year, LifeTech had "received non-securities services compensation" and that it expected to seek or to receive compensation for investment banking services with the next three (3) months.

98. The foregoing was materially false and misleading. Defendants knew or recklessly disregarded that Defendants LifeTech and Dunn had received compensation for the positive research they published on the Company and that the disclosure at the report's end did not fully disclose all material facts about the compensation arrangement between Cellular Biomed and Dunn and LifeTech.

***Stock News Now Promotes Cellular Biomed***

99. On or about February 3, 2015, Stock News Now ("SNN") uploaded a video to its website,[26] Youtube.com and other web sites, consisting of Defendant Kraft's interview with Defendant Cao.[27] The interview purports to be from the 2015 Healthcare Media Day in San Francisco. The interview consisted of Kraft's asking Defendant Cao relatively simple questions

[26]http://stocknewsnow.com/company/CMPNY02022015103/Cellular-Biomedicine-Group-Inc-#prettyPhoto.
[27] https://www.youtube.com/watch?t=8&v=DUWan26oF6k.

and responding overwhelmingly positively to Cao's responses. Importantly, Kraft asked Cao how Cellular Biomed differentiated itself from competitors who make similar claims. Cao responded that Cellular Biomed operated in a relatively unpopulated market with respect to its knee-osteoarthritis treatment while acknowledging that the Company faced stiff competition in the immuno-therapy cancer space. Cao sought to distinguish Cellular Biomedicine by reference to its 60 patents in China and elsewhere at various stages. He praised the Company's strong science team and medical advisors and extolled its plan to innovate.

100. Kraft then prompted Defendant Cao to discuss the Company's prospects on 2015 and 2016. Cao responded that 2015 would be more exciting that 2014. "We are entering the fast growth phase. We are acquiring merge partnership leading technologies to fortify our IP portfolio." Cao continued that in 2016, the Company will "have major trial results coming out and we're going to have Phase IIB results coming out from osteo-arthritis and we're going to kick-off Phase II cancer trials in 2016, so both years we are very very excited. There are many news stories [that] will come out." Kraft concluded the interview, stating, "Dr. Cao, I'm telling you now that our audience is going to want to know more information" and prompting Cao to provide the Company's website.

101. The SNN broadcast contained no disclaimer and nothing to indicate that Cellular Biomed paid for the exposure. On SNN's website, however, it discloses that "The company may have paid consideration to SNN or its affiliates for this page."[28] It continues that "[t]his SNN Website may contain company advertisements/advertorials, which are indicated as such." Information about a company contained in an advertisement/advertorial has been furnished by the company, the owner/operator of this SNN Website has not made any independent investigation of the accuracy of any such information and no warranty of the accuracy of any such information is

[28] http://stocknewsnow.com/company/CMPNY02022015103/Cellular-Biomedicine-Group-Inc-#prettyPhoto.

provided by this SNN Website, its owners, employees and affiliates. Pursuant to Section 17(b) of the Securities Act of 1933, as amended, in situations where the owners, employees or affiliates of this SNN Website have received consideration for the advertisement/advertorial of a company or security, such fact will be disclosed in print."[29]

102. On February 4, 2015, the Company issued a press release, announcing "that an interview with Dr. William (Wei) Cao, Chief Executive Officer for the Company, conducted by Stock News Now (SNN Incorporated) at last month's J.P. Morgan Healthcare Conference in San Francisco, is now available online. The interview," the Company stated, "provides an overview of the Company's immune cell therapy platform focused on oncology and its Phase II clinical trial for Knee Osteoarthritis (KOA), which is differentiated by its use of the patient's own fat tissue. Also highlighted are the Company's impressive IP portfolio and its outlook for 2015 and 2016." After providing a link to the SNN video on Youtube.com, the Company stated that "SNN Incorporated is a global multimedia financial news and publishing company that focuses on market awareness and investor visibility for public and private micro-cap companies. The Company publishes StockNewsNow.com, MicroCap Review Magazine, and co-produces the Growth Capital Expo." Nowhere in the Company's press release did it disclose in any way whatsoever that it had paid SNN to create and upload the content in question.

103. The foregoing was materially false and misleading. Defendants knew or recklessly disregarded that the Company had paid SNN for the broadcast in which Defendant Cao appeared without disclosing it on the broadcast itself or on certain of the internet portals over which the broadcast was carried.

---

[29] http://stocknewsnow.com/legal.php#terms.

***The Company Leverages Its Promoters Across Promotion Platforms***

104. On February 9, 2015, Cellular Biomed issued a press release, disclosing that it had acquired "Chinese PLA General Hospital's ("PLAGH", Beijing, also known as "301 Hospital") Chimeric Antigen Receptor T cell (CAR-T) therapy, its recombinant expression vector CD19, CD20, CD30 and Human Epidermal Growth Factor Receptor's (EGFR or HER1) Immuno-Oncology patents (all pending), and Phase I/II clinical data of the aforementioned therapies and manufacturing knowledge." According to Defendant Cao, the PLAGH acquisition, "further accelerates CBMG's growth in the Immuno-Oncology segment. We look forward to working with PLAGH as a long-term partner as we evaluate paths to commercialization."

105. The Company attached the press release to a Current Report on Form 8-K, filed with the SEC on February 9, 2015. Both the release and that Form 8-K, however, failed to disclose what the Company paid for its acquisition of PLAGH technology, its exact interest in that technology or where PLAGH stands with respect to its competitors in the race to commercialize the technology it was developing. The Form 8-K appended nothing but the press release, failing to append the acquisition agreement or any further information. All that was known publicly at that time was that the PLAGH "team has conducted several preliminary clinical studies of various CAR-T constructs targeting CD19-positive acute lymphoblastic leukemia, CD20-positive lymphoma, CD30-positive Hodgkin's lymphoma and EGFR-HER1-positive advanced lung cancer." Defendant Cao made further vague statements that the Company was "very impressed by the quality of the work done by Dr. Han and his team at PLAGH, and are excited by the safe and efficacious profile of these novel T cell therapies for cancerous diseases, which we deem necessary to be a leader in this field while providing alluring prospective therapies for other cancers."

106. This compensation Cellular Biomed paid for the PLAGH technology and the arrangement it reached is inherently material information. It was critical in this instance, however, because of what PLA is. The Company described it as "PLA General Hospital." PLA is the People's Liberation Army. PLAGH is the largest hospital under the auspices of the People's Liberation Army and it serves as a primary hospital for insuring the health of the political leaders of China and the PLA. This information is a red flag, putting into doubt what right to the technology Cellular Biomed actually purchased – if any.

107. On February 11, 2015, IAI published a blog post on the Internet Stock Review, with a link to its original Cellular Biomed analysis from the January 16 issue of the BioTech Report and a press release, disclosing that LifeTech Capital and Dunn had initiated coverage of Cellular Biomed.[30] The press release that Defendants Dunn and LifeTech issued disclosed the "strong speculative buy" rating and Dunn's $23.75 price target, providing a link to his report. It omitted, however, any disclosure about whether Dunn or LifeTech received compensation for the LifeTech report.

108. On February 17, 2015, only fifteen days after initiating coverage, LifeTech issued another report, raising its price target for Cellular Biomed's stock to $32.50 per share. According to Dunn, the PLA General Hospital technology acquisition, about which he knew very little – because the Company had disclosed almost nothing – somehow propelled the Company's valuation higher by approximately 37%. This is a critical red flag in the context of the ease with which Defendants Dunn and LifeTech could have and should have discovered and disclosed that PLA referred to the People's Liberation Army. In light of the Company's glaring omission of any terms of the technology acquisition, Dunn's failure to disclose the simple fact of the seller's real identity wholly betrays his intent to hype Cellular Biomed rather than to offer any meaningful,

[30]http://internetstockreview.ning.com/profiles/blogs/chart-of-the-day-cellular-biomedicine-group-cbmg-24-20.

independent analysis.

109. Dunn and LifeTech added no further color to their disclosures about funds they received from Cellular Biomed in exchange for their February 17 research report.

110. Once again, LifeTech issued a press release, summarizing Dunn's purported opinion and publicizing his new price target. The press release contained no disclosure concerning any payment LifeTech and Dunn received from Cellular Biomed.

111. The foregoing was materially false and misleading. Defendants knew or recklessly disregarded that Defendants LifeTech and Dunn had received compensation for the positive research they published on the Company and that any disclosure about compensation failed fully to disclose all material facts about the compensation arrangement between Cellular Biomed and Dunn and LifeTech.

112. That same day, once again, IAI published a blog post on the Internet Stock Review, alerting viewers to LifeTech's target price change, and uploading a press release from LifeTech to the post. The press release from Dunn and LifeTech reiterates their "strong speculative buy" rating, but raises Dunn's price target from 23.75 to 32.50 and provides a link to his report. Once again, a LifeTech report took on a life of its own, divorced even from Dunn's inadequate disclosure of compensation for the report itself.

113. The IAI blog post and LifeTech's press release are materially false and misleading because Defendants knew or recklessly disregarded that they wholly omitted any disclosure about whether Dunn, LifeTech, or IAI received compensation for the LifeTech report. By uploading press releases to its website, both LifeTech and IAI avoided any disclosure concerning compensation they may have received.

114. On February 19, 2015, Streetwise Reports published an edition of its online blog *The Life Sciences Report* ("TLSR"). In that edition, next to a banner to the right of the webpage

that the interview mentioned Cellular Biomed, among other biotech firms, TLSR published an interview with LifeTech's Dunn, titled "Immuno-Oncology Promises Continued Wealth and Health: LifeTech Capital's Stephen Dunn." TLSR sought Dunn's opinion on the immune-oncology investment landscape in 2015. TLSR and Dunn engaged in a standard scheme similar to the charade that WWOS and McCamant played in their broadcast. Dunn spent most of the interview touting the immuno-oncology efforts and offerings of some of the largest, best-capitalized, highest research and development spending pharmaceutical companies, including Merck & Co., Inc., Bristol-Myers Squibb Co., Pfizer, Inc. and Roche Holdings, AG.

115. Then, in response to TLSR's question about other stocks "under the radar" about which investors should be aware, Dunn recommended Cellular Biomed, stating:

> Cellular Biomedicine Group Inc. (CBMG:OTCMKTS), a relatively unknown company that I cover, is building up both a CAR T-cell and PD-1 program for the domestic Chinese medical market. While drug pricing is lower in China, lower costs combined with the high-density urban populations make it an ideal market for commercializing autologous therapies such as CAR T-cells.
>
> The company has acquired CAR T-cell data, patents and manufacturing rights to target CD19+, CD20+, CD30+ and EGFR+/HER1+ receptor status. We expect all four CAR T-cell drug candidates to advance into Phase 2b/3 clinical trials in leukemia and lymphoma, as well as in lung cancer, later this year. In addition, Cellular Biomedicine is conducting human clinical trials for ReJoin, an autologous adipose stem cell therapy for knee osteoarthritis and cartilage defects, and is expected to begin clinical trials for allogeneic adipose stem cell therapies in asthma and chronic obstructive pulmonary disease.
>
> We believe China will approve proposed regulations for cell therapy development in 2015, providing a pathway to approval for therapies like those being developed by Cellular Biomedicine. Investors should keep a close eye on this company during 2015.

116. Directly after the interview's text appears a "Disclosure" in which Streetwise Reports lists Cellular Biomed as a sponsor.[31] It does not describe what that means or detail what Cellular Biomed paid or did not pay to become a sponsor. Rather, its states, "[t]he companies mentioned in this interview were not involved in any aspect of the interview preparation or post-interview editing so the expert could speak independently about the sector. Streetwise Reports does not accept stock in exchange for its services." While it does not disclose it anywhere in the interview or the "Disclosure" on that webpage, Streetwise Reports, however, does accept cash.

117. After four dense paragraphs of the Disclosure, Streetwise Reports states, "[t]he interview does not constitute investment advice. Each reader is encouraged to consult with his or her individual financial professional and any action a reader takes as a result of information presented here is his or her own responsibility." This paragraph concludes that "[b]y opening this page, each reader accepts and agrees to Streetwise Reports' terms of use and full legal disclaimer." The page provides a link to the "disclaimer" which states, in relevant part, "[s]ponsor-specific activities include aggregating content and publishing that content on our site, creating and maintaining specialized company pages, interviewing key management and issuing press releases."[32] Sponsors pay fees to Streetwise Reports to "cover the costs for Streetwise Reports to publish sector-specific information in our electronic newsletter and also create content by interviewing experts in the sector. Monthly sponsorship fees," it continued, "range from $1,000 to $3,000 per month." Streetwise Reports concluded that it "does not accept stock for payment of sponsorship fees. Sponsor pages may be considered advertising for the purposes of 18 U.S.C. 1734."

118. As for Dunn, the "Disclosure" states that neither he nor his family received payment from any of the companies he mentioned in the article. He did disclose that LifeTech

---

[31] http://www.thelifesciencesreport.com/pub/na/16540?s=pdfqt-26409.
[32] http://streetwisereports.com/disclaimer/.

"has a financial relationship with" Cellular Biomed, but discloses nothing about that relationship. Dunn claims that Streetwise Reports did not pay him "for participating in this interview. Comments and opinions expressed," Dunn continued, "are my own comments and opinions. I determined and had final say over which companies would be included in the interview based on my research, understanding of the sector and interview theme."

119. The foregoing TSLR interview was materially false and misleading. Defendants knew or were reckless in not knowing that the financial disclosure of both LifeTech and Dunn was inadequate. In turn, Streetwise Reports was able to lessen the effect of its own financial disclosure by establishing Dunn as an independent and disinterested analyst who participated in the interview primarily to discuss the biotech industry when Dunn's true purpose was to serve as a paid shill for Cellular Biomed.

***The Company Again Fails to Disclose Its Extensive Paid Promotional Efforts in an SEC Filing***

120. On March 31, 2015, the Company filed the 2014 10-K with the SEC. Just as in the S-8, the Company disclosed various risks of investing in its common stock. Included in those risks, the Company wrote, were wide fluctuations in stock price due in part to the Company's "status as a relatively unknown company with a small and thinly traded public float. The market for our common shares is characterized by significant price volatility when compared to seasoned issuers," the Company continued, "and we expect that our share price will continue to be more volatile than a seasoned issuer for the indefinite future."

121. Among the factors the Company cited in the 2014 10-K for such volatility in its share price was the sporadic and thin trading of its shares, leading to a "lack of liquidity." In turn, relatively small trades "may disproportionately influence the price of those shares in either direction." In addition, the Company stated, an investment in its stock was speculative, more risk prone, because of the Company's "limited operating history and lack of profits to date." This, the

Company disclosed, may cause more risk-averse investors to abandon the stock more quickly in the face of negative news. "Many of these factors," Defendants wrote, "are beyond our control and may decrease the market price of our common shares, regardless of our operating performance."

122. In addition, Defendants included in the 2014 10-K references to SEC Release No. 34-29093, cautioning that "the market for penny stocks has suffered in recent years from patterns of fraud and abuse." Among the schemes Defendants discussed were concentrated control of the market for a stock by a broker-dealer affiliated with an issuer, manipulation of price by controlling trading volume or issuing false and misleading public statements, and "high-pressure sales tactics and unrealistic price projections by inexperienced sales persons." Defendants stated unequivocally, however, that "management is aware of the abuses that have occurred historically in the penny stock market." Defendants promised to "strive within the confines of practical limitations to prevent the described patterns from being established with respect to [the Company's] securities."

123. The foregoing Company risk disclosures in the 2014 10-K were materially false and misleading. At the time Defendants filed the Company's 2014 10-K with the SEC, Defendants knew or were reckless in not knowing that the Company had entered agreements with WWOS, Streetwise Reports, McCamant, Dunn, IAI and others and that the Company paid those persons and organizations many thousands of dollars to promote the Company and its stock to small, unsophisticated investors through various internet outlets, as described above in detail, above. Defendants knew or were reckless in not knowing that the promotional campaign appeared to be independent by inadequately disclosing that the Company bought and paid for the positive research.

***The Illegal Promotion Scheme Fuels Stock Offering Netting the Company Critical Cash***

124. The Company's stock promotion scheme succeeded. With relatively little change in outlook, the Company's stock price rose in response to the paid promotions. The Company's common stock started the year with a January 2, 2015 close of $13.79. By January 20, 2015, the trading day after the IAI research appeared in *The Biotech Report*, the stock closed at $17.56. By February 19, 2015, the day Streetwise Reports joined the promotion daisy chain, the stock traded for $25.85. By March 5, 2015, the Company's stock price had breached $30 per share, closing that day at $32.39. The Stock stayed above $30 until Pump Stopper uncovered the promotion scheme on April 7, 2015, reaching a Class Period high close of $47.06 on March 23, 2015.

125. As this run-up in the Company's stock price occurred – fueled by the exuberance of the paid promoters – the Company successfully sold shares in private placement. As the Company stated in the 2014 10-K, "In March 2015, the Company initiated a financing transaction pursuant to which it would sell up to 526,316 shares of the Company's common stock, to selected investors at $38 per share, for total gross proceeds of approximately $20,000,000." According to the Company, "[u]p to the issuance of the financial statements, $20,000,000 (unaudited) were received from investors." Had the price of Company's common stock remained at or close to the $13.79 at which it traded in early January, 2015, the Company would have only raised just over $7.25 million.

126. In the 2014 10-K, the Company noted the critical nature of its cash raise. Discussing the receipt of the $20 million private placement, the Company stated, "As we continue to incur losses, achieving profitability is dependent upon the successful development of our immune therapy business and commercialization of our technology in research and development phase, which is a number of years in the future." The Company continued that "unless and until we [achieve profitability], we will continue to need to raise additional capital. Over the next 12

months ending December 31, 2015, we estimate negative operating cash flow of approximately $10.5 million." The Company concluded that "[m]anagement intends to fund future operations through additional private or public debt or equity offerings, and may seek additional capital through arrangements with strategic partners or from other sources."

127. Thus, the promotional campaign succeeded. As a material cause in the run-up of Cellular Biomed's stock price, the promotional campaign enabled the Company to nearly triple the proceeds it received from the March, 2015, private placement.

**THE TRUTH EMERGES**

128. On April 7, 2015, an entity called Pump Stopper uploaded a report to *Seekingalpha.com*, alleging that the Company was engaged in a massive fraudulent scheme to mislead investors and that the Company had no meaningful financial value.[33] Central to Pump Stopper's allegations were that paid promotion, and not fundamentals had driven Cellular Biomed's stock price to unsustainable levels. The post stated, "I do not suggest anyone, EVER, invest in any company that pays to promote their stock. Time and time again we have seen how these end and with 10k+ stocks in the US alone, there is no reason I can see to invest in any company of this poor quality."

129. On this news, CBMG securities declined $7.00 per share, or over 21.7%, to close at $25.22 per share on April 7, 2015. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

130. In an April 8, 2015 press release, the Company responded obtusely to the Pump Stopper article. Defendants did call the post "false and misleading," "selective information,"

[33] *SeekingAlpha.com* has removed the post, stating, "[t]his article has been temporarily removed from the site pending resolution of a dispute of fact." It is still available online, however, at http://pumpstopper.com/?p=345.

designed "to maliciously advance, we believe, a 'short agenda' for personal gain to the detriment of the shareholders of the Company." The Company reasserted its full commitment to "to the highest standard of corporate governance as well as transparency and fair and timely disclosure in full compliance with applicable law and SEC regulations."

131. With respect to the stock promotion, the Company stated that "Investor Relations is a critical and important fiduciary duty of management and is differentiated from 'stock promoting.' The Company employs the highest standards of full disclosure as evidenced by regular and frequent dissemination of news through press releases, conferences and media." The Company continued that "the Company's research analyst possesses years of covering the stem cell and immune cell therapy sectors. CBMG retained this analyst as a strategic consultant for two months between October and November 2014 for drug pipeline, operational review, and technology recommendations. His research coverage is completely independent of this engagement." Presumably, the Company refers to Stephen Dunn as "the Company's analyst." The Company simply ignored the other examples of blatant stock promotion the Pump Stopper article rightly accused it of paying for without adequate disclosure.

132. Defendant Dunn, too, responded to the Pump Stopper post in his May 6, 2015 report, re-initiating coverage after his switch to Newbridge. He defended his record and his stock picks, stating that Pump Stopper "fabricated a 'track record'" as if Dunn "had 'Buy' recommendations on all stocks listed from January 2011 to March 2015. In reality," Dunn protested, he had terminated covering the stocks on which Pump Stopper had focused. Dunn then stated that Pump Stopper "disparages the fake 'track record' as being 'terrible' on one hand while simultaneously criticizing CBMG for doing too well on the other hand."

133. Dunn's piece was deliberate obfuscation. First, Pump Stopper told of his track record over time with stocks Dunn had touted. Whether Dunn terminated coverage does not

change that many stocks that he touted performed very poorly "over time," without respect to when he terminated coverage. Next, Dunn deliberately ignores the point: that Cellular Biomed was doing well, juxtaposed with his terrible track record, was a result of his improper promotion and not the quality of his analysis. Last, Dunn never simply denies that the issuers in question paid him for the recommendations, regardless of when he terminated his recommendation.

134. Dunn continued, quibbling with Pump Stopper's admonition that he did not own Cellular Biomed shares. "Research analysts at the firm," he wrote, "are prohibited from owning stock in the sector they cover." Dunn continued that Pump Stopper "attempted to cast false suspicion despite clear and prominent disclosures" about payment that Dunn had received purportedly for "drug pipeline and operational review and recommendations." Dunn responded that "LifeTech performed strategic consulting work during October and November 2014 focusing on drug development, competitive landscape and commercialization review and recommendations which was reviewed and approved by the compliance department with no research commitment." He stated that "[p]ayment was to the firm with a portion of the fee being received by the analyst as compensation for work performed and approved by the firm's compliance department and CBMG's legal department. Months later," Dunn asserted, "it was determined the company was undervalued and research coverage was initiated on February 2, 2015."

135. Dunn's assertion does nothing to contradict that Dunn both purportedly participated in provided investment banking services to Cellular Biomed and then, himself, issued overwhelmingly positive research on the very same issuer. This was a clear violation of the ethical barrier that legitimate investment banks erect "between different divisions . . . to avoid conflict of interest. A Chinese Wall is said to exist, for example, between the corporate-advisory area and the brokering department of a financial services firm to separate those giving corporate

advice on takeovers from those advising clients about buying shares." The ethical barrier that Dunn ignored is meant "to prevent leaks of corporate inside information, which could influence the advice given to clients making investments, and allow staff to take advantage of facts that are not yet known to the general public."[34]

## LOSS CAUSATION/ECONOMIC LOSS

136. The market for Cellular Biomed securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, Cellular Biomed securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Cellular Biomed securities relying upon the integrity of the market price of Cellular Biomed securities and market information relating to Cellular Biomed, and have been damaged thereby.

137. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Cellular Biomed securities and operated as a fraud or deceit on Class Period purchasers of Cellular Biomed securities by misrepresenting the value of the Company's business and prospects by providing guidance figures that were unrealistic. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Cellular Biomed securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Cellular Biomed securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

138. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the

[34] http://www.investopedia.com/terms/c/chinesewall.asp.

damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Cellular Biomed's business and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Cellular Biomed and its business and financial condition, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing Cellular Biomed securities at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of Cellular Biomed securities was removed and the price of Cellular Biomed securities declined dramatically, causing losses to Plaintiffs and the other members of the Class.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

139. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Cellular Biomed securities traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

140. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cellular Biomed securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds

or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Cellular Biomed or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

141. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

142. Plaintiffs' will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

143. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Cellular Biomed;

(c) whether the Individual Defendants caused Cellular Biomed to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Cellular Biomed securities during the Class Period were artificially inflated because of the Defendants' conduct complained of

herein; and,

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

144. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

145. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) Cellular Biomed securities are traded in efficient markets;

(d) the Company's shares were liquid and traded with sufficient volume during the Class Period;

(e) the Company traded on NASDAQ, and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(g) Plaintiffs and members of the Class purchased and/or sold Cellular Biomed securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed,

without knowledge of the omitted or misrepresented facts.

146. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

147. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

148. At all relevant times, the market for Cellular Biomed's common stock was an efficient market for the following reasons, among others:

149. As a result of the foregoing, the market for Cellular Biomed's common stock promptly digested current information regarding Cellular Biomed from all publicly available sources and reflected such information in Cellular Biomed's stock price. Under these circumstances, all purchasers of Cellular Biomed's common stock during the Class Period suffered similar injury through their purchase of Cellular Biomed's common stock at artificially inflated prices, and a presumption of reliance applies.

150. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

151. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

152. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

153. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Cellular Biomed securities during the Class Period.

154. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cellular Biomed securities. Plaintiffs and the Class would not have purchased Cellular Biomed securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**SECOND CLAIM**
**Violation of Section 10(B) of The Exchange Act and**
**Rule 10b-5(a) and (c) Promulgated Thereunder against all Defendants**

155. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

156. During the Class Period, Defendants violated Rules 10b-5(a) & (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Cellular Biomed publicly traded common stock during the Class Period as alleged herein. Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase Cellular Biomed's common stock at artificially inflated prices. In furtherance of these unlawful schemes, plans and courses of conduct, Defendants, and each of them, took the actions set forth herein.

157. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock to maintain artificially high market prices for Cellular Biomed's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

158. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct, including controlling the trading volume and price of Cellular Biomed's common stock through clandestine trades, causing the publication of undisclosed, paid promotions and suppressing the float. Defendants employed these devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts,

practices, and a course of conduct as alleged herein in an effort to assure investors of Cellular Biomed value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary to make the statements made about Cellular Biomed and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Cellular Biomed common stock during the Class Period.

159. Defendants knew of the devices, schemes, and artifices to defraud or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of supporting the artificially inflated price of Cellular Biomed's securities.

160. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cellular Biomed publicly traded securities. Plaintiffs and the Class would not have purchased Cellular Biomed publicly traded securities at the prices they paid, or at all, had they been aware that the market prices for Cellular Biomed's common stock had been artificially inflated by Defendants' devices, schemes, and artifices to defraud.

## THIRD CLAIM
## Violation of Section 20(a) of The Exchange Act
## Against the Defendant Cao and Cellular Biomed

161. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

162. Plaintiffs sue Defendant Cao herein as a controlling person of Cellular Biomed and the Promoter Defendants. Plaintiffs sue Defendant Cellular Biomed herein as a controlling person of the Promoter Defendants.

163. By virtue of his high-level positions, agency, and his ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, Defendant Cao had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violators, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. In particular, Defendant Cao had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

164. In particular, defendants named in this count had direct and supervisory involvement in the day-to-day operations of Cellular Biomed and/or the Promoter Defendants and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein. Those defendants exercised that power.

165. As set forth above, Cellular Biomed and the Promoter Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

166. By virtue of his and its position as controlling persons, Defendant Cao and Cellular Biomed are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

167. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Michelle Jackson as Lead Plaintiff, Plaintiffs Windom, Liang and Nissenbaum as Named Plaintiffs and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 17, 2015

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg (*pro hac vice*)
THE ROSEN LAW FIRM, P.A.
101 Greenwood Avenue, Suite 203
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com

***Lead Counsel for Plaintiffs and the Class***

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2015 I electronically filed the foregoing ***Amended Class Action Complaint For Violation Of The Federal Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 203
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-M: jgoldberg@rosenlegal.com

***Lead Counsel for Plaintiffs and the Class***