KAUFHOLD GASKIN LLP
STEVEN S. KAUFHOLD, ESQ. (SBN 157195)
Email: SKaufhold@KaufholdGaskin.com
JONATHAN B. GASKIN, ESQ. (SBN 203625)
Email: JGaskin@KaufholdGaskin.com
388 Market St., Suite 1300
San Francisco, CA 94111
Telephone: 415-445-4620
Facsimile: 415-874-1071

ELLENOFF GROSSMAN & SCHOLE LLP
ADRIENNE M. WARD, ESQ. (*pro hac vice*)
Email: award@egsllp.com
MICHAEL SULLIVAN, ESQ. (*pro hac vice*)
Email: msullivan@egsllp.com
1345 Avenue of the Americas, 11th Floor
New York, NY 10105
Telephone: 212-370-1300
Facsimile: 212-370-7889

Attorneys for Defendants Cellular Biomedicine
Group, Inc. and Wei Cao

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| FRANCIS J. BONANNO, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>CELLULAR BIOMEDICINE GROUP, INC., *et al.*,<br><br>        Defendants. | Case No.: 15-CV-01795-WHO<br><br><u>DEFENDANT'S MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT</u><br><br><u>DATE: April 6, 2016</u><br><u>TIME: 2:00 p.m.</u><br><u>COURTROOM: 2</u><br><u>JUDGE: The Hon. William H. Orrick</u><br><br><u>Date Action Filed: April 21, 2015</u> |

# TABLE OF CONTENTS

NOTICE OF MOTION................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

I.      INTRODUCTION ............................................................................... 1

II.     FACTUAL BACKGROUND .............................................................. 4

    a.    CBMG Begins Trading on NASDAQ ............................................ 4

    b.    The Biotech Index and CBMG's Peer Companies Experience Volatility........................ 6

    c.    Excitement Builds About CBMG in February and March 2015 ..................... 7

    d.    Short Seller Pump Stopper's April 2015 Post Proffers Many Theories Challenging CBMG's Value .................................................. 9

    e.    New Plaintiffs and Counsel File the Amended Complaint, Dropping All of Pump Stopper's Theories Except Illegal Stock Promotion........................ 11

III.    ARGUMENT........................................................................... 12

    a.    Legal Standard Governing Motions to Dismiss and the Heightened Standards for Pleading Securities Fraud .............................. 12

    b.    Plaintiffs Have Failed to Plead Loss Causation........................... 13

        i.    Loss Causation Cannot Be Pled Because Most of the Negative Content in the Pump Stopper Post Had Nothing to Do with Paid Promotional Activities ..................... 13

        ii.    The Supposedly Corrective Disclosure in the Pump Stopper Post Regarding Undisclosed Paid Promotion Is Simply Opinion and Information Derived from Publicly Available Materials .............................. 14

        iii.   The Amended Complaint Asserts Facts About the Volatility of the Biotech Sector that Permit this Court to Draw the Conclusion that Market Forces Were as Likely a Cause of the Price Decline as any "Corrective Disclosure".................... 15

    c.    Plaintiffs Cannot Impose Liability on the CBMG Defendants for Misleading Statements or Omissions "Made" by Others.......................... 16

    d.    Plaintiffs Have Failed to Plead Falsity with the Requisite Particularity ..................... 16

        i.    WWOS Disclosed the Amount Paid by CBMG for Marketing  and Any Potential Conflict that a Payment Might Create.................... 16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii.     Plaintiffs Admit LifeTech and Dunn Freely Disclosed Having Received Compensation from CBMG for Services ................................................... 17

iii.    For SNN, Kraft, IAI, and Perry, Because No Facts Have Been Pled to Support that Payments Were Made, There Can Be No False Statement ...................................... 18

iv.    CBMG's Disclosed Role as a "Sponsor" of Streetwise Report Does Not Mean Streetwise's Disclosure that CBMG Was Not Involved in Preparing or Editing the Dunn Interview is False ............................................................................. 18

v.     Plaintiffs Have Not Identified Any Misstatements in CBMG's Risk Disclosures Concerning Owning or Trading in Its Securities ...................................... 18

e.    Plaintiffs Have Not Pled that CBMG Had Any Duty to Disclose Payments ................. 19

f.    Plaintiffs Have Not Pled Any Material Omissions ......................................................... 20

g.    No Allegations Support that the CBMG Defendants Acted with Scienter ..................... 21

h.    Plaintiffs Have Not Pled Unique Conduct to Support a Claim for Scheme Liability ..... 22

i.    Without a Primary Violation, There Can Be No Control Person Liability .................... 22

IV.    CONCLUSION ............................................................................................................. 23

1

## TABLE OF AUTHORITIES

2

<u>Cases</u>

3

*Ashcroft v. Iqbal,*
4
    556 U.S. 662 (2009) ............................................................................................ 12

5

*Basic Inc., v. Levinson,*
6
    485 U.S. 224 (1988) ...................................................................................... 12, 19

7
*Cent. Bank of Denver, N.S. v. First Interstate Bank of Denver, N.A.,*
8
    511 U.S. 164 (1994) ...................................................................................... 19, 22

9
*Dura Pharm., Inc., v. Broudo,*
    544 U.S. 336 (2005) ............................................................................................ 12
10

11
*Garvey v. Arkoosh,*
    354 F. Supp. 2d 73 (D.Mass. 2005) ............................................................. 19, 20
12

13
*Glazer Capital Mgmt., LP v. Magistri,*
    549 F.3d 736 (9th Cir. 2008) ............................................................................. 21

14
*Halliburton Co. v. Erica P. John Fund, Inc.,*
15
    ___U.S.___, 134 S.Ct. 2398 (2014) .................................................................. 22

16
*Howard v. Everex Sys.,*
17
    228 F.3d 1057 (9th Cir. 2000) ........................................................................... 22

18
*In re Blue Earth, Inc., Sec. Class Action Litig.*, slip op.,
19
    CV 14-08263-DSF (C.D. Cal. Nov. 3, 2015)............................................. 9, 14, 15

20
*In re Galectin Therapeutics, Inc. Sec. Litig.,*
    __F. Supp. 3d__, 2015 WL 9647524 (N.D. Ga., Dec. 30, 2015)....................16, *et seq.*
21

22
*In re Galena BioPharma, Inc. Sec. Litig.,*
    ___F. Supp. 3d___, 2015 WL 4643474 (D. Or. 2015) ........................................ 21, 22
23

24
*In re Gilead Sec. Litig.,*
    536 F.3d 1049 (9th Cir. 2008) ........................................................................... 12

25
*In re Nuveen Funds/City of Alameda Sec. Litig.,*
26
    2011 WL 1842819 (N.D. Cal. May 16, 2011) ................................................... 13

27
*In re VeriFone Holdings, Inc. Sec. Litig.,*
28
    704 F.3d 694 (9th Cir. 2012)............................................................................. 13

*Janus Capital Grp., Inc. v. First Derivative Traders,*
   564 U.S. 134 (2011) ................................................................................ 16

*Lattanzio v. Deloitte & Touche LLP,*
   476 F.3d 147 (2d Cir. 2007) .................................................................... 14

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005) .................................................................... 15

*Lipton v. Pathogenesis Corp.,*
   284 F.3d 1027  (9th Cir. 2002) ................................................................ 23

*Loos v. Immersion Corp.,*
   762 F.3d 880 (9th Cir. 2014) .................................................................. 13

*Matrixx Initiatives Inc. v. Siracusano,*
   563 U.S. 31 (2011) ................................................................................ 19

*Police & Fire Ret. Sys. Of the city of Detroit,*
   645 F. Supp. 2d 210 (S.D.N.Y 2009) ....................................................... 14

*Reese v. Malone,*
   747 F.3d 557 (9th Cir. 2014) .................................................................. 13

*Ronconi v. Larkin,*
   253 F.3d 423 (9th Cir. 2001) .................................................................. 12

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,*
   552 U.S. 148 (2011) ................................................................................ 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007). ............................................................................... 13

*Vess v. Ciba-Geigy Corp. USA,*
   317 F.3d 1097 (9th Cir. 2003) ................................................................ 12

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.,*
   655 F.3d 1039 (9th Cir. 2011) ................................................................ 22

*Zucco Partners, LLC, v. Digimarc Corp.,*
   552 F.3d 981 (9th Cir. 2009) ............................................................ 13, 21

Statutes

15 U.S.C. § 77q(b) .................................................................................... 19

15 U.S.C. § 78j(b) .......................................................................... 12, *et seq.*

15 U.S.C. § 78t ............................................................................................... 22

15 U.S.C. § 78u-4(b) ...................................................................................... 12

15 U.S.C. § 78u-4(c) ...................................................................................... 23

Rules and Regulations

17 C.F.R. 240.10b5 ............................................................................ 12, *et seq.*

Fed.R.Civ.P. 11(b) .......................................................................................... 23

Fed.R.Civ.P. 12(b) ..................................................................................... 1, 12

Fed.R.Civ.P. 4(m) .......................................................................................... 11

**NOTICE OF MOTION**

On April 6, 2016 at 2:00 p.m., defendants Cellular Biomedicine Group, Inc. ("CBMG"), and Wei Cao, CBMG's Chief Executive Officer ("Cao" and collectively the "CBMG Defendants"), will and hereby do move pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the Amended Class Action Complaint (the "Amended Complaint," cited as "AC" (docket # 28)). [1]

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

This class action was filed against CBMG, a public company engaged in the development of cell-based treatments for cancerous and degenerative diseases, including the use of chimeric antigen receptors (CAR) T cells against certain forms of cancer, on April 21, 2015, two weeks after a 26-page post by an anonymous short seller, "Pump Stopper", appeared on the financial website *SeekingAlpha.com*.  Per the Amended Complaint, after Pump Stopper "revealed" that CBMG was engaged in an undisclosed promotional scheme to inflate its stock, its stock price dropped $7 overnight.  Per the Amended Complaint, this "promotional scheme" is securities fraud, and anyone who published anything about CBMG in the 4 months preceding the blog post should be held liable.

Although deficiencies abound in the Amended Complaint, the most glaring is that plaintiffs have not, and cannot, allege that Pump Stopper revealed a fraudulent scheme that caused CBMG's stock price to drop.  This failure to plead loss causation requires dismissal of this suit.

First, and most fundamentally, the "fraud" allegedly "revealed" by Pump Stopper and recited in the Initial Complaint, differs vastly from that alleged in the Amended Complaint.  The Initial Complaint alleged that Pump Stopper "revealed" that CBMG had made a wide variety of "materially false and misleading statements" regarding its business, operational and compliance

---

[1]    The Complaint filed April 21, 2015 (the "Initial Complaint," cited as "IC" (Docket #1) names Tony Liu, CBMG's Chief Financial Officer, as a defendant.  The Amended Complaint does not name him as a defendant (and only mentions his name once in passing), and he should therefore be dismissed from this case with prejudice.  To the extent any further argument is necessary, Liu joins in this Motion.

policies, CBMG had not disclosed patient deaths that made its CAR-T technology "worthless", its founders had ties to a person in prison for securities fraud and an "illegal offshore stem cell clinic," CBMG had "[m]ultiple accounting and integrity issues" like "material weaknesses" and "'inability to timely file' a full 50% of quarterly SEC filings," *and* CBMG was using "paid stock promotion" to achieve "an unsustainable $500m valuation."  Pump Stopper concluded, "Assuming CBMG is 'real' and generously valuing CBMG on fundamentals show -94% near term and imminent downside."  Per the Initial Complaint, "on this news, CBMG securities declined $7.00 a share."

The Amended Complaint jettisoned all but the allegation that CBMG did not reveal that it had engaged in a promotional scheme to inflate its valuation – roughly 4 pages of a 25-page post. By abandoning those other theories, plaintiffs cannot claim that the corrective disclosure of the promotional scheme alone caused CBMG's price to drop.

Second, assuming that Pump Stopper's blog post caused CBMG's price to drop, it is unclear that the post revealed any "truth."  To allege causation, there must some basis to infer that the "corrective" news report is accurate. However, plaintiffs admit in footnote 33 in the Amended Complaint that "*SeekingAlpha.Com* has removed the post, stating, '[t]his article has been temporarily removed from the site pending resolution of a dispute of fact.'"

Third, it is axiomatic in a securities fraud case that the "truth" revealed must not already be public knowledge.  Following the Amended Complaint's concession that the other scurrilous allegations in the blog don't matter, most of Pump Stopper's "Paid Stock Promotion" theory centers (3+ of 4 pages) on the research coverage by Stephen Dunn, an analyst at a brokerage firm, who initiated coverage February 2, 2015.  As Pump Stopper admits, Dunn's report disclosed that he had received consulting fees from CBMG in 2014, and his firm expects to receive compensation from CBMG in the coming year.  In other words, because Dunn had already publicly disclosed his and CBMG's business dealings, Pump Stopper's blog post could not make a corrective disclosure of any concealed or misstated information.

Fourth, plaintiffs have not plausibly pled that the Pump Stopper article caused the $7 drop in CBMG's stock price.  Stepping back, after CBMG's stock began trading on NASDAQ on June 18,

2014, it had a very low trading volume (a median of 12,400 shares traded a day) for the balance of 2014.  In early 2015, CBMG, similar to other biotech companies developing CAR T treatments identified in the Amended Complaint (Juno Therapeutics, Inc. and Kite Pharma, Inc., for example), began to garner attention and excitement.  By late February 2014, on still light volume, the stock price doubled.  Volume began to rise – although it remained under 200,000 shares a day.  On March 23, 2015, the stock price peaked at $47.06, in line with the NASDAQ Biotech Index ("NBI").  But, just as quickly, and before Pump Stopper published, CBMG's stock price collapsed.  On April 2, trading closed at $36.16, and on April 6, 2015, at $32.22 on unprecedented heavy trading (547,900 shares).  In the same time frame, Juno and Kite experienced similar peaks and valleys.  It is therefore just as, if not more, plausible that sector volatility combined with the momentum of this unusual volume caused the $7.00 price drop on April 7, 2015, not the minor portion of Pump Stopper's blog post devoted to "promotion."

Not surprisingly, given the failure to plead any "corrective" news, the Amended Complaint alleges no actionable misstatements or misleading omissions.  In an effort to conjure up a "scheme," plaintiffs added Dunn and nine other parties to this case (collectively, the "other defendants").  However, no false statements have been attributed to any of them.  Plaintiffs instead rely on conclusory declarations that the other defendants did not disclose purported payments received from CBMG.  No facts are pled to support any inference that CBMG actually made any such payments.

Similarly, scienter has not been pled with the requisite particularity.  There is no claim that Cao bought or sold any CBMG securities, let alone caused or facilitated insider trading, derived any improper benefit from the other defendants, lied about payments to a content provider or caused any of the other defendants to conceal the true nature of their relationship with CBMG.  There is therefore no scienter as to Cao or any of the other defendants to impute to CBMG, and for this reason, plaintiffs' effort to impose scheme liability also fails.

The Amended Complaint also falls far short of the heightened requirements to plead securities fraud.  Plaintiffs' wholesale abandonment of the theories espoused by Pump Stopper

raises questions about whether a sound factual basis underpins the Amended Complaint.  None exists, and for this reason, the Amended Complaint should be dismissed with prejudice.

## II.      FACTUAL BACKGROUND

### a.   CBMG Begins Trading on NASDAQ

CBMG, as it is known today, was formed on February 6, 2013, through the merger of EastBridge Investment Group Corporation ("EastBridge") with the company controlling Cellular Biomedicine Group, Ltd. (Shanghai) ("CBMG Ltd."). (AC ¶ 50; Ex. A p. 5.)  Since 2009, CBMG Ltd. had been engaged in research in the areas of regenerative and cell therapy. (AC ¶ 51, Ex. A. p. 11.)  On June 18, 2014, CBMG's common stock began trading on NASDAQ. (AC ¶ 2; Ex. B p. 42.)  It had a very low trading volume for the balance of 2014. (Ex. M; *see also* Fig. 1.)

Cao, an officer and director of CBMG Ltd., was appointed President, COO and a director of CBMG upon the merger, and, on September 29, 2013, CEO. (AC ¶ 22; Ex. A p. 91.)  He has a Ph.D. in pharmacology and 30 years of experience in immune-pharmacology. (Ex. A p. 91.)

No noteworthy news marks the start of the alleged class period, December 10, 2014, except that it coincides with the lowest price at which CBMG's stock closed ($12.22) between June 18 and December 31, 2014. (*Id.*)

The Amended Complaint acknowledges this lack of trading volume in CBMG stock, attributing it to a reduction in 2014 in "investor relations expense" of approximately $1.5 million, as reported in the annual report for the fiscal year ended December 31, 2014 (the "2014 Form 10-K"), compared to the $1.7 million increase reported in the annual report for the fiscal year ended December 31, 2013 (the "2013 Form 10-K"). (AC ¶ 64; compare Ex. A p. 80-81, to Ex. J p. 46.)  Plaintiffs do not point to any evidence that this expense, which is a component of General and Administrative Expenses under U.S. GAAP, means "stock promotion" as such.  In fact, Note 13 of the 2013 Form 10-K explains that the expense was a $1,694,682 charge taken when CBMG did not meet certain milestones and had to issue stock to certain investors in the company. (Ex. A p. 146.)

Also on December 10, 2014, CBMG filed a post-effective amendment (the "Form S-8 POS").  (AC ¶ 65; Ex. B.)  The filing was not "news"; it updated a previously filed Form S-8 to register shares issuable under a 2011 employee benefit plan.  (Ex. B p. 3).  The cover highlights that, "**Investing in our common stock involves a high degree of risk**." (*Id.* at 4, bold in orig.)  The filing incorporates the financial statements from the 2013 10-K and the auditors' qualified opinion therein and describes CBMG's need for substantial additional financing.  (*Id.* at 28, 50; *see also* Ex. A pp. 85-86, 118, 129.)  The section describing the risks of trading in CBMG stock highlighted by plaintiffs tracks the verbiage in the 2013 Form 10-K, with the addition of risks pertaining to NASDAQ listing requirements.  (AC ¶¶ 66-69; compare Ex. B pp. 42-45 to Ex. A pp. 67-70.)

Plaintiffs allege that the Form S-8 POS misleadingly omits that in December 2014, CBMG had entered into an agreement with Wide World of Stocks ("WWOS") by which CBMG "paid WWOS many thousands of dollars to promote the Company and its stock."  (AC ¶ 69.)  Plaintiffs do not allege any facts to support that such an agreement existed as of December 10, 2014, so as to make the risk disclosures in the Form S-8 POS misleading, that the amount paid was "many thousands of dollars," or that WWOS actually did anything at all to "promote" CBMG's stock price before December 10, 2014.  For its part, WWOS publicly disclosed the relationship, stating in the legal section of its website (http://wideworldofstocks.com/legal/) that for marketing services "for 3 months starting December 2014 . . . WWOS received ten thousand dollars."  (AC ¶ 84; Ex. C.)

On or about January 15, 2015, CBMG issued a press release to announce that WWOS had posted an interview by Damon Roberts of WWOS with Cao.  (AC ¶¶ 33, 74; Ex. D.)  The video also includes a discussion with John McCamant, publisher of the website www.bioinvest.com ("Bioinvest") and the Medical Technology Stock Newsletter ("MTSN").  (AC ¶¶ 76, 87.)  The press release links to WWOS' website, which disclosed CBMG's agreement to pay $10,000 for marketing services. (*Id.* at ¶¶82-84.)  Plaintiffs allege that the release is "false and misleading," because CBMG and Cao did not disclose that CBMG "compensated WWOS very well for the interview," and WWOS did not disclose any amount it paid to McCamant.  (*Id.* at ¶¶ 82, 86.)  Notably, plaintiffs never actually allege that CBMG paid McCamant to appear on the video.

Plaintiffs allege that MTSN included CBMG in a model portfolio of biotech stocks, but do not provide the date that it was added, nor do they claim that McCamant made any misleading statements about CBMG in MTSN or on Bioinvest.  (*Id.* at ¶¶ 87-88.)  With regard to the bald assertion that CBMG paid for this, they fail to mention that a firewall blocks access to MTSN and it is only available to persons with paid subscriptions. (*See* Ex. D.)  Plaintiffs never consider the more plausible inference that McCamant appeared on WWOS to gain visibility for MTSN.

In addition, plaintiffs allege that CBMG paid Institutional Analyst, Inc. ("IAI"), which is run by Roland Rick Perry, to publish a research report in the Biotech Stock Review (the "BSR") on January 16, 2015.  (AC ¶ 90, 92.)  No factual basis is provided for this allegation that CBMG paid IAI or Perry, and plaintiffs omit the part of the BSR disclaimer language stating that if management receives payment from a covered company, "**it will be clearly noted at the bottom of each report or blog controlled by IA**."  (Compare Ex. E, bold in orig., to AC ¶ 93.)  Plaintiffs also allege that the analysis in the BSR was misleading, but identify no offending language.  (AC ¶ 94.)  Again, the more plausible inference that Perry is a journalist is never considered.

Although plaintiffs make much of the WWOS video, MTSN and the BSR report, there was no corresponding appreciable increase in CBMG's stock price or trade volume.  On average, 8,000 shares per day traded between January 15, 2015, and February 4, 2015.  (Ex. M; *see* Figure 1.)

### b.  The Biotech Index and CBMG's Peer Companies Experience Volatility

The Amended Complaint describes how the biotech area is "fiercely competitive," and several smaller companies, like CBMG, are vying to develop CAR-T therapies.  (AC ¶¶ 43-44.)  Plaintiffs acknowledge that CBMG informed investors of this challenging environment.  (*Id.* at ¶ 46, 48-49.)  Plaintiffs omit, however, that these other companies' stock price – like that of the entire sector – were as volatile, if not more so, than CBMG's during the class period.

Plaintiffs identify Juno Therapeutics, Inc. ("Juno") as one such competitor.  (*Id.* at ¶¶ 43-49.)  Juno went public on December 14, 2014, at $24.00 per share, and by January 12, 2015, had

risen to $61.51.  (Ex. N; *see* Figure 2.)  Within 3 days, the stock price fell to $44.60.  (*Id.*)  On March 30, 2015, it rose to a new high, $60.00, but by April 30, 2015, it had dropped to $42.74.  (*Id.*)

Kite Pharma, Inc. ("Kite") is, like CBMG and Juno, developing CAR-T therapies.  (AC ¶ 44.)  On December 1, 2014, Kite opened at $40.96.  (Ex. O; *see* Figure 2.)  By December 10, 2015, the stock price was $54.37 and it hit a high of $87.62 on January 14, 2015.  (*Id.*)  By February 9, 2015, it had dropped to $60.60, and March and April 2015 saw another $20 price vacillation.  (*Id.*)

Plaintiffs acknowledge that the class period's start date coincides with around when the NASDAQ Biotech Index (the "NBI"), then at 3224, began a rally.  (AC ¶ 63; Ex. P; *see* Figure 3.)  It rose to 3818 on March 20, 2015.  (Ex. P.)  That marked the NBI's peak; by April 6, 2015, the day before the alleged "corrective disclosure," it had dropped over 250 points, to 3547.  (*Id.*)

### c.  Excitement Builds About CBMG in February and March 2015

Not surprisingly, as excitement built in early 2015 around CAR-T research and companies like Kite and Juno, interest also grew in CBMG.

On February 2, 2015, Stephen Dunn, a research analyst then registered with the broker-dealer Aurora Capital LLC ("Aurora"), issued a positive report on CBMG.  (AC ¶ 95.)  There is no allegation that Dunn's report contains anything misleading.  The cover page directs the reader to "Important Disclosures and Analyst Certification," which, as plaintiffs acknowledge, disclose that Dunn and his affiliate LifeTech Capital ("LifeTech") had received compensation from CBMG, specifically "from October 1, 2014 to November 30, 2014 with a portion of the fee received by the analyst as compensation for work performed," and that his firm had "received non-securities services compensation" and that it expected to seek or to receive compensation for investment banking services with the next three (3) months."  (AC ¶ 97; Ex. F p. 24.)

On or about February 4, 2015, the website Stock News Now ("SNN") uploaded an interview of Cao with Shelly Craft, and CBMG issued a related press release.  (AC ¶¶ 99, 102.)  There is no allegation that Cao said anything untrue during the interview.  Plaintiffs claim that the disclaimers on SNN's webpages misleadingly did not disclose that CBMG paid for the video, but no facts are

alleged, however, to support that CBMG paid anything to SNN or Kraft.  (*Id.* at ¶¶ 101-102.)

On February 9, 2015, CBMG announced significant news:  it had entered into a technology transfer agreement with Chinese PLA General Hospital ("PLAGH") pertaining to four CAR-T technologies.  (AC ¶ 104.)  The Amended Complaint incorrectly alleges that CBMG did not disclose the technology's cost, calling that lack of disclosure "material" and a "red flag" (*id.* ¶¶ 105-105), but CBMG provided the cost – 12 million RMB, or approximately $2 million - in both the Form 8-K announcing the transaction and 2014 Form 10-K.  (*See* Ex. A p. 152; Ex H.)

At this point, possibly from these developments or simply the momentum of the overall NBI and peers like Juno and Kite, CBMG's stock price trended upward, rising from $16.59 on February 2, 2015, to $29.99 at month's end.  (*See* Figures 2 and 3.)  Plaintiffs make much of the fact that some websites noted the increase in stock price.  On February 11, 2015, Perry of IAI published a blog post with links to his own analysis published on January 16, 2015, and to the press release announcing Dunn's initiation of research coverage.  (AC ¶ 107.)  There is no allegation pled that CBMG caused IAI to publish this blog post or others like it, such as the blog post IAI published when Dunn published a research update on February 17, 2015.  (*See* AC ¶¶ 108-109, 112-113.)

The last publication for which CBMG supposedly paid is an interview of Dunn in The Life Sciences Report ("TSLR") published by Streetwise Reports on February 19, 2015.  (AC ¶ 15.)  In a three-page interview that mentions 19 companies, including 9 active in immuno-oncology, Dunn only mentions CBMG in response to the last question asked.  (*Id.* at ¶ 115; Ex. I.).  As plaintiffs acknowledge, TSLR discloses that CBMG is a sponsor of the publication, but was "not involved in any aspect of the interview preparation or post-interview editing so the expert could speak independently about the sector," and the article contains disclosures for Dunn similar to those in his research reports.  (AC ¶¶ 116, 118.)  In a now well-established pattern, the Amended Complaint baldly calls these disclosures "false and misleading," but does not plead supporting facts.  (*Id.* at ¶ 119.)

Plaintiffs do not allege that any further stock promotions took place after February 19, 2015.  Contrary to their "pumping" theory, CBMG's stock continued to rise, closing at a high of $47.06 on March 23, 2015, the trading day after the NBI had reached its high. (Ex. M and P; *see* Figures 1 and 3.)

Like the NBI, CBMG then trended down, closing at $43.03 on March 25, 2015, the date that CBMG announced the closing of a private financing, and to $31.46, on March 31, 2015, the date CBMG filed the 2014 Form 10-K.  (Ex. M.)  Although plaintiffs assert that the motive for the alleged stock promotion was to increase the value of funds raised through private placements (AC ¶ 125), CBMG had already disclosed in the Form S-8 POS and 2013 Form 10-K that it depended upon such private placements to meet its liquidity needs.  (*See, e.g.,* Ex. A p. 46, 84-86, 129.)

The Amended Complaint conclusorily alleges that the 2014 Form 10-K was misleading because CBMG did not disclose paid agreements with "WWOS, Streetwise Reports, McCamant, Dunn, IAI and others and that the Company paid those persons and organizations many thousands of dollars to promote the Company and its stock."  (AC ¶ 123.)  Apart from the disclosed $10,000 paid to WWOS for three months of consulting, there are no facts alleged to support that any other person was paid to promote the Company's stock, or that there was a duty to disclose payments, or that such payments were material.

NASDAQ reported that in March 2015, short interest in the stock more than doubled.  (*See* http://www.nasdaq.com/symbol/cbmg/short-interest.)  On April 6, 2015, trading at unprecedented high volume of 547,900, the stock closed at $32.22, down almost $4.00 from the prior day.

### d.  Short Seller Pump Stopper's April 2015 Post Proffers Many Theories Challenging CBMG's Value

Pump Stopper has been characterized by one court as "an anonymous short seller."  *See In re Blue Earth, Inc., Sec. Class Action Litig.*, CV 14-08263-DSF, slip op at 3 (C.D. Cal. (Nov. 3, 2015) (Ex. Q).  Plaintiffs allege that with Pump Stopper's April 7, 2015 post, "THE TRUTH EMERGES."  (AC ¶ 128.)  The question, however, is what truth?

The law firm Pomerantz LLP filed the Initial Complaint on April 21, 2015, naming CBMG, Cao and Liu as defendants and alleging a class period that began on June 18, 2014, the date the company uplisted to NASDAQ.  The Initial Complaint quoted portions of the blog post verbatim (*see* IC ¶ 5), and fully embraced Pump Stopper's theories that CBMG's public filings and press releases "misrepresented and/or failed to disclose that: (i) the Company achieved an unsustainable $500m valuation by using paid stock promoters; (ii) its "Car-T" technology has experienced patient

deaths and had no meaningful market value; (iii) its founders have been the target of multiple allegations of dishonesty; and (iv) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times."  (IC ¶ 32.)  By contrast, the Amended Complaint says little about what Pump Stopper says, likely because it relies on only a small "stock promotion" slice (4 of 25 pages) of his far-fetched claims, and has cut out the rest.  (Ex. L.)

As to the 4 pages devoted to stock promotion, they mostly appear aimed at discrediting Dunn, listing companies covered by Dunn that allegedly performed poorly and noting regulatory disclosures about brokerage firms (none are alleged to have to do with Dunn) with which he had been affiliated.  Pump Stopper makes no claim that any of this pertains to CBMG and does not question the truth of Dunn's conflict disclosures concerning his relationship with CBMG.

Apart from disparaging Dunn, the Pump Stopper post has just three sentences about purported stock promoters, none of which identifies wrongful conduct by CBMG during the class period.  For example, Pump Stopper mentions a relationship with See Through Equity, but the embedded link pertains to a conference sponsored by that firm in December *2012*, and links to a March 2014 article that doesn't even refer to CBMG.  (*See* http://www.nasdaq.com/article/behind-the-scenes-with-proactive-inovio-and-unilife-cm340779.)  Pump Stopper opines that Cao's interview with SNN is "comically bad," deeming it transparent (and non-actionable) puffery.

Pump Stopper does note the disclosure in the 2014 Form 10-K concerning investor relations expense, asking, "If their investor relations expenses declined by over $1.5m in one year what was the total?!"  On its face, this is merely unfounded and unsupported speculation by Pump Stopper.

Not surprisingly, given the heavy volume the day before, CBMG experienced heavy trading on April 7, 538,000 shares, and closed at $25.22.  That also happened to be the day that Seeking Alpha published the post.  (Ex. M.)

Notwithstanding Pump Stopper's post and theory that CBMG's stock had "imminent near term downside of -89%," by May 22, 2015, the stock price rebounded and exceeded its closing price on April 6, 2015 – the day before "the truth was revealed."

### e.   New Plaintiffs and Counsel File the Amended Complaint, Dropping All of Pump Stopper's Theories Except Illegal Stock Promotion

New lead counsel, Rosen Law Firm, was appointed and filed an Amended Complaint on September 17, 2015, with four new plaintiffs, none of whom owned CBMG stock before March 2015.[2]  At that time, SeekingAlpha had removed the Pump Stopper post "pending resolution of dispute of fact."  (AC ¶ 128 n. 33.)  The Amended Complaint dropped the most inflammatory Pump Stopper claims (the purported patient deaths, illegal offshore stem cell clinic, doing business with a securities fraudster, and so on) and instead focused on the theory that CBMG's value had been artificially inflated by undisclosed stock promotion.

With this shift in focus, plaintiffs also added the 10 other defendants to this case: Dunn and LifeTech Capital; Streetwise Reports, which published the TLSR interview with Dunn; Perry and IAI, publisher of Biotech Stock Review; Roberts and WWOS; McCamant, who participated in the WWOS interview of Cao and publishes Bioinvest; and SNN and Kraft, who conducted the February 3, 2015 interview of Cao.  (*Id.* at ¶¶ 27-36).[3]

---

[2]      Two of the plaintiffs, Diang Liang and Ervin D. Windom, made short term trades in CBMG in March 2015, before buying positions on March 30, 2015, and April 2, 2015, respectively, that they and plaintiff Michelle Jackson sold on April 7, 2015.  Depending on what time they placed their sell orders, their losses may have no conceivable tie whatsoever to Pump Stopper's "corrective disclosures" and any presumed movement in the stock thereafter, as the timestamp on SeekingAlpha shows the article was not even posted until 11:53 a.m. ET.

[3]      The Court held a status conference on November 3, 2015.  At that conference, plaintiffs' counsel represented that service of the other defendants was in process, but had not been completed. The Court set January 19, 2016, as the answer date to allow unserved defendants sufficient time to respond.  (Docket # 42.) On January 11, 2016, Plaintiffs filed unexecuted summons for IAI, Kraft, Perry and SNN.  (Docket # 46, 47.)  Contrary to the representations made at the November 3, 2015 conference, the unexecuted summons indicate that plaintiffs efforts to serve Kraft and SNN had been abandoned on October 16, and IAI and Perry October 22, 2015.  As IAI, Kraft, Perry and SNN have not been served in time to meet the January 19, 2015 deadline, and the time to serve has expired under Fed.R.Civ.P. 4(m), these other defendants should be dismissed with prejudice.

III.     ARGUMENT

a.  **Legal Standard Governing Motions to Dismiss and the Heightened Standards for Pleading Securities Fraud**

Under Fed.R.Civ.P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted).  The court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted deduction of fact, or unreasonable inferences."  *In re Gilead Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citation omitted).

To plead a claim under Section 10(b) of the Exchange Act and Rule 10b-5, plaintiffs must allege the following basic elements: (i) a material misrepresentation or omission of fact, (ii) scienter, (iii) a connection with the purchase or sale of a security, (iv) transaction and loss causation, and (v) economic loss.  15 U.S.C. § 78j(b); 17 C.F.R. 240.10b5; *see Dura Pharm., Inc., v. Broudo,* 544 U.S. 336, 341-342 (2005).  A statement or omission is misleading only if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc., v. Levinson,* 485 U.S. 224, 231-32 (1988) (citation omitted).

Under the Private Securities Litigation Reform Act of 1995 ("PSRLA"), securities fraud claimants must 'plead with particularity both falsity and scienter." *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir. 2001).  A plaintiff must therefore aver the "who, what, when, where, and how" of the alleged fraudulent conduct, and "set forth what is false or misleading about a statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotations and citations omitted).  With respect to falsity, "the complaint must specify each statement alleged to have been misleading." 15 U.S.C. § 78u-4(b)(1)(B).  With respect to scienter, "the complaint shall, with respect to each act or omission alleged … state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2).  The required state of mind is intentional or deliberate recklessness.  *See Zucco*

*Partners, LLC, v. Digimarc Corp.,* 552 F.3d 981, 990 (9th Cir. 2009); *see also Reese v. Malone,* 747 F.3d 557, 568 (9th Cir. 2014) (discussion of dual obligation of PSLRA and Rule 9(b).)

"Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.,* 704 F.3d 694, 701 (9th Cir. 2012) (citation omitted). Accordingly, "a court must consider plausible, nonculpable explanations for the defendants' conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007).

The PSLRA also requires a plaintiff to plead loss causation. 15 U.S.C. § 78u-4(b)(4). This requires pleading a corrective disclosure; that is, that the "decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Loos v. Immersion Corp.,* 762 F.3d 880, 886 (9th Cir. 2014).

**b.  Plaintiffs Have Failed to Plead Loss Causation**

Plaintiffs' theory is that the defendants, by failing to alert the market to CBMG's secret "paid promotional" activities committed a "fraud-on-the-market", and that when Pump Stopper's anonymous post appeared on *Seeking Alpha*, its "corrective disclosure" revealed the deception and led to a decline in the stock price. This theory falls far short of pleading loss causation.

**i.  *Loss Causation Cannot Be Pled Because Most of the Negative Content in the Pump Stopper Post Had Nothing to Do with Paid Promotional Activities***

"To be corrective, a disclosure must relate back to the misrepresentation and not to some other negative information about the company." *In re Nuveen Funds/City of Alameda Sec. Litig.,* 2011 WL 1842819, at 10 (N.D. Cal. May 16, 2011), aff'd sub nom, *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.,* 730 F.3d 1111 (9th Cir. 2013) (internal quotation marks and citation omitted).

Pump Stopper's post, the "corrective disclosure" alleged here, contained (not surprisingly, coming from a shortseller) a litany of negative information attacking CBMG's underlying value, its

founders and the value of its technology.  (*See, supra,* pp. 10-11.)  Only a fraction of the post touched on the promotional "issue," and most of that fraction simply disparaged Dunn.

The Initial Complaint recognized the obvious conclusion to be drawn from the Pump Stopper post:  if anything in it affected the stock price, it was the tsunami of vicious, negative allegations going to core company issues.  After citing these allegations, the Initial Complaint concludes: "on this news, CBMG securities declined $7.00 a share."  (IC ¶ 34.)  The Amended Complaint reverses course and pretends that the negative (mis)information on core issues had no effect and instead the mere mention of undisclosed stock promotion sent a corrective shock wave.

The Court should reject the Amended Complaint's implausible contention that a passing reference to paid content would outweigh lengthy and vitriolic references to patient death, dishonesty and a value crisis.  In the *Blue Earth* case, *supra*, the court faced a situation in which Pump Stopper had published a scathing post about an issuer, of which only a small percentage (5 of 58 pages) involved the negative content that those plaintiffs claimed constituted a corrective disclosure that caused the stock price to decline.  The *Blue Earth* court refused to accept the small negative portion of the post as establishing loss causation, at least in part because it was dwarfed by other negative content.  *See also Police & Fire Ret. Sys. Of the City of Detroit,* 645 F. Supp. 2d 210, 228-29 (S.D.N.Y 2009) (finding no corrective disclosure alleged when plaintiffs failed to "explain why the disclosure on page eight—as opposed to all the other information in the extended 12-page press release—caused the price decline."); *Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 158 (2d Cir. 2007) (finding no loss causation alleged when plaintiffs did not "allege[] facts that would allow factfinder to ascribe some rough proportion of the whole loss" to the corrective content.)

### ii.    *The Supposedly Corrective Disclosure in the Pump Stopper Post Regarding Undisclosed Paid Promotion Is Simply Opinion and Information Derived from Publicly Available Materials*

For a statement to qualify as a "corrective disclosure," the disclosure must be just that, a disclosure.  If the statement is merely a rehash of already publicly available information, or the statement alleged to be corrective is merely an *opinion* of the speaker made after evaluating public information, it is legally insufficient.  In *Blue Earth, supra*, the court also held that the Pump

Stopper post could not be used to establish loss causation, in part, because the negative content was not truly the public revelation of a previously hidden falsehood, but the short seller's *opinion*:

> "[T]he short-seller [Pump Stopper] states that he or she 'believes' the size of the market opportunity 'appears' misleading and 'is not even close to accurate.' This opinion appears to be based only on Blue Earth's allegedly conflicting representations – which were 'revealed' to the market some time before, other publicly available information, and the author's personal views about the traffic signal battery market in general."

*See*, *id.* at *5.*

The supposed corrective disclosure in the Pump Stopper post here is of exactly the same ilk as that in *Blue Earth.*  Plaintiffs only quote Pump Stopper once, and that quote is self-evidently the author's *opinion* that paying for promotion indicates that a company has underlying value problems:

> I do not suggest anyone, EVER, invest in any company that pays to promote their stock. Time and time again we have seen how these end and with [sic] 10k+ stocks in the US alone, there is no reason I can see to invest in any company of this poor quality.

(AC ¶ 128.)  A more fulsome review of the entire Pump Stopper post adds little else in terms of allegedly "hidden" truths.  Pump Stopper mostly just collects publicly available content that refers to CBMG or persons (so he says) who allegedly have interacted with CBMG.  There is no unveiling of a journalistic sting, no Deep Throat whistleblower, no release of smuggled company emails. Instead, there is just an admitted short seller's opinion, and opinion, right or wrong, cannot rise to the level of revealing hidden truths to the public required to plead a corrective disclosure.

### iii.     The Amended Complaint Asserts Facts About the Volatility of the Biotech Sector that Permit this Court to Draw the Conclusion that Market Forces Were as Likely a Cause of the Price Decline as any "Corrective Disclosure"

An adequate pleading of loss causation must plausibly assert that the *corrective disclosure*, rather than *other market forces*, is the probable cause of a plaintiff's loss.  *See Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 174 (2d Cir. 2005).  The Amended Complaint here does the opposite, alleging the high degree of volatility of biotech companies and, in particular, companies developing CAR-T treatments. (*See, e.g.,* AC ¶¶ 43-49, 63.).  Indeed, the very companies named in the Amended Complaint, Juno and Kite, were just as, if not more, volatile than CBMG.  Even without a

purported "corrective disclosure," CBMG's price tumbled approximately $15.00 in the two weeks prior to April 7, 2015, tracking the NBI, and it is public record that short interest reported by NASDAQ quadrupled between February and March 2015. (*See, supra,* pp. 7-10.)

On these facts, it is more plausible that market volatility, and volatility in CBMG's stock, caused the April 7, 2015 price drop rather than a small portion of the Pump Stopper post.

### c.   Plaintiffs Cannot Impose Liability on the CBMG Defendants for Misleading Statements or Omissions "Made" by Others

The Amended Complaint alleges omissions or misrepresentations that can be arranged into two categories: those supposedly made by Cao and/or CBMG, and those made by others. To the degree that Plaintiffs seek to hold the CBMG Defendants liable for statements "made" by others, the plaintiffs run afoul of the holding in *Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 134 (2011). For this reason, in a similar case in which an issuer was sued for paying stock promoters and not disclosing the payments, the court granted a motion to dismiss, writing: "To the extent that Plaintiff bases his Rule 10b-5(b) claim on the articles by the stock promoters, the Supreme Court has foreclosed his claim." *In re Galectin Therapeutics, Inc. Sec. Litig.,* __F. Supp. 3d__, 2015 WL 9647524 (N.D. Ga., Dec. 30, 2015).

The vast majority of the statements in the Amended Complaint quote the other defendants from content those defendants created. Such statements (or omissions) can never give rise to liability to anyone except those that made them. For this reason the statements alleged at AC ¶¶ 82, 86, 89, 94, 98, 103, 119 are not actionable against the CBMG Defendants.

### d.   Plaintiffs Have Failed to Plead Falsity with the Requisite Particularity

Although a few of the alleged statements are attributed to the CBMG Defendants, even in a light most generous to plaintiffs, none survive as a properly pled misrepresentation or omission.

### i.   *WWOS Disclosed the Amount Paid by CBMG for Marketing and Any Potential Conflict that a Payment Might Create*

The Amended Complaint claims that the January 2015 WWOS interview of Cao by McCamant and Roberts was merely a paid promotional piece, and that nowhere was the public made aware of the paid nature of the relationship between WWOS and CBMG. (AC ¶¶ 74-86.)

However that claim is simply not true, *as plaintiffs themselves acknowledge in the Amended Complaint.*  Plaintiffs admit that the WWOS website specifically disclosed that in 2014, WWOS received $10,000 from CBMG for marketing services.  (*Id.* at ¶¶ 83-84.)  Plaintiffs admit that the WWOS disclaimer went even farther, with a robust discussion of the fact that payments could affect the objectivity of the content created by WWOS, and multiple pages from which one can access a video link to WWOS' disclaimer.  (*See id.* at ¶¶ 70 – 89.)

The WWOS disclaimer completely negates the Plaintiffs' allegation that the WWOS piece included an actionable material omission.  The very concept of the fraud-on-the-market theory upon which Plaintiff relies rests on the assumption that CBMG's securities were trading in an efficient market, a market that digested all material information then publicly available.  (*See id.* at ¶¶ 145-150.)  Because WWOS informed the public of its agreement with CBMG, the presumption must be that the market digested this information, and it was reflected in CBMG's stock price. [4]

As for Roberts, the host of WWOS, there are no facts alleged that CBMG personally paid him any amount separate from that paid to WWOS.  (*See id.* at ¶¶ 75-82.)  Likewise, for McCamant, there are no facts alleged to support that he received payment from CBMG for the interview or to add CBMG to the Bioinvest portfolio.  (*Id.* at ¶¶ 86-89.)  For this reason, plaintiffs have failed to allege any fraudulent omissions chargeable to either of them or, derivatively, CBMG.

### ii. *Plaintiffs Admit LifeTech and Dunn Freely Disclosed Having Received Compensation from CBMG for Services*

Plaintiffs assert that LifeTech and Dunn published favorable content on CBMG without adequately disclosing payments made by CBMG.  (AC ¶¶ 95-98.)  Again, the Amended Complaint itself contradicts this proposition, because plaintiffs admit that Dunn disclosed that LifeTech had been paid by CBMG for consulting services two months before he issued his research report, and that Aurora might earn investment banking compensation in the coming year.  (*Id.* at ¶¶ 97.)  No

---

[4]     Plaintiffs quibble that one had to click a mouse to get to the disclaimer page.  (*Id.* at ¶ 83.) There is no case law to support the proposition that a broad and clear public disclaimer is legally ineffective because it appears in the disclaimer section of a website.

facts have been alleged to support that any of these disclosures are false.  The reality is that Dunn fully and publicly disclosed that he had a conflict of interest that might influence his research report.

### iii. For SNN, Kraft, IAI, and Perry, Because No Facts Have Been Pled to Support that Payments Were Made, There Can Be No False Statement

The critical failure of pleading with regard to the SNN interview with Kraft, and IAI, publisher of TBSR, and Perry, is that plaintiffs fail to plead with any specificity at all the critical predicate facts as to whether CBMG did in fact pay anything to any of them.  (*See, e.g.,* AC ¶¶ 90-94; 99-103.)  Plaintiffs' theory is that CBMG paid for content and failed to disclose the payment to the public.  Accordingly, plaintiffs must plead that there was in fact a payment and must plead something approaching a where, when, and how.  That has not been done here.

### iv. CBMG's Disclosed Role as a "Sponsor" of Streetwise Report Does Not Mean Streetwise's Disclosure that CBMG Was Not Involved in Preparing or Editing the Dunn Interview is False

Plaintiffs similarly complain about Streetwise's interview with Dunn, questioning the disclosure at the article's end that CBMG was "not involved in any aspect of the interview or the interview editing so the expert could speak independently about the sector."  (AC ¶¶ 114-116).  However, undercutting this claim, the Amended Complaint admits in the next paragraph that below the text of the interview, the Streetwise Report prints a disclaimer that lists CBMG as a "sponsor", and elsewhere on the site states that sponsors pay monthly fees to cover Streetwise Reports' costs in creating content.  (*Id.* at ¶¶ 116-117.)  The Amended Complaint does not assert any facts anywhere to support the contention that the CBMG Defendants had any involvement whatsoever in the interview or say in the topics covered, as would be necessary to plead falsity.

### v. Plaintiffs Have Not Identified Any Misstatements in CBMG's Risk Disclosures Concerning Owning or Trading in Its Securities

The Amended Complaint contains extensive disclosures from CBMG's Form S-8 POS and the 2014 Form 10-K concerning the risks of trading in its stock.  (AC ¶¶ 120-123.)  Plaintiffs do not, however, identify anything inaccurate and attribute no particular statements to Cao.  At most they complain about an absence of information about stock promotional activities.  However, having not made any statement about CBMG's own efforts in this area, as discussed in the section

below, CBMG had no affirmative duty to disclose.  In *Galectin,* the court found that generic representations that the issuer was not aware of stock manipulation did not become misleading omissions by virtue of its silence about paid promotional activities.  2015 WL 9647524, at *5. Here, as in *Galectin*, the company engaged in none of the nefarious activity seen in other cases in connection with paid promotional activities, such as insider trading, so there was nothing material to disclose in its public filings.  *Id.* at *5-6.

> **e.   Plaintiffs Have Not Pled that CBMG Had Any Duty to Disclose Payments**

Although this case is based on a supposed failure to disclose payments that CBMG made to promote its stock, it has been long-established that Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information.  *Matrixx Initiatives Inc. v. Siracusano,* 563 U.S. 31 (2011).  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic,* 485 U.S. at 239 n.17.

To avoid the stricture of *Basic,* plaintiffs look to Section 17(b) of the Securities Act of 1933 to create a disclosure duty not elsewhere embedded in the securities laws.  (*See* AC ¶¶ 38-39.) Section 17(b) provides that it is unlawful for any person to:

> Publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which … describes such security for a consideration received, directly or indirectly, from an issuer, underwriter, or dealer, directly or indirectly, without fully disclosing the receipt, whether past or prospective, or such consideration and the amount thereof.

15 U.S.C. § 77q(b).  The citation to Section 17(b) does not salvage this case.

First, there is no private cause of action against *anyone* for an alleged § 17(b) violation: not the publisher/payee, nor the issuer/payor.  *Garvey v. Arkoosh,* 354 F. Supp. 2d 73, 83 (D.Mass. 2005).  The Amended Complaint is really an attempt to convert a Section 17(b) claim against publishers (for which there can be no private cause of action) into a Section 10(b) and Rule 10b-5 claim against the CBMG Defendants for aiding and abetting those publishers.  This is not permitted, because Rule 10b-5's private right of action precludes suits against aiders and abettors.  *Cent. Bank of Denver, N.S. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 180 (1994).

Second, Section 17(b) requires *publishers* of content about issuers to disclose payments from issuers.  The section does not place any burden on the issuer/payor to disclose the payment to the publisher/payee.  "As the plain language of Section 17(b) makes clear, the burden to disclose rests on the person who publishes the analyst's report; by contrast, there is no duty imposed by the statute on the issuer who has paid for the puffery."  *Garvey,* 354 F. Supp. 2d at 83.  In *Garvey,* a remarkably similar case, the court dismissed a class action against an issuer whose stock was allegedly "artificially inflated by a scheme in which stock analysts were secretly paid to praise Diomed and its stock."  *Id.* at 75.  The court held that the issuer had no duty to disclose to investors that it had paid the analysts to publish favorable information.  *Id.* at 83.  Similarly, the *Galectin* court explained, "For the court to impose a duty to disclose on [the issuer] would encroach on the Drafter's decision to create a duty to disclose on analysts."  2015 WL 9647524, *5.

Third, there is no allegation in the Amended Complaint that the CBMG Defendants knew of or ignored any failure of a publisher of content (if there was any such failure, which is not adequately alleged), to make disclosures required by Section 17(b), and certainly there is no allegation that the CBMG Defendants caused any publisher to engage in any act of non-disclosure.

In short, plaintiffs allege no basis to impose a public disclosure duty on the CBMG Defendants with respect to any payments to content providers, and such duty cannot be imported from Section 17(b) onto the CBMG Defendants.

### f.  Plaintiffs Have Not Pled Any Material Omissions

Plaintiffs allege that the CBMG Defendants failed to advise the public that CBMG had paid for content.  Even if that were the case, and as shown above, plaintiffs fail to allege any facts to suggest that whether CBMG paid a commentator or website to feature content about CBMG would alter the total mix of information for the average investor, especially since plaintiffs have failed to identify anything in the actual content of the "stock promotions" that was untrue.

### g.  No Allegations Support that the CBMG Defendants Acted with Scienter

The PSLRA requires that when all of the facts alleged are taken collectively, they must give rise to a strong inference of scienter.  *Zucco,* 552 F.3d at 991; *In re Galena BioPharma, Inc. Sec. Litig.*, ___F. Supp. 3d___, 2015 WL 4643474 (D. Or. 2015), illustrates the kind of deceitful activity that gives rise to a finding of scienter.  In *Galena*, the plaintiffs alleged that Galena had entered into an unlawful promotional arrangement with two promotional entities, DreamTeam and Lidingo, and then its officers profited by insider trading when the stock price increased.  Galena President and CEO Mark Ahn was alleged to have: (1) selected DreamTeam and Lidingo, outfits against which he was warned because they engaged in unprofessional tactics, (2) signed contracts paying them significantly more than a traditional, full service investor relations firm that Galena was also paying, (3) granted stock options to Lidingo despite that fact that Ahn had no power to do so, (4) concealed the improper grant of options from Galena's Board, (5) directly signed a check to Lidingo to pay content writers, (6) knowingly oversaw the placement of false articles published over the names of various fraudulent aliases, and (7) reviewed and approved draft articles before publication.  *Id.*, at *15-18.  After this activity increased the stock price, the management team arranged for a completely atypical grant of millions of dollars of options.  In an 18-day period, six of Galena's officers sold all of their stock, and a seventh sold 20 percent, for a collective take of $16 million. *Id.*  Ahn allegedly conspired to help insiders sell in small batches so that the SEC would not be alerted.  *Id.*  In ruling that the complaint pled scienter sufficiently against Ahn and others in management, the *Galena* court emphasized the insider stock sales.  *Id.* at *19.

By contrast, in *Galectin*, the court, having noted the absence of the conduct like that alleged in *Galena,* dismissed the complaint with prejudice.  2015 WL 9647524, *5.  Here, too, Cao sold no stock, and he is not alleged to have engaged in any of the other nefarious acts found in *Galena*.  No strong showing of scienter has been made against him.

As for CBMG, "corporate scienter relies heavily on the awareness of the directors and officers."  *Glazer Capital Mgmt., LP v. Magistri,* 549 F.3d 736, 744 (9th Cir. 2008).  Because there is no strong showing of scienter (nor any showing) against Cao, and there are no other special

circumstances pled to assign corporate scienter to CBMG, all Section 10(b) and Rule 10b-5 claims against the company should be dismissed.

### h.  Plaintiffs Have Not Pled Unique Conduct to Support a Claim for Scheme Liability

Plaintiffs also attempt to plead scheme liability under Rule 10b-5(a) and (c). Claims of scheme liability involve deceptive conduct beyond deceptive statements or omissions.  *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039 (9th Cir. 2011).  To state a claim for securities fraud based on scheme liability, a plaintiff must allege: (1) the defendant committed a deceptive or manipulative act in furtherance of the alleged scheme; (2) scienter; (3) a connection with a purchase or sale of a security; (4) reliance; (5) loss causation; and (6) economic loss.  *Halliburton Co. v. Erica P. John Fund, Inc.,* ___U.S.___, 134 S.Ct. 2398 (2014); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,* 552 U.S. 148, 158 (2011).  Scheme liability cannot be used as a proxy for what is really no more than an aiding and abetting claim.  *Central Bank, supra.*

Not only do all of the arguments raised above regarding a failure of pleading with regard to scienter and loss causation apply with equal force to scheme liability and require dismissal, but there is no separate conduct to support a scheme liability claim.  In *Galena,* the court determined that there *was* enough pled to satisfy the pleading standard for scheme liability, citing the plethora of deceitful actions unique to that case listed above.  2015 WL 4643474, *38.

By contrast, in *Galectin,* the Court dismissed the scheme liability claim under Rule 10b-5(a) and (c) because there were no wrongful acts alleged beyond the omissions underlying the Rule 10b-5(b) claim.  That reasoning applies here, and Cao engaged in *no* deceitful actions that could make up a plausible claim for scheme liability.

### i.   Without a Primary Violation, There Can Be No Control Person Liability

Liability under Section 20(a) of the Securities Exchange Act requires a primary violation of the securities laws.  Because there is no primary violation properly pled, the Section 20(a) claims against Cao, as control person of CBMG, must be dismissed.  *Howard v. Everex Sys.,* 228 F.3d 1057, 1065 (9th Cir. 2000); *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1035 n. 15 (9th Cir.

2002).  Plaintiffs also oddly claim that Cao and CBMG are control persons of all the other defendants.  (AC ¶ 164.)  This attempt to plead aiding and abetting under another name must also be dismissed.

## IV.     CONCLUSION

For the reasons set forth above, the CBMG Defendants respectfully request that the Court grant their motion to dismiss the Amended Complaint with prejudice as any amendment would be futile, enter judgment in favor of the CBMG Defendants, and conduct the review required under the PSLRA, 15 U.S.C. § 78u-4(c), for compliance with Fed.R.Civ.P. 11(b).


Dated: January 19, 2016                           **KAUFHOLD GASKIN LLP**

                                                  /s/ Jonathan B. Gaskin
                                                  Jonathan B. Gaskin
                                                  388 Market Street, Ste. 1300
                                                  San Francisco, CA 94920
                                                  T: 415-445-4621
                                                  F: 415-874-1071
                                                  jgaskin@kaufholdgaskin.com

                                                  **ELLENOFF GROSSMAN & SCHOLE LLP**
                                                  Adrienne Marie Ward (*pro hac vice*)
                                                  Michael Sullivan (*pro hac vice*)
                                                  1345 Avenue of the Americas
                                                  New York, NY 10105
                                                  T: 212-370-1300
                                                  award@egsllp.com

                                                  ***Counsel for Defendants Cellular Biomedicine Group, Inc. and Wei Cao***