UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FRANCIS J. BONANNO, et al.,
   Plaintiffs,
      v.
CELLULAR BIOMEDICINE GROUP, INC., et al.,
   Defendants.

Case No. 15-cv-01795-WHO

**ORDER GRANTING MOTIONS TO DISMISS**

Re: Dkt. Nos. 51, 54, 59

## INTRODUCTION

Plaintiffs Michelle Jackson, Ervin Windom, Ding Liang, and Beverly Nissenbaum allege that defendants Cellular Biomedicine Group, Inc. ("CBMG"), Wei "William" Cao, LifeTech Capital, Stephen Dunn, Streetwise Reports, Institutional Analyst, Inc. ("IAI"), Roland Perry, Wide World of Stocks ("WWOS"), Damon Roberts, John McCamant, SNN, Inc., and Shelly Kraft participated in a stock promotion scheme designed to artificially increase CBMG's stock price in order to raise cash for offerings. Plaintiffs claim that defendants' nondisclosure of the paid stock promotion campaign violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. They allege that defendants' illegal behavior was allegedly exposed in an April 7, 2015 internet posting authored by an anonymous blogger calling himself the Pump Stopper (the "Pump Stopper Report"). I heard argument on defendants CBMG, Cao, LifeTech, Dunn, and Streetwise Reports motions to dismiss on April 20, 2016. Dkt. Nos. 51, 54, 59. Because the Pump Stopper Report is insufficient to serve as a corrective disclosure in this case, defendants' motions to dismiss are GRANTED.

## BACKGROUND

CBMG was incorporated in 2001 and operated as both a mobile entertainment company

and an investment consulting business before shifting to biotechnology. First Amended Complaint ("FAC") ¶¶ 2, 50 [Dkt. No. 28]. As a biotechnology company, it focuses on developing cell-based therapies to treat serious chronic and degenerative diseases such as cancer, osteoarthritis, inflammatory diseases, etc. *Id*. ¶ 3. According to plaintiffs, CBMG did not start off with technology or robust intellectual property of its own; in order to succeed it needed large cash infusions to purchase relevant technology and run clinical trials. *Id*. ¶¶ 4-5, 53.

By late 2014, CBMG began paying investor relations firms to create positive spin through analyst coverage on its stock with the sole goal of raising CBMG's stock price. The analysts wrote reports or produced "professional looking" broadcasts in order to attract investors. *Id*. ¶ 6. For example, in November 2014, CBMG entered into an agreement with WWOS to promote it. *Id*. ¶ 7. Two months later, WWOS uploaded a half-hour broadcast to various internet sites that included McCamant's discussion regarding the broader biotech market as well as an interview with Cao, CBMG's Chief Executive Officer, giving "glowing praise" to CBMG. *Id*. "At no point during the broadcast did the anchor, the purportedly independent [McCamant] or [Cao] disclose that [CBMG] bought and paid for the broadcast." *Id*. By "clicking through several links," a user would arrive at WWOS's disclaimer that WWOS and CBMG had entered into a contract pursuant to which WWOS would provide marketing services. *Id*. ¶¶ 7, 84. The disclosure also described that this "conflict of interest" could affect WWOS's objectivity in how it "provides marketing services or chooses to feature CBMG." *Id*. ¶ 84. Plaintiffs claim that the disclosure is "wholly inadequate" and "insufficient on its face." *Id*. ¶¶ 7, 86.

After WWOS produced its broadcast, other paid analysts generated research content for inclusion in reports and interviews with analysts that were uploaded onto the internet. *Id*. ¶ 8. For example, "LifeTech produced a long and dense research report on [CBMG] with a wholly insufficient disclosure on the facts surrounding a payment from [CBMG] to LifeTech and its analyst, Defendant Stephen Dunn. Defendant IAI then uploaded a press release, from LifeTech, summarizing Dunn's research opinion, but omitting all reference to the payment LifeTech and Dunn received." *Id*. Similarly, plaintiffs allege that, akin to WWOS's presentation of McCamant as an independent analyst, Streetwise Reports, another paid outlet, interviewed Dunn as an

independent expert who promoted CBMG. *Id*. ¶ 9. However, "Streetwise Reports and Dunn both lacked independence and their disclosures about payment failed adequately to inform investors about the true nature of the paid promotion." *Id*.

      Additionally, plaintiffs allege that, around the same time as the stock promotion campaign was occurring, CBMG made misleading filings with the SEC. For example, on December 10, 2014, CBMG filed a Post-Effective Amendment No. 1 to Form S-8 Registration Statement under the Securities Act of 1933 ("S-8"). *Id*. ¶ 65. In the S-8, CBMG stated that wide fluctuations in its stock price were due in part to the its status as a relatively unknown company and therefore that its stocks could be subject to significant price volatility when compared to more seasoned issuers. *Id*. ¶ 66. The S-8 also acknowledged that the market for penny stocks could be susceptible to fraud and abuse, but that CBMG's management was aware of the potential for abuse and "strive[s] within the confines of practical limitations to prevent the described patterns from being established with respect to the Company's securities." *Id*. ¶ 68 (modifications omitted). Plaintiffs allege that these disclosures were materially false and misleading because they did not disclose the paid stock promotion campaign.[1] Defendants "knew or were reckless in not knowing that the promotional campaign would appear to be independent by inadequately disclosing that the Company had bought and paid for the positive research." *Id*. ¶ 69.

      The stock promotion scheme succeeded. *Id*. ¶ 124. "Unsuspecting investors were duped." *Id*. ¶ 10. According to plaintiffs, despite "relatively insignificant news" from CBMG during the class period, the stock price rose as a proximate result of the undisclosed paid promotion scheme. *Id*.

      On April 7, 2015, a blogger known as "Pump Stopper" uploaded a posting to SeekingAlpha.com, a financial news and analysis website, entitled "Cellular Biomedicine: Strong Sell on Patient Death, Fraud Ties and Stock Promotion, -94.6% Downside." *Id*. ¶ 11. The posting encompassed approximately twenty five pages and included a discussion of a paid stock promotion campaign, patient deaths following CMBG's clinical trials, allegations of dishonesty on

---

[1] Plaintiffs allege defendants' nondisclosure of the paid stock campaign in a 2014 Form 10-K filing with the SEC made it similarly misleading. *Id*. ¶¶ 120-123.

3

behalf of its founders, CMBG's connections to an alleged illegal offshore stem clinic, and predicting a "-94.6% near term and imminent downside". Report at 2.[2] "On this news," CBMG stocks declined $7.00 per share, or over 21.7%. FAC ¶ 129.

Plaintiffs bring this lawsuit on behalf of themselves and all persons who purchased or otherwise acquired CBMG securities between December 10, 2014 and April 7, 2015 in order to recover damages caused by defendants' violations of federal securities law and pursue remedies under 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.

## LEGAL STANDARD

### I. FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 1949 (2009). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In considering whether the complaint is sufficient to state a claim, the court accepts as true all of the factual allegations contained in the complaint. *Iqbal*, 556 U.S. at 678. However, the court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted).

### II. PLEADING REQUIREMENTS IN SECURITIES FRAUD ACTIONS

---

[2] I consider the Pump Stopper Report, reproduced at Dkt No. 52, Exhs. H, I; Dkt. No. 57, Exh. K; Dkt. No. 64, Exh. C, under the doctrine of incorporation by reference. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (The incorporation by reference doctrine allows courts to "to take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading.") (internal quotation marks and modifications omitted). The request for judicial notice of the *In re Blue Earth, Inc. Securities Class Action Litigation*, 14-cv-8263 (C.D. Cal. Nov 3, 2015) decision, Dkt. No. 57, Exh. Q, is also GRANTED. *See Hunt v. Check Recovery Sys. Inc.*, 478 F. Supp. 2d 1157, 1160-61 (N.D. Cal. 2007) ("Judicial notice may be taken of 'adjudicative facts' such as court records, pleadings."). Because the remaining documents were not considered in deciding this motion, all other requests are DENIED as MOOT.

1   Section 10(b) of the Exchange Act makes it unlawful "for any person . . . to use or employ,
2   in connection with the purchase or sale of any security . . . any manipulative or deceptive device or
3   contrivance in contravention of such rules and regulations as the Commission may prescribe[.]"
4   15 U.S.C. § 78j(b). SEC Rule 10b-5, promulgated under the authority of Section 10(b), in turn,
5   provides that "[i]t shall be unlawful for any person . . . (a) To employ any device, scheme, or
6   artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a
7   material fact necessary in order to make the statements made, in light of the circumstances under
8   which they were made, not misleading, or (c) To engage in any act, practice, or course of business
9   which operates or would operate as a fraud or deceit upon any person, in connection with the
10  purchase or sale of any security." 17 C.F.R. § 240.10b-5.

11  The basic elements of a Rule 10b-5 claim are: (i) a material misrepresentation or omission
12  of fact, (ii) scienter, (iii) a connection with the purchase or sale of a security, (iv) transaction and
13  loss causation, and (v) economic loss. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005)
14  (citation omitted). To state a Rule 10b-5 claim, "the plaintiff shall have the burden of proving that
15  the act or omission of the defendant alleged to violate this chapter caused the loss for which the
16  plaintiff seeks to recover damages." *Id*.

17  In order to establish a prima facie case under Section 20(a), a plaintiff must prove: (i) a
18  primary violation of federal securities laws; and (ii) that the defendant exercised actual power or
19  control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir.
20  2000). "Whether [a defendant] is a controlling person 'is an intensely factual question,' involving
21  scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the
22  defendant's power to control corporate actions." *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir.
23  1994) (citation omitted). A director or CEO "is not automatically liable as a controlling person."
24  *Id*.; *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996).

25  **III. FEDERAL RULE OF CIVIL PROCEDURE 9(b) AND THE PSLRA**
26  Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), securities fraud
27  claims must "plead with particularity both falsity and scienter." *Ronconi v. Larkin*, 253 F.3d 423,
28  429 (9th Cir. 2001). This is the same standard under Federal Rule of Civil Procedure 9(b). With

respect to falsity, "the complaint must specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B).  With respect to scienter, "the complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Daou Sys.*, 411 F.3d at 1015 (citation and internal quotation marks omitted).

## DISCUSSION

## I.   SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 (COUNTS ONE AND TWO)

Defendants assert the complaint should be dismissed for multiple reasons, including that plaintiffs have failed to establish: (1) what is false or misleading about the statements at issue; (2) who should be responsible as the ultimate maker of those statements; (3) that defendants acted with scienter; and (4) causation between the Pump Stopper Report and the economic loss suffered. Because I find that plaintiffs have not adequately pleaded loss causation, I do not address defendants' other arguments.[3]

Loss causation, "i.e. a causal connection between the material misrepresentation and the loss" experienced by the plaintiff, is a necessary element of pleading a securities fraud claim under section 10(b) of the Exchange Act. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "Even when deceptive conduct is properly pleaded, a securities fraud complaint must also adequately plead loss causation." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (internal quotation marks omitted). "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which caused the company's stock price to drop and investors to lose money." *Id.* (internal quotation marks omitted). To be corrective, the disclosure must "relate back to the misrepresentation and not to

---

[3] In the event plaintiffs decide to amend, they should pay attention to defendants' other well-reasoned contentions that I am not addressing here because it is not necessary.

some other negative information about the company." *In re Nuveen Funds/City of Alameda Sec. Litig.*, No. 08-cv-4575-SI, 2011 WL 1842819, at *10 (N.D. Cal. May 16, 2011) (internal quotation marks omitted). Federal Rule of Civil Procedure 9(b) requires a plaintiff to state with particularity the elements of a securities fraud claim, including loss causation. *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

Defendants contend plaintiffs have not adequately pleaded causation. The complaint contains a section entitled "Loss Causation/Economic Loss," which consists of only three paragraphs. FAC ¶¶ 136-138. Particularly relevant here is plaintiffs' allegation that "[a]s Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of [CBMG] securities fell precipitously, as the prior artificial inflation came out of the price." *Id.* ¶ 137. This generalized causal formulation is mirrored in the proceeding allegation which provides that "[w]hen the true facts about the Company were revealed to the market, the inflation in the price of [CBMG] securities was removed and the price of [CBMG] securities declined dramatically, causing losses to Plaintiffs and the other members of the Class." *Id.* ¶ 138.

Plaintiffs do not specify in this section of the complaint when the "true facts" about CBMG were revealed, or made apparent, to the market. However, in a previous section entitled "The Truth Emerges," plaintiffs point directly to the Pump Stopper Report as constituting the corrective disclosure. *Id.* ¶ 128. Beyond quoting two sentences describing the Pump Stopper's admonition against purchasing stocks from companies that pay to promote their stocks, no other specific statements or disclosures from the Pump Stopper Report are identified in that section. *Id.* Instead, plaintiffs allege that "[o]n this news," CBMG's stock declined $7.00 per share, or over 21.7%. *Id.* ¶ 129.

These allegations fail to sufficiently establish causation. The section of the Pump Stopper Report plaintiffs quote in their complaint contains merely the opinions of the author and cannot be categorically labeled as "the truth." *Lloyd*, 811 F.3d at 1209 (loss causation is satisfied by pleading "the defendant revealed *the truth* through 'corrective disclosures' which caused the company's stock price to drop and investors to lose money") (internal quotation marks omitted) (emphasis added). The section of the report that plaintiffs rely on proclaims, "I do not suggest

7

anyone, EVER invest in any company that pays to promote their stock. Time and time again we have seen how these end and with 10k+ stocks in the US alone, there is no reason I can see to invest in any company of this poor quality." FAC ¶ 128. This "advice" appears in the Pump Stopper Report without any referenced footnotes or hyperlinks. Report at 2. These two sentences form the majority of a three sentence paragraph that ends with the sentence, "I recommend you read the extensive research below and form your own opinions." An anonymous poster's opinion cannot reveal to the market the falsity of CBMG's misrepresentations. *See Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) ("If every analyst or short-seller's opinion based on already-public information could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst's negative analysis of public filings as a corrective disclosure. That cannot be – nor is it – the law.").

Plaintiffs also have not identified with particularity the sections of the Pump Stopper Report that were not already public information. New information is critical to demonstrating loss causation because it is assumed that the "market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988). Therefore, a corrective disclosure that is derived entirely from public sources is insufficient. *See Meyer*, 710 F.3d at 1198 ("Because a corrective disclosure obviously must disclose new information, the fact that the sources used in the [analyst's presentation] were already public is fatal to the Investors' claim of loss causation."); *Loos*, 762 F.3d at 889 (agreeing with the Eleventh Circuit that causation was not established when the information in a corrective disclosure "had been derived entirely from public filings and other publicly available sources of which the stock market was presumed to be aware") (internal quotation marks and modifications omitted).

Here, the Pump Stopper Report does not claim that any of the information regarding the paid promotion stock campaign was non-public. The paragraphs discussing the campaign contain multiple hyperlinks leading to publicly available internet sources. For example, the report states:

> It's not only Stephen Dunn and his group involved with CBMG though, the See Through Equity shop has been involved in promoting CBMG, as has the comically bad StockNewsNow.com

8

> who promoted CBMG also seems to be a paid stock promotion website given their disclaimer about company compensation. Another paid stock promotion firm "Wide World of Stocks!" was also apparently paid to promote CBMG with host Damon Roberts, famous for his extensive infomercial experience. CBMG also paid for the "Life Sciences Report", also mentioned in Richard Pearsons's famous stock promotion research piece, while CBMG also apparently paid StreetWise Reports as well (see disclosure at bottom).

Report at 5 (hyperlinks provided at the underlined words). It also describes the disclosure at the end of one of LifeTech's reports as "prov[ing] clear compensation along with direct conflicts of interest." Report at 2. The author thereafter provides a screenshot of the LifeTech disclosure in question, highlighting the allegedly troubling disclosure language for its readers.

This case shares important similarities with *In re Blue Earth, Inc. Securities Class Action*, No. 14-cv-8263 (C.D. Cal. November 3, 2015). Dkt. No. 57, Exh. Q. In *Blue Earth*, the plaintiff alleged that Blue Earth, Inc. and its officers misrepresented its market potential. *Id*. at 1. Pump Stopper had published an article accusing Blue Earth of engaging in a pump-and-dump stock promotion. *Id*. at 3. Following the publication of the article, Blue Earth's stock fell. *Id*. Just as in this case, the *Blue Earth* plaintiff alleged that the Pump Stopper report constituted a corrective disclosure that revealed the falsity of the company's previous misrepresentations. The court found the report to be an insufficient corrective disclosure, in part because the information contained in the Pump Stopper's report was a compilation of publicly available information. *Id*. at 4

Without providing supporting citations, plaintiffs here attempt to distinguish *Blue Earth* by asserting that while every other allegation in the Pump Stopper Report was publicly available, the existence of the stock promotion scheme was not. Oppo. at 56 [Dkt. No. 64]. To the contrary, multiple hyperlinks underlie the Pump Stopper's discussion of the paid campaign and there is no indication that this section of the report is based on non-public information.[4]

Additionally, the complaint does not differentiate the "disclosure" of the paid stock promotion campaign from the multiple other negative accusations contained within the Pump

---

[4] Neither *Teague v. Alternate Energy Holdings, Inc*., No. 10-cv-00634, 2011 WL 6337611 (D. Idaho Dec. 19, 2011) nor *Ansell v. Laikin*, No. 10-cv-9292, 2011 WL 3274019 (C.D. Cal. Aug. 1, 2011) help plaintiffs on this point, as the issue is not whether alternate events caused the stock price to fall, but whether the Pump Stopper Report can serve as an adequate corrective disclosure in this case.

1    Stopper Report. As described above, plaintiffs plead generally that "[a]s Defendants'
2    misrepresentations and fraudulent conduct became apparent to the market," the stock price fell.
3    FAC ¶ 137. The truth, they allege, was revealed in the Pump Stopper Report. *Id*. ¶¶ 128-129. But
4    the Pump Stopper Report's discussion of the paid stock campaign encompasses only
5    approximately four out of twenty-five pages of the posting. The report attributes a wide variety of
6    misrepresentations and fraudulent conduct to CBMG, including "multiple allegations of
7    dishonesty with many disclosure questions, connections to alleged illegal offshore stem cell clinic
8    [] apparently engaging in illegal activities in China, plus direct partnerships with a convicted
9    fraudster currently serving an 11 year sentence in prison." Report at 6.

"[L]oss causation is not adequately pled unless a plaintiff alleges that the market learned of and reacted to the practices the plaintiff contends are fraudulent, as opposed to merely reports of the defendant's [poor behavior] generally." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010). Many of the Pump Stopper's accusations are unrelated to plaintiffs' claims regarding the undisclosed paid marketing campaign. While the alleged misrepresentations need not be the sole reason for the decline in value, they must be at least a "substantial cause." *In re Daou Sys., Inc.*, 411 F.3d at 1025. Because Rule 9(b)'s heightened pleading standard applies, plaintiffs must plead causation with particularity. Plaintiffs' allegations do not satisfy this standard.

## II.    SECTION 20(a) OF THE EXCHANGE ACT (COUNT THREE)

To establish a prima facie case violation of Section 20(a), plaintiffs must prove: (1) a primary violation of federal securities laws and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Here, because plaintiffs have failed to state a claim for primary liability under section 10(b) of the Exchange Act, there can be no secondary liability under section 20(a). *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) ("Section 20(a) claims may be dismissed summarily. . . if a plaintiff fails to adequately plead a primary violation of section 10(b).").

## CONCLUSION

Defendants' motions to dismiss are GRANTED WITH LEAVE TO AMEND. Plaintiffs

1 may amend their complaint within 20 days of this Order.  A Case Management Conference will
2 coincide with any hearing on a motion to dismiss the amended complaint.  If no motion to dismiss
3 is filed, the Case Management Conference is set for July 19, 2016.  A Joint Case Management
4 Statement shall be filed a week prior to the Conference.

5     **IT IS SO ORDERED**.

6 Dated: May 20, 2016



WILLIAM H. ORRICK
United States District Judge

11