Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jacob A. Goldberg (*pro hac vice*)
THE ROSEN LAW FIRM, P.A.
101 Greenwood Avenue, Suite 203
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com

***Lead Counsel for Plaintiffs and the Class***

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| FRANCIS J. BONANNO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>vs.<br><br>CELLULAR BIOMEDICINE GROUP, INC., *et al.*,<br><br>Defendants. | CASE No.: 3:15-CV-01795-WHO<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff, Michelle Jackson ("Lead Plaintiff") and named plaintiffs Ervin D. Windom, Ding Liang and Beverly J. Nissenbaum ("Named Plaintiffs" and, together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants Cellular Biomedicine Group, Inc. ("CBMG" or the "Company"), Wei "William" Cao ("Cao"), Institutional Analyst, Inc. ("IAI"), Roland Rick Perry ("Perry"), Wide World of Stocks ("WWOS"), Damon Roberts ("Roberts") John

McCamant ("McCamant"), SNN, Inc. ("SNN"), and Shelly Kraft ("Kraft"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cellular Biomedicine Group, Inc., ("CBMG" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired CBMG securities between December 10, 2014 and April 7, 2015, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2. Defendant CBMG was incorporated in 2001. Its shares trade on the NASDAQ exchange under the ticker symbol "CBMG." It began as a mobile entertainment company, shifted to investment consulting and ultimately was a virtual shell into which a new, Chinese Operating Company that claimed to focus on biotechnology merged. CBMG is the result of a reverse merger with a Chinese operating company of a similar name.

3. The Company claims to be developing cell-based therapies to treat serious chronic and degenerative diseases, such as cancer, osteoarthritis, tissue damage, various inflammatory diseases, and metabolic diseases. It claims to utilize proprietary cell based technologies, including immune cell therapy for the treatment of a range of cancers; human adipose-derived mesenchymal

progenitor cells for the treatment of joint and autoimmune diseases; and tumor cell specific dendritic cell therapy.

4. CBMG competes against vastly larger companies that are far better capitalized who partner with each other and with research institutions, spending billions on technology, technologists, research, development and clinical trials. The Company did not start off with technology or robust intellectual property of its own. Rather, its purported reason for existing is to leverage cell-therapy technology in the Chinese healthcare market. Except that stem cell therapies are not widgets. Whichever competitor successfully develops therapies will commercialize its intellectual property worldwide. Thus, unless CBMG intends to violate others' intellectual property, being in China seemingly offers it no discernable competitive advantage, especially given its vow to employ United States and European standards and protocols in the development and testing of its potential therapies. That said, CBMG projects itself as a stem cell China-play and once exposed to the market, Defendants knew, small retail investors were bound to be attracted once it achieved a certain recognition – recognition that due to its lackluster story was difficult to achieve.

5. By 2014, therefore, the Company's real reason for existing became raising enough money to purchase technology that may or may not ultimately produce a therapy and to conduct clinical trials on potential therapies. The Company needed large cash infusions both to purchase the technology and to run the clinical trials. In an effort to avoid the scrutiny of a registration of securities with the SEC, however, the Company chose private placements as its funding source of choice. It promised investors that it would file a registration statement, enabling them to trade their shares, as soon as reasonably practical. Thus, market price for the shares that already traded was critical.

6. Because the Company's story was uninspiring, by late 2014 it decided to pay multiple purported "investor relations" firms to create positive spin through bespoke analyst coverage on the stock with the sole goal of raising CBMG's price. CBMG's decision to retain multiple paid promoters was strategic. While a single paid promotion is unlikely to materially affect stock price, a broad campaign of such promotions is more likely to influence investors, particularly where the existence of the concerted campaign is unrevealed. Part of the Company's strategy was hiding from the investing public the very fact of a campaign. Though the promoters themselves promoted each other, thus immunizing the taint of the paid aspect of the promotions, none ever revealed the existence of or their participation in a campaign, nor did the Company.

7. Each promoter masked the true nature of its involvement. Some admitted that CBMG had paid them, but misled by claiming that payment was for services other than paid promotions. These same promoters, and others, hid incomplete and/or false disclosures by making them inconspicuous, forcing the reader or viewer to click through multiple hyperlinks, many marked in ways that did not logically suggest that relevant information would be found after the next click, or the click after that.

8. Worse still, Defendant Cao himself appeared in multiple promotional videos, falsely couched as legitimate interviews, and including purportedly independent "experts." The Company touted these interviews in press releases, never revealing that viewers were watching paid advertisements that were part of a sustained campaign. The videos themselves contained no indication that they were advertisements, or that the Company was paying for a campaign.

9. This promotional campaign was presented in different forms. Under the guise of serious financial analysis, "analysts" wrote long, glossy reports touting CBMG, and referencing the Company by way of comparison with much larger, more successful biotech companies, creating the impression that CBMG deserved to be mentioned with these competitors. Others produced

professional looking broadcasts, complete with purportedly "independent experts," themselves paid to promote the Company, in a concerted effort to make it seem as if CBMG had attracted the attention of legitimate, independent analysts whom investors should believe. While such paid promotions can be legal, they are only legal if the promoter clearly discloses to otherwise unsuspecting potential investors that the issuer has bought and paid for the purported research, and, as here, that the promoter was participating in a larger promotional campaign.

10. By late November, 2014, the Company entered into an agreement to pay Defendant Wide World of Stocks to promote CBMG. In mid-January, 2015, WWOS uploaded a half hour broadcast to various internet sites. The broadcast followed a tried and true format. A broadcast "anchor" first discussed the broad biotech market. He then introduced a purportedly independent analyst, Defendant John McCamant, who continued the discussion on the broad market, narrowing its focus to well-established companies within that market. Left undisclosed was that McCamant had previously been labeled an "expert" by Streetwise Reports ("Streetwise"), another paid promoter participating in the campaign. They then introduced with glowing praise and interviewed Defendant Cao, CBMG's CEO, who was paying both Wide World of Stocks and McCamant to promote the Company. At no point during the broadcast did the anchor, the purportedly independent Defendant McCamant or Defendant Cao disclose that the Company bought and paid for the broadcast. While clicking through several links displays an obtuse disclosure about the producer of the broadcast, it is insufficient on its face, never mentioning the campaign, or specifically stating that McCamant was paid to appear in the video. Nor would the reasonable investor watching the promotion have any reason to believe that somewhere, undisclosed and inconspicuous, there existed information about a promotion, and thus had no reason to click through to WWOS' website, and then to continue to click through to a disclosure.

11. After WWOS produced its broadcast, other paid analysts began to produce research content that they uploaded to the internet for unsuspecting investors. These posts took the form of very professional looking research reports or interviews with the analysts who drafted them. For example, LifeTech Capital ("LifeTech") and its analyst, Stephen M. Dunn ("Dunn"), produced multiple long, dense research reports on CBMG, in each of which, through hyperlinks, the reader could reach a disclosure where these LifeTech and Dunn baldly denied being paid to promote the Company, instead claiming payment for services unrelated to the promotion of CBMG, such as "strategic consulting." Never did LifeTech or Dunn reveal not only that they were being paid for promoting the Company, but their participation in a scheme designed to overwhelm investors and convince them that the Company had achieved success it in fact had not.

12. After the publication of each Dunn and LifeTech report, Defendant Institutional Analyst, Inc. uploaded press releases, from LifeTech, to its own website, summarizing Dunn's research opinion while omitting all reference to any payment LifeTech and Dunn received for any services they may have performed for CBMG. While Dunn's bottom line appears, making it available to investors, it is attenuated from the initial report which was paid for by CBMG. Never did IAI reveal, or hint, that it, LifeTech and Dunn were participants in a concerted campaign to promote CBMG.

13. Just as WWOS had showcased Defendant McCamant, anointed previously by Streetwise Reports as a purported "independent" "expert," Streetwise Reports published an interview with Dunn, presenting him as an "independent" "expert." As in WWOS's broadcast, Streetwise Reports interviewed Dunn about the broad biotech market and some well-established companies therein. Towards the end, Dunn promoted CBMG, seemingly as an afterthought, cleverly linking the Company he was paid to promote with companies that had actually earned success. Streetwise admitted that CBMG was a "sponsor" of Streetwise's, but clicking through to

the definition of "sponsor" led any reasonable investor to conclude that CBMG paid Streetwise for services other than promotion. The "interview" succeeded in immunizing Dunn from the taint of his status as a paid promoter, as no reader of the interview, or of the disclosures of Dunn, LifeTech or Streetwise, would logically conclude that CBMG was paying any of these individuals or entities to promote it. As for the fact of CBMG's campaign, neither Streetwise nor Dunn ever mentioned, or even hinted at, its existence. The opinion from a purported expert like Dunn progressed from original research reports to an interview that presented Dunn as an independent expert, to all of that content being uploaded to a broad investor web-site like *SeekingAlpha.com*.[1] That progression – that sophisticated daisy chain of posts that ultimately disassociated promotion from payment – sterilized the promotions of their taint as bought and paid for materials.

14. All of the promoters, including Dunn, LifeTech, Streetwise Report, IAI, WWOS, and SNN, lacked independence, and their disclosures about payment were either buried behind so many links that a reasonable investor would never think they existed, or believe there was a reason to look, and/or obfuscated the fact of payment for promotion by claiming that payment was for reasons other than promotion. None revealed to investors the true nature of the paid promotional campaign, or its existence. CBMG and Cao furthered the deception, promoting individual promotions without revealing that they were indeed promotions, and never revealing the existence of a campaign designed to boost its stock price, even as they filed with the SEC documents wherein they wrote of the risk of stock volatility.

15. Defendants' scheme was successful. During the Class Period, the Company's stock price soared in direct response to the promotions, from a January 2, 2015 close of $13.79 per share

---

[1]*SeekingAlpha.com* is a financial news and analysis website. It publishes third party reports, analysis, and commentary as articles, and permits open discussion of the articles. As of February, 2014, *Seeking Alpha* had 3 million registered users, and as of August, 2013, received between 500,000 and 1 million unique visitors per day. It received *Forbes*' Best of the Web Award in 2007, and took first place in *Inc. Magazine*'s list of Essential Economic blogs.

to a high, Class Period close on March 23, 2015 of $47.06 per share. With the stock price inflated as a proximate result of the undisclosed paid promotion scheme, the Company issued shares of stock in a private placement at $38 per share, raising $20 million.

16. On April 7, 2015, a blogger known as "Pump Stopper" uploaded a post to *SeekingAlpha.com*, titled "Cellular Biomedicine: Strong Sell on Patient Death, Fraud Ties and Stock Promotion, -94.6% Downside." While Pump Stopper, who is apparently in the business of analyzing publicly traded companies, revealed the fact of some of the promotions, and in revealing multiple promotions, the campaign, even he was unable to discern the true extent of the campaign, or the insidious interrelated web of promotions. Though Pump Stopper included in the article his opinion that nobody should ever "invest in any company that pays to promote their stock," and that "[t]ime and time again we have seen how these end and with 10k+ stocks in the US alone, there is no reason I can see to invest in any company of this poor quality," his opinion was based on the newly disclosed fact of paid promotions.[2]

17. On this news, CBMG securities declined $7.00 per share, or over 21.7%, to close at $25.22 per share on April 7, 2015. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

[2] Pump Stopper wrote of multiple other reasons that he recommended against purchasing CBMG stock. Unlike the revelation of multiple paid promotions, however, all of these other reasons were based on facts long available to the market.

19. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

20. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred. Defendant CBMG maintains its headquarters and conducts business in this District.

21. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

22. Lead Plaintiff, Michelle Jackson purchased the common stock of CBMG during the Class Period as set forth in the certification presented to the Court in her motion for appointment as lead plaintiff, incorporated by reference herein, and has been damaged thereby.

23. Named Plaintiff Ervin D. Windom purchased the common stock of CBMG during the Class Period as set forth in the Certification previously presented to the Court in the Amended Complaint, and incorporated herein by reference, and has been damaged thereby.

24. Named Plaintiff Ding Liang purchased the common stock of CBMG during the Class Period as set forth in the Certification previously presented to the Court in the Amended Complaint, and incorporated herein by reference, and has been damaged thereby.

25. Named Plaintiff Beverly J. Nissenbaum purchased the common stock of CBMG during the Class Period as set forth in the Certification previously presented to the Court in the Amended Complaint, and incorporated herein by reference, and has been damaged thereby.

26. Defendant Cellular Biomedicine Group, Inc. ("CBMG" or the "Company") is a Delaware corporation with its principal executive offices located at 530 University Avenue, Suite 17, Palo Alto, CA 94301. CBMG's common stock trades on the NASDAQ under the ticker symbol "CBMG."

27. Defendant Wei "William" Cao ("Cao") was the Company's Chief Executive Officer ("CEO") during the entire class period. Mr. Cao's last day as CEO was February 6, 2016. The very next day, February 7, 2016, he became a consultant to the new CEO, at an annual salary of $145,000. Defendant Cao:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company, and that the statements were related to a promotional campaign designed solely to increase the Company's stock price; and

(f) approved of or ratified these statements in violation of the federal securities laws.

28. As officer, director, and controlling person of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ and governed by the provisions of the federal securities laws, Defendant Cao had a duty to disseminate accurate and truthful information promptly with respect to the Company's

business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue so as to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

29. CBMG is liable for the acts of Defendant Cao and the Promoter Defendants under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment and with authorization. Defendants Cao's and other Company employees' and agents' scienter is similarly imputed to CBMG under *respondeat superior* and agency principles.

30. Defendants Cao and CBMG are referred to collectively as the "Company Defendants."

31. Defendant Institutional Analyst, Inc. ("IAI") claims to be a privately held investment research firm. During the Class Period, IAI prepared and disseminated research reports in the "Biotech Stock Review" and web content, including through "Internet Stock Review," without adequately disclosing that it and its experts were paid to create and distribute that content, that it was republishing and promoting reports of other paid promoters, or the existence of and its participation in a promotional campaign.

32. Defendant Roland Rick Perry ("Perry") is the principal of IAI and principal draftsperson of the content it disseminates. During the Class Period, Perry prepared and disseminated research reports and other web content without adequately disclosing that IAI, he and its other experts were paid to create and distribute that content, that he was republishing and promoting reports of other paid promoters, or the existence of and his participation in a promotional campaign.

33. Defendant Wide World of Stocks ("WWOS"), a subsidiary of Valhalla Venture Group, LLC, claims to be "a print and digital content provider with multi-channel integration

including television, radio, video, webcasts, podcasts and a magazine in both digital and print formats that delivers visibility to companies in the micro and small-cap sectors." According to WWOS, its "program has been seen in 100+ million homes, regionally and nationally on cable and major networks including CBS, NBC, ABC, and FOX." During the Class Period, WWOS prepared and disseminated broadcast and written content without adequately disclosing that it and its experts were compensated to create and distribute that content, or the existence of and its participation in a promotional campaign.

34. Defendant Damon Roberts ("Roberts") is the Director & Television Host of WWOS. During the Class Period, Roberts prepared and disseminated broadcast content without adequately disclosing that WWOS and its experts were compensated to create and distribute that content, or the existence of and his participation in a promotional campaign.

35. Defendant John McCamant ("McCamant") claims to be an expert in the biotech market who controls content on several different internet sites, including BioInvest.com. During the Class Period, McCamant prepared and disseminated broadcast and written content without adequately disclosing that WWOS and he were compensated to create and distribute that content, or the existence of and his participation in a promotional campaign.

36. Defendant SNN, Inc. ("SNN") bills itself as "a global multimedia financial news and publishing company that focuses on market awareness and investor visibility for public and private microcap companies. The company publishes the MicroCap Review magazine and StockNewsNow.com." During the Class Period, SNN prepared and disseminated broadcast and written content without adequately disclosing that it was compensated to create and distribute that content, or the existence of and its participation in a promotional campaign.

37. Defendant Shelly Kraft ("Kraft") is a presenter for SNN. During the Class Period, Kraft prepared and disseminated broadcast and written content without adequately disclosing that

he and SNN were compensated to create and distribute that content, or the existence of and his participation in a promotional campaign.

38. Together, Defendants IAI, Perry, WWOS, Roberts, SNN, Kraft, and McCamant are hereafter designated as the "Promoter Defendants."

## SUBSTANTIVE ALLEGATIONS

### *The Federal Securities Laws on Stock Promotion*

39. Section 17(b) of the Securities Act of 1933, 15 U.S.C. 77q(b), is commonly known as the "anti-touting" provision. It prohibits publicizing information about a security without "fully disclosing" any consideration received or to be received, directly or indirectly, from the issuer. *Id.*

40. Congress enacted the anti-touting provision in part to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for."[3]

41. The SEC defines "microcap companies" as those with market capitalizations of less than $250 million and more than $50 million. According to its Annual Report on Form 10-K for the year ended December 31, 2014, filed with the SEC on March 31, 2015 ("2014 10-K"), as of December 31, 2014, CBMG had 9,182,429 weighted average shares outstanding. As of that same date, the closing price was $12.91 per share, giving CBMG a market capitalization of just over $118.5 million. As the class period began, therefore, CBMG was a microcap company.

42. In an "investor bulletin," the SEC has stated that "[s]ome microcap companies pay stock promoters to recommend or 'tout' the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows." The SEC continued that any such publication must "disclose who paid them for the promotion, the amount,

[3] *S.E.C. v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 376 (D.C. Cir. 1988) (*quoting* House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).

and the type of payment. ***But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice***." (Emphasis added).[4]

43. On June 2, 2014, the SEC issued an "Investor Alert," titled "Investment Newsletters Used as Tools for Fraud."[5] In that Alert, the SEC urged investors to "read carefully" newsletters and other promotional materials for information about whether the issuer compensated the promoter for a favorable article. In particular, the SEC warned about promoters who disclosed not having received compensation or those that offer only vague disclosures – who fail specifically to disclose who paid them, the amount, and the type of payment. The SEC further warned of promoters' "disclosures [that] are difficult to find or appear in tiny, hard-to-read print. "Even if a newsletter makes specific disclosures about being compensated for promoting a stock," the SEC continued, "be aware that fraudsters may include such disclosures to create the false appearance that the newsletter is legitimate." CBMG and the Promoter Defendants engaged in just such a scheme.

***Background on the Company***

44. CBMG began operations as a manufacturer of mobile entertainment products. In 2005, it exited that market, dedicating "its activities to providing investment related services in Asia, with a strong focus on high GDP growth countries, such as China." On February 6, 2013, the Company claims, it merged into CBMG (BVI), changing the Company name to Cellular Biomedicine Group, Inc. The Company continued to operate its investment related business until June 23, 2014, when it discontinued those operations, instead "focusing its resources on becoming a biotechnology company bringing therapies to improve the health of patients in China."

---

[4] http://www.sec.gov/investor/pubs/microcapstock.htm.

[5] http://investor.gov/news-alerts/investor-alerts/investor-alert-investment-newsletters-used-tools-fraud.

45. The Company claims to have founded its biomedicine operations "as a newly formed specialty biomedicine company by a team of seasoned Chinese-American executives, scientists and doctors." The Company claims a "good manufacturing practices" ("GMP") facility in Wuxi, China and "a U.S. Food and Drug Administration ("FDA") GMP standard protocol-compliant manufacturing facility in Shanghai." According to the Company, its "focus has been to monetize the rapidly growing health care market in China by marketing and commercializing stem cell and immune cell therapeutics, related tools and products from our patent-protected homegrown and acquired cell technology, as well as by utilizing exclusively in-licensed and other acquired intellectual properties." The Company claims that its current focal points are on therapies for cancer and other degenerative diseases.

46. The Corporate structure is standard for a Chinese "reverse takeover." The Company owns a British Virgin Islands entity called Cellular Biomedicine Group, Ltd. (BVI) which, in turn, owns Cellular Biomedicine, Ltd. Hong Kong, which, in turn, owns Cellular Biomedicine Group (Wuxi), Ltd. ("Wuxi"). Wuxi has only a contractual interest in the purported products and research and development of Cellular Biomedicine Group, Ltd. (Shanghai). As such, the Company does not own its operating assets, but only has a commercial interest in them.

***The Biotech Industry and CAR T Sector***

47. The biotech industry is fiercely competitive, and the race is on to develop safe and effective therapies, using the body's own cells, to treat various cancers, the very space in which CBMG claims to operate. This particular sector is well-populated by companies with very deep resources, such as Juno Therapeutics ("Juno"), willing to make massive investments in research and product development, and who are far ahead of CBMG in both clinical trials and results. For example, in an April 1, 2015 article in The Scientist, titled "The Car-T Cell Race," author Vicki Brower ("Brower") wrote that in late 2014, Juno, founded in 2013, reported that its chimeric antigen

receptor (CAR) T-cell therapy, successfully achieved remission in 24 of 27 adults with refractive acute lymphoblastic leukemia (ALL). Six of those patients remained in remission for more than a year. According to Juno's founder, "CAR therapy is at the same time cell therapy, gene therapy, and immunotherapy. It represents a radical departure from all forms of medicine in existence until now." Juno boasts of "four CD19-targeting CAR T-cell therapies in trials," and is also in trials for a number of solid cancers. According to Brower, Juno's success has increased its valuation to $4.7 billion.

48. Nor is Juno the only late-stage, well-capitalized corporation in the field. Brower noted that the space in which Juno operates is crowded, "experiencing a frenzy of scientific activity, corporate partnering, and financing that took off in late 2013, continued throughout 2014, and moved straight into the new year with no sign of letting up." She wrote that "most major pharmaceutical companies have jumped into the CAR T-cell arena. In the past two years alone, at least half a dozen companies have made deals worth hundreds of millions of dollars up front, with much more expected in the future as products move through the pipeline." Dozens of clinical trials are already ongoing. Brower named other major players in the CAR T race, both commercial and non-commercial, and noted collaborations among the two, including Kite Pharma, Bellicum Pharmaceuticals, the MD Anderson Cancer Center in Houston, and the University of Pennsylvania/Novartis collaboration.

49. Indeed, on July 1, 2015, Bob Grant published an article in *The Scientist*, titled "CAR-T Therapies Get $1 Billion Boost – The biotech firm Celgene inks a huge collaboration deal with Juno Therapeutics to develop and commercialize new cancer immunotherapies." In his article, Grant wrote that CAR T-cell cancer therapies "just got a big shot in the arm. Celgene, the global biopharmaceutical company headquartered in New Jersey, signed a $1 billion deal with Juno Therapeutics to develop CAR T-Cell immunotherapies for cancer." According to Celgene's CEO,

"Juno has assembled world class experts and built impressive capabilities and technologies in the areas of T-cell biology and cellular therapy; we believe this long-term collaboration enhances the potential of both companies to deliver transformational therapies to patients with significant unmet medical needs." Importantly, while Juno would retain U.S. rights to commercialize its products, "Celgene will have options to commercialize Juno's programs outside North America."

50. Citing to a recent report by EP Vantage, the editorial team at life science market intelligence firm Evaluate Ltd, Brower warned that "while investor enthusiasm for this sector is unlikely to diminish anytime soon, 'there may be hidden dangers' for those in it to make a big return." Quoting author and biochemist Jacob Plieth, Brower stated that while CAR T therapy is potentially revolutionary, "numerous risks are being lost in the hype. It is important to appreciate the risks as well as the opportunities to have a clear understanding of the market potential of these therapies and their developers." Brower concluded that given the many CAR T-cell trials in leukemia and lymphoma in progress or about to commence, "[s]cientists in this arena are energized by these and other results, and many see CAR T-cell therapies as the future of cancer treatment. Brower never mentioned any micro-cap companies in her piece.

51. CBMG recognized the fierce nature of the competition in the CAR T therapy filed in its 2014 10-K. "To date there are over thirty publicly listed and several private cellular biomedicine focused companies outside of China with varying phases of clinical trials addressing a variety of diseases," the Company wrote. "We compete with these companies in bringing cellular therapies to the market." Claiming to follow "international standards" for its trials and facilities – including numerous international and Chinese certifications, the Company claims that its "focus is to develop a core business in the China market. This difference in focus places us in a different competitive environment from other western companies with respect to fund raising, clinical trials, collaborative partnerships, and the markets in which we compete."

52. In the 2014 10-K, the Company noted the Chinese government's interest in enabling Chinese companies to compete in biotechnology, including funding from the "973 Program [which] has funded a number of stem cell research projects" in China. While naming "two large stem cell companies in China," Defendants conclude that "none of the Chinese companies are utilizing our proposed international manufacturing protocol and our unique technologies in conducting what we believe will be full compliant CFDA-sanctioned clinical trials to commercialize cell therapies in China."

53. This is the market that defendants chose to enter in 2013, without any company owned-or developed technology. The Company bound itself to "western" standards and protocols, has received no funding from the Chinese government, and recognizes the fierce global competition. Yet somehow, it contends that it can compete with, and indeed overcome the head start of, the much larger and better-funded "western" and "worldwide" companies and commercial-academic collaborations who are its competitors, and who the Company admits, "include pharmaceutical, biopharmaceutical and biotechnology companies, as well as numerous academic and research institutions and government agencies engaged in drug discovery activities or funding, in the U.S., Europe and Asia." Acknowledging its status as a minnow in a sea of whales, the Company wrote that "[m]any of these companies are well-established and possess technical, research and development, financial, and sales and marketing resources significantly greater than ours."

54. The Company acknowledged that even in China the future might bring "more fierce market competition." According to the Company, in 2015, "Eli Lilly and Company (NYSE:LLY) and Innovent Biologics, Inc. (Innovent) announced one of the largest biotech drug development collaborations in China to date between a multi-national and domestic company," a collaboration "to support the development and potential commercialization of at least three cancer treatments

under the next decade." Notwithstanding this sobering development, the Company continued to tout its "strategic advantage over our competitors based on [its] ability meet CGMP regulatory requirements," unlike its peers in China. Though "[m]eeting exacting standards and achieving extremely high purity levels is crucial to success," the Company somehow claimed an advantage over rivals in the Chinese market because of lower cost.

***The Company's Need for Acquisitions and Cash***

55. About its operations, in the 2014 10-K, the Company stated, "[t[he majority of our biomedicine business is in the development stage. We intend to concentrate our business on cell therapies and in the near-term, carrying our [knee osteo-arthritis ("KOA")] stem cell therapy and cancer immune cell therapies to commercialization." The Company's most advanced cell therapy "involves adipose-derived mesenchymal stem cells to treat KOA." The Company estimates that it will be able to commercialize its KOA therapy within the next three to five years.

56. With respect to technology and research and development, however, the Company has been dependent on purchasing existing companies and their technologies, and requires cash to fund those purchases. In the context of Celgene's $1 billion spend to buy into Juno, these expenditures are tiny, and may portend that the technology CBMG is buying is worth what it pays for it – very little.

57. For example, on September 26, 2014, the Company acquired all of the outstanding equity of Agreen Biotech Co. Ltd. ("Agreen") for aggregate consideration of $17,747,415, consisting of $3,240,000 in cash and the issuance of 753,522 shares of CBMG common stock. According to Defendants, Agreen is a "biotech company with operations in China, engaged in the development of treatments for cancerous diseases utilizing proprietary cell technologies, which include preparation of subset T Cell and clonality assay platform technology for treatment of a broad range of cancers by AG's primary hospital partner, Jilin Hospital." Agreen became a wholly-

owned subsidiary of the Company's Shanghai affiliate.

58. According to the 2014 10-K, the Agreen acquisition enabled the Company to "generate technical services revenue comprised of T Cells Receptor ("TCR") clonality analysis technology and T Central Memory Cell ("Tcm") and Dendritic Cell ("DC") preparation methodologies." Of the Company's Agreen acquisition, Defendants stated, "[w]e plan to integrate CBMG's state-of-the art infrastructure and clinical platform with the aforementioned acquired technologies to boost the Company's Immuno-Oncology presence, and pave the way for future partnerships." It continued, "[w]e plan to initiate certain cancer clinical trials in China upon receiving acceptance of the clinical trial designs with the principal investigator and obtaining the requisite approvals. We have yet to derive revenue from our CAR-T or anti-PD-1 technologies." In addition, in 2014, the Company reported pro forma results, including revenue of $1,762,791, of which $1,198,414, or 68%, was revenue from Agreen.

59. The Agreen acquisition highlighted the Company's need to acquire new technologies and revenues, and the importance of the market price of its common stock. As a factor in any valuation decision, the higher the market price of its common stock, the fewer shares the Company would be forced to issue as consideration for any merger. In turn, the higher the market price of the Company's stock, the lower the dilution of the then current shareholders' interests, including those of the senior officers, directors and founders of CBMG.

60. In the first two months of 2015 the Company made two further purchases. On January 9, 2015, it announced that it had acquired from a company called Persongen Biotechnology, Ltd. "third generation CAR-T, anti-PD-1, CD19 and aAPC cancer immunotherapy technologies." Except for the Company's notice, little information about Persongen is available on the internet. Nor did the Company issue a press release announcing either the acquisition or the price it paid. While the Company disclosed the acquisition in the 2014 10-K, it did not disclose the

price.

61. On February 9, 2015, CBMG issued a press release, attached to a current report on Form 8-K, disclosing that it had acquired technology, including Car T therapy, from "Chinese PLA General Hospital's ("PLAGH")." According to Defendants, PLAGH had "conducted several preliminary clinical studies of various CAR-T constructs targeting [four different types of cancer]." What Cao and CBMG failed to reveal, however, was that "PLAGH" stands for "People's Liberation Army General Hospital," i.e., that PLAGH is the largest hospital under the auspices of the People's Liberation Army. This information, had it been revealed, would have been seen as a red flag, as it would have raised doubts about what rights the Chinese Army had actually given up to this small private company, and what technology CBMG actually purchased and controlled – if any. The Company further failed to disclose its exact interest in the technology, or where the technology stood with respect to its competitors in the race to commercialize.[6]

62. Though these acquisitions made it readily apparent, the Company admitted in the 2014 10-K that financing was critical to the Company. While it completed a private placement in 2014, raising over $19 million, its cash burn was significant and it needed to acquire technology to enable it to grow. As the Company stated in the 2014 10-K, "to finance our medium to long term plans, we intend to rely upon external financing. This financing may be in the form of equity and or debt, in private placements and/or public offerings, or arrangements with private lenders." The Company continued that "[d]ue to our short operating history and our early stage of development, particularly in our biomedicine business, we may find it challenging to raise capital on terms that are acceptable to us, or at all." The Company expressed that its "negotiating position in the capital raising process may worsen as we consume our existing resources. Investor interest in a company

[6] While the Company took upon itself the funding of costs and expenses in connection with clinical trials, "PLAGH is responsible for obtaining governmental approval for the clinical trial related to the Technology."

such as ours is dependent on a wide array of factors. . . .”

63. In discussing the issuance of additional equity, the Company enumerated certain risks, such as equity-holder dilution, and the potential failure of its stock price to “reach levels necessary to induce option or warrant exercises. If we are unable to raise the capital necessary to meet our medium- and long-term liquidity needs,” the Company stated, “we may have to delay or discontinue certain clinical trials, the licensing, acquisition and/or development of cell therapy technologies, and/or the expansion of our biomedicine business; or we may have to raise funds on terms that we consider unfavorable.”

64. If CBMG, an amoeba in a sea of well-capitalized, technologically advanced competitors, was to succeed, it would have to raise money to acquire technologies it had not developed on its own. In 2014, however, biotech stocks fell into brief disfavor. On November 16, 2014, “The Life Sciences Report,” a publication of Streetwise Reports,[7] a stock promotion website, discussed more fully below, published a report on the biotech industry.[8] The Report stated that “[w]hen the biotechnology market hit a speed bump in early 2014, every stock in the sector was jolted. Large-cap biotech and big pharma have largely recovered, but small- and micro-cap companies haven’t yet entirely recouped the losses.” The report continued that “[t]he performance of Streetwise Reports’ Biotechnology Watchlist to date reflects this trend: The portfolio lingered

[7] Streetwise Reports claims “to share promising investment ideas in a changing world.” It provides what it calls “authoritative interviews with leading industry experts and analysts” that “provide a clear picture of the causes of macro-economic shifts and the strategies that will help you capitalize on these developing trends.” The Company claims that it integrates its “valuable insight . . . with in-depth company information, summaries from the latest research and news that will help you make smart investment decisions.” During the Class Period, Streetwise prepared and disseminated research reports, interviews and other web content without adequately disclosing that it was paid to create and distribute that content, that its “experts,” themselves, are paid promotes, and without disclosing the existence of and its participation in a promotional campaign. *See* http://www.streetwisereports.com/.

[8] http://www.thelifesciencesreport.com/pub/na/16357.

in negative territory after the late-winter punch, and hovers near breakeven as of Nov. 3. To get a handle on the drivers of small-cap stock price volatility," the report stated, it sought analysis from "a pair of the analysts who selected companies for its 2014 Watchlist, John McCamant of the Medical Technology Stock Letter and George Zavoico of MLV & Co."

65. The analysts noted that in the wake of the decline the biotech indices experienced during early 2014, while "the major indices, such as the NASDAQ Biotechnology Index (IBB), which is up about 30% year-to-date, have since rallied," the small-cap and micro-cap stocks – "like those on the Watchlist" – did not recover. The report described McCamant's "thoughts on what might be behind the market volatility, and [] his reflections as noted in the September 2014 issue of his Medical Technology Stock Newsletter." McCamant described as "frustrating" the quick retreat and failure to recover of stocks on The Life Science Report's "Biotech Watchlist" "despite a slew of positive fundamental events." McCamant continued, observing that "[b]iotechnology stocks appear stuck in a trading range. . . . Based upon exceptional fundamentals and overwhelming catalyst calendar," however, McCamant "expected stock prices to hold steady."

66. This swoon in micro-cap and small-cap biotech stocks coincided with The Company's retreating from its investor relations push in 2013. According to the 2014 10-K, the Company reduced its investor relations expense in 2014 by $1,503,000 from 2013. While CBMG's stock price had increased to over $15 per share on the heels of the commencement of trading on the NASDAQ, reaching into the $30 per share range in the summer of 2014, its reduction in investor relations spending corresponded to a lackluster performance. By the fall of 2014, CBMG's stock price had fallen to $15-$16 per share – not high enough for the Company to reap the proceeds it needed to pursue the acquisitions that it required to sustain any growth whatsoever. The Company turned back to purported investment relations professionals in the fall of 2014 to push the price of

CBMG's stock higher, in turn enabling the Company to issue stock in a March, 2015, private placement at more than twice the November 6, 2014, $16 close.

***The Company's Undisclosed, Interrelated Stock Promotion Campaign***
***The WWOS Promotional Video***

67. The promotional campaign to artificially increase CBMG's stock price began with the recording and uploading of a paid promotional video by Defendant WWOS on or around January 15, 2015.[9] WWOS bills itself as "a print and digital content provider with multi-channel integration including television, radio, video, webcasts, podcasts and a magazine in both digital and print formats that delivers visibility to companies in the micro and small-cap sectors."[10] WWOS boasts that its broadcasts "ha[ve] been seen in 100+ million homes, regionally and nationally on cable and major networks including CBS, NBC, ABC, and FOX." Each trading day, small, relatively unsophisticated investors "tune-in" to WWOS's broadcast on BizTV[11] and Youtoo America. In addition, WWOS makes full episodes of its broadcast available on its YouTube Channel.[12]

68. On January 15, 2015, the Company issued a press release, announcing "that the interview with Dr. William (Wei) Cao, Chief Executive Officer of Cellular Biomedicine Group, will be broadcast on Wide World of Stocks today, Thursday, January 15, at 5:00 p.m. and 6:00 p.m.

---

[9] WWOS is a wholly owned subsidiary of Valhalla Venture Group ("VVG"). Small and micro-cap issuers pay VVG and its affiliates to promote their stocks to greater market valuations and stock prices when the actual value story is weak.

[10] http://wideworldofstocks.com/about-us/.

[11] BizTV lists WWOS as one of its shows. It brags that WWOS "showcases companies that are only being held back by their inability to gain visibility on Wall Street and Main Street." *See* http://www.biztv.com/shows/232-wide-world-of-stocks. BizTV claims to reach 50 million households daily. However, nowhere does BizTV state that WWOS is a paid promotions mill, nor does BizTV link to WWOS' practically unfindable disclosure. Viewers of WWOS programming on BizTV have no way to discover that WWOS is paid for promotions.

[12] http://wideworldofstocks.com/watch-now/.

EST into more than 50 million homes nationwide over BizTV, BizTV Radio, and Youtoo America Networks." About the interview, the Company continued, Defendant "Cao provides insight into the company's recent successes from" several of its knee osteoarthritis trials and "other clinical progress. Cao stated, "[i]t was a pleasure to present Cellular Biomedicine Group's compelling value proposition. We are looking forward to continued progress in our clinical trials and communicating this information to our shareholders and partners." The press release concluded with a list of internet links on which investors could view the broadcast, and a blurb about WWOS. The press release never disclosed that the Company paid WWOS to produce and broadcast the interview, that the Company paid all of the participants appearing in the video, or that the interview was just one small part of a larger promotional campaign orchestrated and paid for by the Company.[13]

69. All of the participants in the WWOS video were either paid by Defendant Cao and the Company, or, in the case of Cao, who himself appeared in the video promotion, paid all of the other participants. Any viewer of the professional-looking promotion would believe that he was watching a legitimate news segment. There was no text on the video announcing that this was a promotion, nor any text below the video, on a computer screen, informing as much. None of the speakers in the video ever state that they are participating in, or that the reasonable investor is watching, a paid promotion. None of the speakers discloses the existence of the interrelated, multi-promoter promotional campaign. Nor would the reasonable investor watching the promotion have any reason to believe that somewhere, undisclosed and inconspicuous, and only after beginning the journey by clicking on a button inconspicuously marked "see more," could a disclaimer from WWOS be found.

[13] http://www.cellbiomedgroup.com/newsroom/interview-with-ceo-dr-william-cao-on-wide-world-of-stocks-television/.

70. On or around January 15, 2015, WWOS broadcast an episode of its show, titled "BioTech Blitz 2015 - Cellular Biomedicine Group (NASDAQ:CBMG)," and uploaded the episode to YouTube. The broadcast is sophisticated, reminiscent of broadcasts on network business news channels, complete with a professional set and scrolling content. WWOS host Damon Roberts, reporting from the JP Morgan Healthcare Conference, tells viewers that WWOS' goal is "to provide investors with innovative, high quality investing ideas from the top minds in the biotech space and to focus on more investing insights, expanded company information and new expert perspectives."

71. The video followed the familiar playbook for promotional videos attempting to pass as real content, with Roberts summarizing the market for healthcare generally, and biotech in particular. Roberts then introduced John McCamant ("McCamant"), editor of *The Medical Technology Stock Letter* ("MTSL"), as an "expert." The viewer cannot know that McCamant is a hired shill, paid by the Company and Cao through WWOS, because that information is not provided in any format. Nor can the viewer discern that another promoter in the Company's promotional campaign, Streetwise Reports, lists McCamant as an independent "expert" on its own website, thereby providing McCamant with the imprimatur of undeserved authenticity and independence.

72. McCamant, who claims 25 years as a biotech analyst and expert with extensive industry knowledge, first presented his general overview of the industry, mentioning two established global biotechnology companies, Gilead Sciences, Inc. and AbbVie, each with multi-billion dollars in revenue in second quarter 2015. He intended this technique to establish his *bona fides* by seeming to have analyzed these well-established, well-capitalized companies, while subtly drawing a comparison between them and the real subject of the program, CBMG. Roberts then shifted the conversation to smaller companies within the biotech space, providing an opportunity for McCamant to segue into a discussion of CBMG, whom he wanted viewers to believe belonged in the same conversation with these successful companies.

73. Roberts and McCamant then interviewed Defendant Cao. In response to questions, Cao stated that the Company's osteoarthritis treatment was then a much larger part of the Company's business and far closer to commercialization. About the Company's immunotherapy cancer treatments, Cao acknowledged that the Company depended on technology acquisitions to fuel its product growth, stating, "we are acquiring new technology, putting all the pieces to the puzzle together to formulate a strategy to tackle the hematological cancers and solid tumors." Cao continued that the Company's strategy was "to build a platform for [the] China market and to attract mature, therapeutic technology and to put into clinical trials and commercialize them in the China market."

74. Later in the interview, McCamant questioned Cao about the spate of recent fraud cases at Chinese RTOs involving elaborate accounting and business fraud schemes, and the possible effect of this trend on the Company. Apparently without irony, Cao responded by touting facts to establish the Company's rigorous ethical structure and virtuous nature, stating that, "we are probably the first one [out of thousands] to jump out from OTC to NASDAQ. That tells all and our compliance and corporate governance and practice of business is all international standards and our board members are mixed with U.S. board members and European board members. So being uplisted from OTC and being the first one as a pure play biomedicine company out of all Asia, that tells all on these questions. So we were struggling last year, as we said, educating investors, but I think the fact. . . the results tells all that we are on the right track. We are in the best stage of the Company's development so we are ready to continue our corporate development strategy and rapidly [buy] other companies and build up more platforms to push out the product [to market]."

75. Roberts continued with fawning questions touting the Company, stating "it definitely seems like we're catching you at the start of a long term upswing in value for your investors that seems like it's being driven by your IP portfolio and the results of your clinical trials

and smart business decisions, as you said, the management team has made." In his last question to Defendant Cao, referring to "a lot of first time investors watching you tonight as we broadcast all across the Country," Roberts asked, "what's the most important thing you can tell an investor that we haven't covered yet on the show or something you'd like to reinforce?"

76. In response, Defendant Cao referred to the size of the Chinese market. "If [investors] can go personally to China and look at the China development, they'll be convinced the market is huge" and China's medical needs are substantially similar those in the United States with triple the size. Cao continued that "there is no therapy for certain diseases. . . and [] China is lacking in technology to make new medicines. CBMG," he claimed, "is so well positioned in the relatively insulated medical market and by translating the U.S. and European development technology into China and quickly push through the clinical trial based on international standards and then we commercialize them much faster than peers in the western world."

77. As noted, neither the Company, Cao, WWOS or McCamant ever revealed that the video was a paid promotion, or that the Company paid McCamant.

78. With respect to WWOS, on YouTube, beneath the video content, a message appears stating that the video is an interview by Roberts and McCamant of Cao.[14] Beneath that announcement is a button that simply reads "show more." Clicking "show more," reveals a page, stating, "Showcase during San Francisco Biotech Week," describing CBMG and providing a brief summary of the interview with Defendant Cao. At the very bottom of this page are the words, "[p]lease read the Wide World of Stocks disclaimer as it relates to all of our published materials: http://wideworldofstocks.com/legal/."

---

[14] https://www.youtube.com/watch?v=htl9qqqr_4E.

79. Upon clicking that link the reader finally arrives at WWOS's disclaimer page. Seven paragraphs down, WWOS reveals that it has entered into an agreement with CBMG to provide marketing services to a company called the Alkaline Water Company, Inc. ("Alkaline"),[15] and that "WWOS and Cellular Biomedicine Group Inc. ("CBMG"), have entered into an Agreement pursuant to which WWOS has agreed to provide marketing services to WTER for 3 months starting December, 2014." In consideration for providing such services, WWOS received ten thousand dollars." The disclaimer continues that "[t]his conflict of interest could affect the WWOS's objectivity in how the WWOS provides marketing services or chooses to feature CBMG on Electronic WWOS Content."[16] The disclaimer concludes, "CBMG also from time to time may reimburse the Company for the cost of engaging third parties to provide services for the CBMG in connection with the WWOS's provision of marketing services."[17]WWOS' relationship with fellow paid promoter McCamant goes deeper than simply one video, and demonstrates the interconnected maze of paid promoters legitimizing each other and obscuring their status as paid shills. On its website, WWOS lists BioInvest.com ("BioInvest") as a partner. BioInvest is the "web portal" of MTSL, McCamant's online newsletter. BioInvest claims to offer "in-depth research and analysis of a unique portfolio of bio-pharmaceutical companies and [its] insights regarding relevant trends in the biotechnology industry."[18] BioInvest, in turn, includes CBMG in its portfolio of stocks. The daisy chain extends even further and overlaps until it is difficult to know who is paid for what and

---

[15] http://wideworldofstocks.com/legal/. Alkaline's ticker symbol is "WTER."

[16] http://wideworldofstocks.com/legal/.

[17] In a subsequent version of WWOS's disclaimer, for 2015, WWOS states that it had entered into an agreement with CBMG to provide services to Alkaline for 12 months starting in March, 2015 for which "WWOS received thirty-two thousand dollars." It reiterated that "[t]his conflict of interest could affect the WWOS's objectivity in how the WWOS provides marketing services or chooses to feature CBMG on Electronic WWOS Content."

[18] http://wideworldofstocks.com/partners.

by whom. McCamant, as noted above, is listed as an "expert" for Streetwise Reports. Upon clicking on the link to one of his reports on Streetwise, the reader is redirected to… BioInvest, where, once again, the reader finds the model portfolio that includes CBMG. Nowhere on BioInvest, or on his link in Streetwise Reports, does McCamant disclose that he was paid by the Company, nor does Streetwise disclose that McCamant is a paid promoter, nor does WWOS reveal as much.

***The SNN Promotional Video***

80. SNN Incorporated is a global multimedia financial news and publishing company that focuses on market awareness and investor visibility for public and private micro-cap companies. The Company publishes StockNewsNow.com, MicroCap Review Magazine, and co-produces the Growth Capital Expo.

81. On February 4, 2015, the Company issued a press release, announcing "that an interview with Dr. William (Wei) Cao, Chief Executive Officer for the Company, conducted by Stock News Now (SNN Incorporated) at last month's J.P. Morgan Healthcare Conference in San Francisco, is now available online. The interview," the Company stated, "provides an overview of the Company's immune cell therapy platform focused on oncology and its Phase II clinical trial for Knee Osteoarthritis (KOA), which is differentiated by its use of the patient's own fat tissue. Also highlighted are the Company's impressive IP portfolio and its outlook for 2015 and 2016." The press release provided a link to the SNN video on Youtube.com. Nowhere in the Company's press release did it disclose in any way whatsoever that it had paid SNN to create and upload the content in question, or that the Company had orchestrated and paid for a promotional campaign designed to artificially increase its stock price.

82. On or about February 3, 2015, Stock News Now ("SNN") uploaded to its website,[19] Youtube.com and other web sites, a video of Defendant Kraft's interview of Defendant Cao.[20] The interview purports to be from the 2015 Healthcare Media Day in San Francisco. The interview consisted of Kraft asking Defendant Cao relatively simple questions and responding overwhelmingly positively to Cao's responses. Importantly, Kraft asked Cao how CBMG differentiated itself from competitors who make similar claims. Cao responded that CBMG operated in a relatively unpopulated market with respect to its knee-osteoarthritis treatment while acknowledging that the Company faced stiff competition in the immuno-therapy cancer space. Cao sought to distinguish Cellular Biomedicine by reference to its 60 patents in China and elsewhere at various stages. He praised the Company's strong science team and medical advisors and extolled its plan to innovate.

83. Kraft then prompted Defendant Cao to discuss the Company's prospects in 2015 and 2016. Cao responded that 2015 would be more exciting than 2014. "We are entering the fast growth phase. We are acquiring merge partnership leading technologies to fortify our IP portfolio." Cao continued that in 2016, the Company will "have major trial results coming out and we're going to have Phase IIB results coming out from osteo-arthritis and we're going to kick-off Phase II cancer trials in 2016, so both years we are very very excited. There are many news stories [that] will come out." Kraft concluded the interview, stating, "Dr. Cao, I'm telling you now that our audience is going to want to know more information" and prompting Cao to provide the Company's website.

---

[19] http://stocknewsnow.com/company/CMPNY02022015103/Cellular-Biomedicine-Group-Inc-#prettyPhoto.

[20] https://www.youtube.com/watch?t=8&v=DUWan26oF6k.

84. The SNN broadcast contained no disclaimer in print, nor any other language specifically disclosing the fact that CBMG paid SNN and Kraft to produce the promotional video. SNN's website leads the reader to conclude, falsely, that it has not been paid by the Company, reading that "[t]his SNN Website may contain company advertisements/advertorials, which are indicated as such."[21] It went on to state that information contained in an advertisement/advertorial is furnished by the company, and in the case of paid advertisements, SNN does not independently investigate the accuracy of information presented. The website continues, "Pursuant to Section 17(b) of the Securities Act of 1933, as amended, in situations where the owners, employees or affiliates of this SNN Website have received consideration for the advertisement/advertorial of a company or security, such fact will be disclosed in print."[22]

***IAI Touts CBMG***

85. As part of its interrelated promotional campaign, CBMG paid IAI to tout its stock through "analyst" reports from its principal, Defendant Perry. IAI bills itself as "a highly regarded investor and public relations firm specializing in creating market awareness programs for publicly-traded companies involved in thirteen distinct industries via industry specific financial web portals including the Internet, Biotech, Alternative Energy, Airlines and Private Equity."[23] Among the newsletters IAI publishes is *The Biotech Stock Review*, which it distributes "free to industry and trade executives."[24] According to the press release of one client, Trans-Pacific Aerospace, Chicago-based IAI "introduces small cap and micro-cap companies to professional investors

---

[21] http://stocknewsnow.com/company/CMPNY02022015103/Cellular-Biomedicine-Group-Inc-#prettyPhoto.

[22] http://stocknewsnow.com/legal.php#terms.

[23] http://tpacbearings.com/news/tpac-engages-institutional-analyst-inc.

[24] *Id.*

including investment brokers, small cap mutual funds, private investment managers and hedge fund managers."[25]

86. IAI publishes research reports, blog posts and analysis on the internet. For example, on May 4, 2011, *Internet Stock Review*, an IAI front, published "IAI's Special Situation Report," touting Trans-Pacific Aerospace. That Situation Report contained a "disclaimer,"[26] indicating that Trans-Pacific Aerospace had paid cash and shares for the article and reminding viewers that the decision to buy or sell a security was wholly theirs. "The Internet Stock Review," it wrote, "is owned by a Public Relations firm (Institutional Analyst Inc.) that specializes in getting (or creating) coverage for publicly traded companies. As such," it continued, "it is important to note that anytime we say anything about a company, it is because the company is a client of our parent company, or because we would like them to be a client of our parent company. In a nutshell, you can throw out any thoughts of us being even a little bit impartial. It just ain't gonna happen. We love everyone."

87. On January 16, 2015, IAI published an edition of "The Biotech Stock Review," on its own blog, The Internet Stock Review,[27] which was republished on *SeekingAlpha.com*. Discussing CBMG, Perry offered a glowing report, opining that with the stock trading at approximately $16.50 per share, mid-January, 2015 was an "Excellent Entry Point," and that his target price was $25.00 per share.

88. IAI's disclaimer stated that "Institutional Analyst, Inc., the parent company of the Biotech Stock Review," "is an investment research and public relations firm, which has not been compensated by CBMG or any other entity for investor and public relations services including but not limited to this report." Thus, IAI expressly denied what it had previously exuberantly admitted

[25] *Id.*

[26] http://internetstockreview.ning.com/profiles/blogs/ia-transpacific-aerospace-tpac.

[27] http://internetstockreview.ning.com/main/search/search?q=cellular+biomedicine.

as true, that CBMG was a client, and anything IAI said about the Company was part of a promotion. In addition to denying being paid for positive promotions, IAI, with knowledge of the layering effect of cross-promotions, failed to disclose the existence of the promotional campaign.

***The Promotional Campaign in Full Flower – LifeTech, Dunn, IAI and Streetwise***

89. LifeTech[28] is a purported research-focused biotechnology and medical technology investment bank. Stephen M. Dunn is LifeTech's Senior Managing Director of research. On February 2, 2015, LifeTech initiated research coverage of CBMG with a "strong speculative buy" rating and a price target of $23.75. The 25-page report, authored by Dunn, discussed CBMG's latest acquisitions and new market valuation. In the report Dunn stated, "[w]ith 4 human clinical and 2 preclinical programs in immuno-oncology, CBMG is now the leader in China for this promising cancer technology. We expect CBMG to continue their aggressive acquisition strategy for immuno-oncology drugs in China as well as sign development partnerships with western pharma companies for the Chinese market." Dunn's report failed to disclose either that the Company paid him and LifeTech for positive promotions, or the existence of the promotional campaign in which both Dunn and LifeTech participated.

90. On that same day, LifeTech issued a press release, summarizing Dunn's purported opinion and publicizing his price target. The press release failed to disclose payments LifeTech and Dunn received from CBMG for promotions, or the existence of the promotional campaign.

91. Dunn and LifeTech denied payment for promotional work, instead claiming that

[28] LifeTech Capital claims to be "a multi-disciplinary team of investment professionals specializing in serving the unique needs of the Biotech, MedTech and High-Tech industries and investor community." It boasts an institutional research team that purports to "provide[] exceptional industry insight into the complex analysis of determining the future value of drugs, devices and companies as well as access to leading key opinion leaders." It claims that "our institutional research team assists companies and investors in unlocking the value of science." It also claims to have investment banking and capital markets teams. LifeTech claims access to "a broad base of accredited retail investors through both Newbridge Securities Corporation and investor syndicates."

CBMG paid them for "strategic consulting services" from October 1, 2014 to November 30, 2014, and that it expected to seek or to receive compensation for "investment banking services" in 2015. However, the actual output produced by LifeTech and Dunn – multiple positive reports touting CBMG, press releases touting the reports, cross-promotions with IAI and Streetwise, each touting Dunn and LifeTech's promotions, or disseminating positive promotions of the Company – suggests strongly what LifeTech and Dunn refused to reveal, that CBMG paid them for positive promotion, and to participate in the promotional campaign whose only goal was to artificially increase the Company's stock price.

92. On February 9, 2015, CBMG issued a press release, attached to a current report on Form 8-K, disclosing that it had acquired technology from "Chinese PLA General Hospital's ("PLAGH")." What Cao and CBMG failed to reveal, however, was that "PLAGH" stands for "People's Liberation Army General Hospital," i.e., that PLAGH is the largest hospital under the auspices of the People's Liberation Army. This information, had it been revealed, would have been seen as a red flag, as it would have raised doubts about what rights the Chinese Army had actually given up to this small private company, and what technology CBMG actually purchased and controlled – if any. The Company further failed to disclose its exact interest in the technology, or where the technology stood with respect to its competitors in the race to commercialize.

93. On February 11, 2015, IAI published a blog post on the Internet Stock Review, which linked to its earlier CBMG promotion in the January 16, 2015 issue of the BioTech Report, as well as a press release, disclosing that LifeTech Capital and Dunn had initiated coverage of CBMG,[29] had issued a strong speculative buy" rating, and that Dunn had set a $23.75 price target. IAI provided a link to Dunn's report. It omitted, however, to disclose that itself, Dunn and LifeTech

[29]http://internetstockreview.ning.com/profiles/blogs/chart-of-the-day-cellular-biomedicine-group-cbmg-24-20.

were paid by the Company Defendants to promote CBMG, or the existence of the promotional campaign.

94. On February 17, 2015, only fifteen days after initiating coverage, LifeTech issued a second report, raising its price target for CBMG's stock to $32.50 per share. According to Dunn, the PLA General Hospital technology acquisition, about which he knew very little – because the Company had disclosed almost nothing – somehow propelled the Company's valuation higher by approximately 37%. This is a critical red flag in the context of the ease with which Dunn and LifeTech could have and should have discovered and disclosed that PLA referred to the People's Liberation Army. In light of the Company's glaring omissions, Dunn's failure to disclose the simple fact of the seller's real identity wholly betrays his intent to promote CBMG, rather than to offer meaningful, independent analysis. Dunn's report again failed to disclose either that the Company paid him and LifeTech for positive promotions, or the existence of the promotional campaign.

95. LifeTech again issued a press release, summarizing Dunn's purported opinion, publicizing his new price target, and reiterating his "strong speculative buy" rating. The press release failed to disclose either that the Company paid Dunn and LifeTech for positive promotions, or the existence of the promotional campaign.

96. That same day, IAI published another blog post on the Internet Stock Review, alerting viewers to LifeTech's target price change, and uploading LifeTech's second press release to its post. Once again, a LifeTech promotional report took on a life of its own, divorced from Dunn's inadequate disclosure of compensation for the report itself, republished by another promoter, removing the taint of paid promotions from Dunn's work. IAI again failed to disclose that itself, Dunn and LifeTech were paid by the Company Defendants to promote CBMG, or the existence of the promotional campaign.

97. On February 19, 2015, Streetwise Reports, which had previously sanitized promoter McCamant's status as a paid shill for CBMG by deeming him an independent "expert," published an edition of its online blog *The Life Sciences Report* ("TLSR"). Next to a banner to the right of the webpage stating that the interview mentioned CBMG, among other biotech firms, TLSR published an interview with LifeTech's Dunn, titled "Immuno-Oncology Promises Continued Wealth and Health: LifeTech Capital's Stephen Dunn." TLSR sought Dunn's opinion on the immune-oncology investment landscape in 2015. TLSR and Dunn engaged in a standard scheme, similar to the charade that WWOS, McCamant and Cao played in the WWOS promotional video. Dunn spent most of the interview touting the immuno-oncology efforts and offerings of some of the largest, best-capitalized, highest research and development spending pharmaceutical companies, including Merck & Co., Inc., Bristol-Myers Squibb Co., Pfizer, Inc. and Roche Holdings, AG.

98. Then, in response to TLSR's question about other stocks "under the radar" about which investors should be aware, Dunn recommended CBMG, attempting to pair the Company in investor's minds with the far larger, far more successful companies he had discussed. Unsurprisingly, he offered a positive review of CBMG, stating that "[w]e believe China will approve proposed regulations for cell therapy development in 2015, providing a pathway to approval for therapies like those being developed by Cellular Biomedicine. Investors should keep a close eye on this company during 2015." As with Dunn and LifeTech's earlier reports and press releases, this interview served only to promote the Company, and did not fit within the definition of "strategic consulting."

99. Directly after the interview's text appears a "Disclosure" in which Streetwise Reports lists CBMG as a "sponsor."[30] The page does not describe the meaning of "sponsor," or

---

[30] http://www.thelifesciencesreport.com/pub/na/16540?s=pdfqt-26409.

what CBMG could expect from Streetwise for the money it paid, which was not disclosed on this page. Rather, only after, for no apparent reason, having to click onto a separate page, does the investor learn that a sponsor pays Streetwise between $1,000 and $3,000 per month.

100. Rather than admit that the sponsorship money is in exchange for positive promotions, Streetwise's disclaimer falsely denies that the Company paid it specifically to produce positive promotions. Its very first claim with regards to sponsorship fees is that "[t]here are no specific performance expectations in exchange for these fees," a flat denial of payment for positive promotions. The "disclaimer" web page goes on to further dilute the fact of Streetwise's participation in a paid promotions scheme by stating that CBMG is paying not only for "sponsor-specific activities," but also for publication of materials unrelated to CBMG, stating that "[f]ees fund both sponsor-specific activities *and general report activities"* (emphasis added)), and for publications and materials that might instead promote CBMG's competitors, reading "[t]he fees also cover the costs for Streetwise to publish sector-specific information… and also create content by interviewing experts in the sector."[31] Streetwise never discloses that it has been paid by the Company for positive promotions, or, despite its participation in cross-promotions with both McCamant and Dunn, the existence of the promotional campaign.

101. As for Dunn, in the Streetwise "Disclosure" he repeats his "strategic consulting" claim, flatly denying, even as he participated in cross-promotions with Streetwise, LifeTech and IAI, and produced positive promotion after positive promotion, that he had been paid by CBMG to promote the Company or the existence of the promotional campaign in which he played a central role.

[31] http://streetwisereports.com/disclaimer/.

***The Undisclosed Promotion Scheme Fuels a Stock Offering, Netting the Company Critical Cash***

102. The Company's stock promotion scheme succeeded. With relatively little change in outlook, the Company's stock price rose in response to the paid promotions. The Company's common stock started the year with a January 2, 2015 close of $13.79. By January 20, 2015, the trading day after the IAI research appeared in *The Biotech Report*, the stock closed at $17.56. By February 19, 2015, the day Streetwise Reports joined the promotion daisy chain, the stock traded for $25.85. By March 5, 2015, the Company's stock price had breached $30 per share, closing that day at $32.39. The Stock stayed above $30 until Pump Stopper uncovered the promotion scheme on April 7, 2015, reaching a Class Period high close of $47.06 on March 23, 2015.

103. CBMG's stock gains far exceeded those of both its competitors, Kite Pharma ("Kite") and Juno, and the biotech index ("NBI") during the period of the promotions. On February 4, 2015, after LifeTech released Dunn's first report, and SNN uploaded its video interview of Defendant Cao, the Company issued a press release, quoting Cao and directing investors to the video. The next day, with no substantive change in the Company's fortunes, CBMG's stock rose 14.2%, with volume increasing by 649%. Kite's stock price stayed static that day, and volume *decreased* by 34%. Juno's stock price rose 6.4%, less than half as much as CBMG's, though volume *decreased* by 48.6%. That day, the NBI, tracking the entire biotech sector, rose by a mere 2.3%.

104. On February 11, 2015, IAI reissued its earlier glowing report, and shared the positive report of LifeTech and Dunn. From February 4-11, 2015, CBMG's stock rose 53.3%. During this same period Kite's stock price *decreased* almost 1%, the NBI rose a paltry 1.5%, and Juno's stock rose 8.2%, *i.e.*, more than six times slower than the Company's price growth.

105. The next eight days saw an onslaught of paid promotions and cross-promotions from

LifeTech, Dunn, IAI and Streetwise. From February 4-20, 2015, the most intense period of promotions, and without any significant events, there were stark differences between the fortunes of the Company, its competitors and the biotech index. CBMG's stock rose 58%. Kite's stock declined almost 1%, Juno's rose 18%, and the index as a whole increased only 7.5%. Finally by March 6, 2015, CBMG's stock price had increased 108%, dwarfing the 5% increase in Kite's price, the 31% increase in Juno's, and the 9.5% increase in the NBI over the same period.

106. As this run-up in the Company's stock price occurred – fueled by the exuberance of the paid promoters – the Company successfully sold shares in private placement. As the Company stated in the 2014 10-K, "In March 2015, the Company initiated a financing transaction pursuant to which it would sell up to 526,316 shares of the Company's common stock, to selected investors at $38 per share, for total gross proceeds of approximately $20,000,000." According to the Company, "[u]p to the issuance of the financial statements, $20,000,000 (unaudited) were received from investors." Had the price of Company's common stock remained at or close to the $13.79 at which it traded in early January, 2015, the Company would have only raised just over $7.25 million, almost $13 million less.

107. In the 2014 10-K, the Company noted the critical nature of its cash raise. Discussing the receipt of the $20 million private placement, the Company stated, "As we continue to incur losses, achieving profitability is dependent upon the successful development of our immune therapy business and commercialization of our technology in research and development phase, which is a number of years in the future." The Company continued that "unless and until we [achieve profitability], we will continue to need to raise additional capital. Over the next 12 months ending December 31, 2015, we estimate negative operating cash flow of approximately $10.5 million." The Company concluded that "[m]anagement intends to fund future operations through additional private or public debt or equity offerings, and may seek additional capital through arrangements

with strategic partners or from other sources."

108. Thus, the promotional campaign succeeded. As a material cause in the run-up of CBMG's stock price, the promotional campaign enabled the Company to nearly triple the proceeds it would otherwise have received from the March, 2015, private placement.

**THE TRUTH EMERGES**

109. On April 7, 2015, an entity called Pump Stopper uploaded a report to *Seekingalpha.com*,[32] alleging that the Company had no meaningful financial value and was vastly overpriced. Almost every charge leveled by the Pump Stopper was publicly available long before the report's publication, most years before, including citations to the published results of CBMG's CAR T studies, criticism of the Company's founders and their backgrounds, criticism of the wisdom of the Agreen acquisition, criticism of the Company's corporate structure, and questioning the chances of the Company's future success in a market with far larger competitors who owned more technology and were years ahead of CBMG in research and testing. None of these charges reflected changing market conditions or changing investor expectations, nor were other, unrelated factors present.

110. Pump Stopper disclosed, however, that CBMG had instigated and paid for a promotional campaign, describing, for the first time, the scope of those promotions. Pump Stopper revealed for the first time, in one place, the existence of the barrage of paid promotions, enabling the market to piece together the interrelatedness of the promoters and the process of sanitizing the taint of CBMG's payments.

111. On revelation of the multiple promotions and promoters constituting a promotional campaign, CBMG securities declined $7.00 per share, or over 21.7%, to close at $25.22 per share

[32] http://seekingalpha.com/article/3054796-cellular-biomedicine-strong-sell-on-car-t-failure-dishonesty-allegations-and-stock-promotion-minus-94_6-percent-downside.

on April 7, 2015. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

112. In an April 8, 2015 press release, the Company responded obtusely to the Pump Stopper article. With respect to the stock promotion, the Company continued its complete denial of its existence, while hypocritically claiming that it "employs the highest standards of full disclosure as evidenced by regular and frequent dissemination of news through press releases, conferences and media." Notably, the Company failed to mention the press releases referencing Cao's appearances in the WWOS and SNN videos, neither of which mentioned payment to those promoters. Ignoring the vast majority of promoters named by the Pump Stopper, the Company referred only to Dunn, denying his involvement in paid promotions, and continuing to claim that he was a 'strategic consultant." The Company failed to address the repeated positive promotions produced by Dunn and LifeTech, and the cross-promotions with IAI and Streetwise.

113. Dunn, too, responded to the Pump Stopper post in his May 6, 2015 report, claiming that Pump Stopper "fabricated a 'track record,'" unfairly criticizing his record of recommending stocks. Dunn's piece was deliberate obfuscation. Pump Stopper told of Dunn's track record over time with stocks he had touted, and that many stocks he touted had performed very poorly "over time." Dunn deliberately ignored the main point: the fact that CBMG was doing well was a result of his improper promotions, and not the quality of his analysis.

## **DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

114. On December 10, 2014, the Company filed with the SEC a Post-Effective Amendment No. 1 to Form S-8 Registration Statement under the Securities Act of 1933 ("S-8"). The S-8 included "an amended and restated Prospectus . . . that relates to the resale of up to 780,000 shares of Common Stock that have been or may be issued under Cellular Biomedicine Group, Inc.

2011 Incentive Option Plan to various selling stockholders." The S-8 continued that the "prospectus relates to the shares of our common stock that are being registered for reoffers and resale by selling stockholders who have acquired or may acquire shares pursuant to the Plan." The selling shareholders were Defendant Cao and other officers and directors, including Wen Tao Liu, Executive Chairman, Andrew Chan SVP, Corporate Business Development, Bizuo (Tony) Liu CFO, Secretary and Director, and a Former Director, Jianping Dai. After the S-8, the sellers were entitled to "resell all, a portion or none of the shares of our common stock covered by this prospectus" onto the market.

115. In the S-8, the Company disclosed various risks of investing in its common stock. Prominent among those risks, the Company wrote, was the fact that "[t]he market for our common shares is characterized by significant price volatility when compared to seasoned issuers, and we expect that our share price will continue to be more volatile than a seasoned issuer for the indefinite future." Also mentioned as a risk factor was the Company's "status as a relatively unknown company with a small and thinly traded public float."

116. With respect to the "volatility" cited by the Company, it listed factors affecting said volatility, including the sporadic and thin trading of its shares, leading to a "lack of liquidity." In turn, relatively small trades "may disproportionately influence the price of those shares in either direction." The Company also stated that an investment in its stock was speculative and more risk prone because of the Company's "limited operating history and lack of profits to date." This, the Company disclosed, may cause more risk-averse investors to abandon the stock more quickly in the face of negative news. "Many of these factors," Defendants wrote, "are beyond our control and may decrease the market price of our common shares, regardless of our operating performance."

117. The foregoing risk disclosure was false and misleading because:

(a) Defendants Cao and CBMG knew or recklessly disregarded that they failed

to disclose that, having chosen voluntarily to discuss factors affecting "volatility" in their risk disclosures, they had a duty "not to mislead" and to mention all such factors known to them or that they should have known, including their orchestration of a campaign of multiple, multi-promoter, overlapping promotions designed with the sole purpose of artificially increasing the Company's stock price;

(b) The Company Defendants knew or recklessly disregarded that they failed to disclose in their risk disclosures in the S-8 discussing "volatility," the facts of their agreement with and payment to WWOS of thousands of dollars to promote the Company and its stock to small, unsophisticated investors through various internet outlets, an agreement entered into for the sole purpose of artificially increasing the Company's stock price, thus affecting volatility;[33]

(c) The Company Defendants knew or recklessly disregarded that they failed to disclose that the WWOS promotion would appear to be independent, by inadequately disclosing that the Company had bought and paid for the positive research and promotion;

(d) The Company Defendants knew or recklessly disregarded that they failed to disclose, in their risk disclosures discussing "volatility," that the Company planned a campaign of multiple, overlapping promotions designed with the sole purpose of artificially increasing the Company's stock price, thus affecting volatility.

118. In the same December 10, 2014, S-8 Registration Statement, the Company cited SEC Release No. 34-29093, which cautioned that "the market for penny stocks has suffered in recent years from patterns of fraud and abuse." Among the schemes Defendants discussed were concentrated control of the market for a stock by a broker-dealer affiliated with an issuer, manipulation of price by controlling trading volume or issuing false and misleading public statements, and "high-pressure sales tactics and unrealistic price projections by inexperienced sales

[33] http://wideworldofstocks.com/legal/.

persons." Defendants stated unequivocally that "management is aware of the abuses that have occurred historically in the penny stock market," and Defendants promised to "strive within the confines of practical limitations to prevent the described patterns from being established with respect to [the Company's] securities."

119. The promise to "strive within the confines of practical limitations to prevent the described patterns [of fraud and abuse] from being established with respect to [the Company's] securities," was materially false and misleading because:

(a) The Company Defendants knew or recklessly disregarded that they failed to disclose that the Company had itself engaged in "fraud and abuse" by hiring WWOS to promote the Company with the sole goal of artificially inflating the Company's stock price, without disclosing the fact of payment to WWOS;

(b) The Company Defendants knew or recklessly disregarded that they failed to disclose that the Company had itself engaged in "fraud and abuse" in its planned campaign of multiple, overlapping promotions designed with the sole purpose of artificially increase the Company's stock price.

120. On March 31, 2015, the Company filed the 2014 10-K with the SEC. Just as in the S-8, in the 2014 10-K the Company disclosed various risks of investing in its common stock. Prominent among those risks, the Company wrote, was the fact that "[t]he market for our common shares is characterized by significant price volatility when compared to seasoned issuers, and we expect that our share price will continue to be more volatile than a seasoned issuer for the indefinite future." Also mentioned as a risk factor was the Company's "status as a relatively unknown company with a small and thinly traded public float."

121. With respect to the "volatility" cited by the Company, it listed factors affecting said volatility, including the sporadic and thin trading of its shares, leading to a "lack of liquidity." In

turn, relatively small trades "may disproportionately influence the price of those shares in either direction." The Company also stated that an investment in its stock was speculative and more risk prone because of the Company's "limited operating history and lack of profits to date." This, the Company disclosed, may cause more risk-averse investors to abandon the stock more quickly in the face of negative news. "Many of these factors," Defendants wrote, "are beyond our control and may decrease the market price of our common shares, regardless of our operating performance."

122. The foregoing risk disclosure was false and misleading because:

(a) The Company Defendants knew or recklessly disregarded that they failed to disclose that, having chosen voluntarily to discuss factors affecting "volatility" in their risk disclosures, they had a duty "not to mislead" and to mention all such factors known to them or that they should have known, including their orchestration of a campaign of multiple, multi-promoter, overlapping promotions designed with the sole purpose of artificially increasing the Company's stock price;

(b) The Company Defendants knew or recklessly disregarded that they failed to disclose, in the risk disclosures in the 2014 10-K discussing "volatility," the fact that they hired and paid multiple stock promoters, each hired to promote the Company and its stock to small, unsophisticated investors through various internet outlets, for the sole purpose of artificially increasing the Company's stock price, thus affecting volatility;

(c) The Company Defendants knew or recklessly disregarded that they failed to disclose that the multiple, interrelated promotions and cross-promotions would appear to be independent, by inadequately disclosing that the Company had bought and paid for the positive research and promotion;

(d) The Company Defendants knew or recklessly disregarded that they failed to disclose, in their risk disclosures discussing "volatility," that the Company had planned, paid for

and carried out a campaign of multiple, overlapping promotions, through multiple paid promoters, designed with the sole purpose of artificially increasing the Company's stock price, thus affecting volatility. Defendants further knowingly or recklessly disregarded that they failed to disclose the fact that the campaign had succeeded, and that the Company's stock was artificially inflated.

123. In the 2014 10-K, the Company cited again to SEC Release No. 34-29093, which cautioned that "the market for penny stocks has suffered in recent years from patterns of fraud and abuse." Among the schemes Defendants discussed were concentrated control of the market for a stock by a broker-dealer affiliated with an issuer, manipulation of price by controlling trading volume or issuing false and misleading public statements, and "high-pressure sales tactics and unrealistic price projections by inexperienced sales persons." Defendants stated unequivocally that "management is aware of the abuses that have occurred historically in the penny stock market," and Defendants promised to "strive within the confines of practical limitations to prevent the described patterns from being established with respect to [the Company's] securities."

124. The promise to "strive within the confines of practical limitations to prevent the described patterns [of fraud and abuse] from being established with respect to [the Company's] securities," was materially false and misleading because:

(a) The Company Defendants knew or recklessly disregarded that they failed to disclose that the Company had itself engaged in "fraud and abuse" by hiring multiple promoters to conduct an undisclosed, or inadequately disclosed, interrelated campaign to promote the Company with the sole goal of artificially inflating the Company's stock price;

125. On January 15, 2015, the Company issued a press release, announcing "that the interview with Dr. William (Wei) Cao, Chief Executive Officer of Cellular Biomedicine Group, will be broadcast on Wide World of Stocks today, Thursday, January 15, at 5:00 p.m. and 6:00 p.m. EST into more than 50 million homes nationwide over BizTV, BizTV Radio, and Youtoo America

Networks."

126. The foregoing press release was false and misleading because:

(a) The Company Defendants knew or recklessly disregarded that they failed to disclose the fact that the interview was a paid promotion;

(b) The Company Defendants knew or recklessly disregarded that they failed to disclose that CBMG paid WWOS to produce the video interview, and paid Defendants Roberts and McCamant for their participation in the promotional video;

(c) The Company Defendants knew or recklessly disregarded that they failed to disclose the fact that the WWOS promotional video interview was part of a larger, multi-promoter, promotional campaign, designed to artificially increase the Company's stock price.

127. On or about January 15, 2015, Defendant WWOS broadcast an episode of its show, filmed at the JP Morgan Healthcare Conference, titled "BioTech Blitz 2015 - Cellular Biomedicine Group (NASDAQ:CBMG)." The broadcast featured an interview of Defendant Cao by Defendant Roberts, the WWOS host, and by Defendant McCamant, appearing as a purported independent "expert."

128. The foregoing WWOS video was false and misleading because:

(a) Defendants WWOS and Roberts knew or recklessly disregarded that they failed to adequately disclose that the Company Defendants had hired them to perform promotional work, either in the video itself or in any other way;

(b) Defendants WWOS and Roberts knew or recklessly disregarded that they failed to disclose specifically that McCamant had been paid to appear in the video and promote the Company;

(c) Defendant McCamant knew or recklessly disregarded that he failed to disclose, either in the video itself of in any other way, that he was paid by the Company Defendants

to tout CBMG in the video by passing himself off as an independent expert;

(d) Defendant Cao knew or recklessly disregarded that he failed to disclose, either in the video itself of in any other way, that he paid WWOS, Roberts and McCamant to produce, upload, and/or appear in the promotional video;

(e) Defendants WWOS and Roberts knew or recklessly disregarded that they failed to disclose the existence of a larger, multi-promoter, promotional campaign, designed to artificially increase the Company's stock price;

(f) Defendant McCamant knew or recklessly disregarded that he failed to disclose the existence of a larger, multi-promoter, promotional campaign, designed to artificially increase the Company's stock price;

(g) Defendant Cao knew or recklessly disregarded that he failed to disclose the existence of a larger, multi-promoter, promotional campaign, designed to artificially increase the Company's stock price;

(h) Defendants WWOS, Roberts, McCamant and Cao knew or recklessly disregarded that they failed specifically to disclose the interrelatedness of McCamant, BioInvest, Streetwise Reports and WWOS;

(i) Defendant Cao knew or recklessly disregarded that he failed to disclose, in response to a question from McCamant about fraud schemes in Chinese RTOs, that the Company had itself engaged in a fraudulent scheme by hiring multiple promoters to conduct an undisclosed, or inadequately disclosed, interrelated promotional campaign to promote the Company, with the sole goal of artificially inflating the Company's stock price.

129. On February 4, 2015, the Company issued a press release, announcing "that an interview with Dr. William (Wei) Cao, Chief Executive Officer for the Company, conducted by Stock News Now (SNN Incorporated) at last month's J.P. Morgan Healthcare Conference in San

Francisco, was available online.

130. The foregoing press release was false and misleading because:

(a) The Company Defendants knew or recklessly disregarded that they failed to disclose the fact that the interview was a paid promotion;

(b) The Company Defendants knew or recklessly disregarded that they failed to disclose that CBMG paid SNN and Kraft to produce and upload the video interview;

(c) The Company Defendants knew or recklessly disregarded that they failed to disclose the fact that the SNN promotional video interview was part of a larger, multi-promoter, promotional campaign, designed to artificially increase the Company's stock price.

131. On or about February 3, 2015, SNN uploaded a video of Defendant Kraft's interview of Defendant Cao to its website, Youtube.com and other web sites. The interview purports to have been recorded at the 2015 Healthcare Media Day in San Francisco.

132. The foregoing SNN video was false and misleading because:

(a) Defendants SNN and Kraft knew or recklessly disregarded that they failed to disclose that the Company Defendants had hired them to perform promotional work, either in the video itself or on any of the sites to which the video was uploaded;

(b) Defendant Cao knew or recklessly disregarded that he failed to disclose, either in the video itself of on any of the sites to which the video was uploaded, that he paid SNN and Kraft to produce, upload, and/or appear in the promotional video;

(c) Defendants SNN and Kraft knew or recklessly disregarded that they failed to disclose the existence of and their participation in a larger, multi-promoter, promotional campaign, designed to artificially increase the Company's stock price;

(d) Defendant Cao knew or recklessly disregarded that he failed to disclose the existence of a larger, multi-promoter, promotional campaign, designed to artificially increase the

Company's stock price.

133. On January 16, 2015, IAI and Perry published an edition of "The Biotech Stock Review," on its own blog, The Internet Stock Review, which was republished on *SeekingAlpha.com*, offering a glowing evaluation of CBMG and its prospects.

134. The foregoing IAI publication was false and misleading because:

(a) Defendants IAI and Perry knew or recklessly disregarded that they failed to disclose in their disclaimer that the Company Defendants had hired them to perform promotional work;

(b) Defendants IAI and Perry knew or recklessly disregarded that they failed to disclose the existence of, and their participation in, a larger, multi-promoter, promotional campaign, designed to artificially increase the Company's stock price;

135. On February 11, 2015, IAI and Perry published a blog post on the Internet Stock Review, which linked to IAI's earlier CBMG promotion in the January 16, 2015 issue of the BioTech Report, as well as a press release, disclosing that LifeTech Capital and Dunn had initiated coverage of CBMG, had issued a "strong speculative buy" rating, and that Dunn had set a $23.75 price target.

136. On February 17, 2015, IAI and Perry published another blog post on the Internet Stock Review, alerting viewers to LifeTech's and Dunn's target price change, and uploading LifeTech's second press release to its post.

137. The foregoing blog posts were false and misleading because:

(a) Defendants IAI and Perry knew or recklessly disregarded that they failed to disclose that the Company Defendants had hired them to perform promotional work;

(b) Defendants IAI and Perry knew or recklessly disregarded that they failed to disclose the existence of, and their participation in, a larger, multi-promoter, promotional campaign,

designed to artificially increase the Company's stock price.

## LOSS CAUSATION/ECONOMIC LOSS

138. The market for CBMG securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, CBMG securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired CBMG securities relying upon the integrity of the market price of CBMG securities and market information relating to CBMG, and have been damaged thereby.

139. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of CBMG securities and operated as a fraud or deceit on Class Period purchasers of CBMG securities by misrepresenting the value of the Company's business and prospects by providing guidance figures that were unrealistic. Defendants' misrepresentations and fraudulent conduct became apparent to the market upon publication of the Pump Stopper report in *Seekingalpha.com* on April 7, 2015, causing the price of CBMG securities to fall precipitously, as the prior artificial inflation, caused by Defendants' multi-promoter, promotional campaign, designed to artificially increase the Company's stock price, came out of the price. As a result of their purchases of CBMG securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

140. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about CBMG's business and operations. These material misstatements and omissions

had the cause and effect of creating, in the market, an unrealistically positive assessment of CBMG and its business and financial condition, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing CBMG securities at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the artificial inflation in the price of CBMG securities was removed and the price of CBMG securities declined dramatically, causing losses to Plaintiffs and the other members of the Class.

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

141. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CBMG securities traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

142. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CBMG securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CBMG or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

143. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

144. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

145. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of CBMG;

(c) whether the Individual Defendants caused CBMG to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of CBMG securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

146. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

147. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) CBMG securities are traded in efficient markets;

(d) the Company's shares were liquid and traded with sufficient volume during the Class Period;

(e) the Company traded on NASDAQ, and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(g) Plaintiffs and members of the Class purchased and/or sold CBMG securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

148. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

149. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

150. At all relevant times, the market for CBMG's common stock was an efficient market.

151. As a result of the foregoing, the market for CBMG's common stock promptly digested current information regarding CBMG from all publicly available sources and reflected such information in CBMG's stock price. Under these circumstances, all purchasers of CBMG's common stock during the Class Period suffered similar injury through their purchase of CBMG's common stock at artificially inflated prices, and a presumption of reliance applies.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

152. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

153. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

154. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a

course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of CBMG  securities during the Class Period.

155. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CBMG securities. Plaintiffs and the Class would not have purchased CBMG securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## SECOND CLAIM
## Violation of Section 10(B) of The Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against all Defendants

156. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

157. During the Class Period, Defendants violated Rules 10b-5(a) & (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of CBMG publicly traded common stock during the Class Period as alleged herein. Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase CBMG's common stock at artificially inflated prices. In furtherance of these unlawful schemes, plans and courses of conduct, Defendants, and each of them, took the actions set forth herein.

158. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock to maintain artificially high market

prices for CBMG's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful conduct charged herein or as controlling persons as alleged below.

159. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct, including controlling the trading volume and price of CBMG's common stock through the execution of a multi-promoter, multiple promotion campaign, designed to artificially increase the Company's stock price through undisclosed, paid promotions. Defendants employed these devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CBMG value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary to make the statements made about CBMG and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of CBMG common stock during the Class Period.

160. Defendants knew of the devices, schemes, and artifices to defraud or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of supporting the artificially inflated price of CBMG's securities.

161. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CBMG publicly traded securities. Plaintiffs and the Class would not have purchased CBMG publicly traded securities at the prices they paid, or at

all, had they been aware that the market prices for CBMG's common stock had been artificially inflated by Defendants' devices, schemes, and artifices to defraud.

**THIRD CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against Defendants Cao and CBMG**

162. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

163. Plaintiffs sue Defendant Cao herein as a controlling person of CBMG and the Promoter Defendants. Plaintiffs sue Defendant CBMG herein as a controlling person of the Promoter Defendants.

164. By virtue of his high-level positions, agency, and his ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, Defendant Cao had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violators, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. In particular, Defendant Cao had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

165. In particular, defendants named in this count had direct and supervisory involvement in the day-to-day operations of CBMG and/or the Promoter Defendants and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein. Those defendants exercised that power.

166. As set forth above, CBMG and the Promoter Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

167. By virtue of his and its position as controlling persons, Defendant Cao and CBMG are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their

wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

168. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Michelle Jackson as Lead Plaintiff, Plaintiffs Windom, Liang and Nissenbaum as Named Plaintiffs and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: June 9, 2016

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

and

Jacob A. Goldberg (*pro hac vice*)
THE ROSEN LAW FIRM, P.A.
101 Greenwood Avenue, Suite 203
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com

***Lead Counsel for Plaintiffs and the Class***

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2016 I electronically filed the foregoing ***Second Amended Class Action Complaint for Violation of the Federal Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 203
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-M: jgoldberg@rosenlegal.com

***Lead Counsel for Plaintiffs and the Class***