UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCIS J. BONANNO, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>CELLULAR BIOMEDICINE GROUP, INC., et al.,<br><br>　　　　Defendants. | Case No. 15-cv-01795-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Dkt. No. 83 |

## INTRODUCTION

Plaintiffs Michelle Jackson, Ding Liang, and Beverly Nissenbaum allege that defendants Cellular Biomedicine Group, Inc. ("CBMG"), Wei "William" Cao, Institutional Analyst, Inc. ("IAI"), Roland Perry, Wide World of Stocks ("WWOS"), Damon Roberts, John McCamant, SNN, Inc., and Shelly Kraft participated in a stock promotion scheme designed to artificially increase CBMG's stock price in order to raise cash for offerings. Plaintiffs claim that defendants' nondisclosure of the paid stock promotion campaign violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. They allege that defendants' illegal behavior was exposed in an April 7, 2015 internet posting authored by an anonymous blogger calling himself the Pump Stopper.

On May 20, 2016 I dismissed plaintiffs' First Amended Complaint ("FAC") (Dkt. No. 28) with leave to amend because I concluded that the Pump Stopper Report is insufficient to serve as a corrective disclosure in this case. Dkt. No. 77 at 1. Plaintiffs filed a Second Amended Complaint ("SAC") (Dkt. No. 80) on June 9, 2016 which asserts, as the FAC did, that the Pump Stopper Report was a corrective disclosure. For the reasons outlined in my prior Order, the Pump Stopper Report is insufficient to serve as a corrective disclosure because it merely compiled already public

information that an average investor would have understood and plaintiffs failed to plausibly plead that the decline in CBMG's stock was substantially caused by the Pump Stopper Report's discussion of CBMG's stock promotion. I GRANT defendants' motion to dismiss.

## BACKGROUND

A full background of the facts at issue in this case is included in my May 20, 2016 Order granting defendants' motion to dismiss plaintiffs' FAC. Dkt. No. 77 at 1-4. I will include only a short summary of the relevant facts here.

CBMG was incorporated in 2001 and operated as both a mobile entertainment company and an investment consulting business before shifting to biotechnology. SAC ¶ 2. As a biotechnology company, it focuses on developing cell-based therapies to treat serious chronic and degenerative diseases such as cancer, osteoarthritis, and inflammatory diseases. *Id.* ¶ 3. Plaintiffs allege that CBMG did not start off with technology or robust intellectual property of its own and in order to succeed it needed large cash infusions to purchase relevant technology and run clinical trials. *Id.* ¶ 4-5

By late 2014, CBMG began paying investor relation firms to create positive spin through analyst coverage on its stock with the goal of raising CBMG's stock price. *Id.* ¶ 9. Several different companies and individuals released promotional broadcasts or materials praising CBMG. *Id.* ¶ 10-13. All of these promoters "lacked independence, and their disclosures about payment were either buried behind so many links that a reasonable investor would never think they existed, or believe there was a reason to look, and/or obfuscated the fact of payment for promotion by claiming that payment was for reasons other than promotion." *Id.* These disclosures were inadequate. *Id.*

Plaintiffs allege that defendants' scheme to raise CBMG's stock price was successful and that CBMG's stock price went from $13.79 per share on January 2, 2015 to a high of $47.06 per share on March 23, 2015. *Id.* ¶ 15.

On April 7, 2015, a blogger known as "Pump Stopper" uploaded a posting to *SeekingAlpha.com*, a financial news and analysis website, entitled "Cellular Biomedicine: Strong Sell of Patient Death, Fraud Ties and Stock Promotion, -94.6% Downside." *Id.* ¶ 16. The posting

encompassed approximately twenty five pages and included a discussion of a paid stock promotion campaign, patient deaths following CBMG's clinical trials, allegations of dishonesty on behalf of its founders, CBMG's connections to an alleged illegal offshore stem clinic, and a prediction of a "-94.6% near term and imminent downside." Pump Stopper Report ("Report") at 2.[1] Plaintiffs allege that "[o]n revelation of the multiple promotions and promoters constituting a promotional campaign, CBMG securities declined $7.00 per share, or over 21.7%, to close at $25.22 per share on April 7, 2015." SAC ¶ 111.

Plaintiffs bring this lawsuit on behalf of themselves and all persons who purchased or otherwise acquired CBMG securities between December 10, 2014 and April 7, 2015 in order to recover damages caused by defendants' violations of federal securities law and pursue remedies under 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.

## LEGAL STANDARD

### I. FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 1949 (2009). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In considering whether the complaint is sufficient to state a claim, the court accepts as true all of the factual allegations contained in the complaint. *Iqbal*, 556 U.S. at 678. However, the court need not "accept as true allegations that contradict matters

---

[1] I consider the Pump Stopper Report reproduced at Dkt. No. 52, Exs. H, I; Dkt. No. 57, Ex. K; Dkt. No. 64, Ex. C, under the doctrine of incorporation by reference. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (The incorporation by reference doctrine allows courts "to take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading.") (internal quotation marks and modifications omitted). The request for judicial notice of the *In re Blue Earth, Inc. Securities Class Action Litigation*, No. 14-cv-8263 (C.D. Cal. Jul. 25, 2016) decision, Dkt. No. 89 Ex. T is GRANTED. *See Hunt v. Check Recovery Sys. Inc.*, 478 F. Supp. 2d 1157, 1160-61 (N.D. Cal. 2007) ("Judicial notice may be taken of 'adjudicative facts' such as court records, pleadings."). Because the remaining documents were not considered in deciding this motion, all other requests for Judicial Notice are DENIED as moot.

properly subject to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted).

## II. PLEADING REQUIREMENTS IN SECURITIES FRAUD ACTIONS

Section 10(b) of the Exchange Act makes it unlawful "for any person . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" 15 U.S.C. § 78j(b). SEC Rule 10b-5, promulgated under the authority of Section 10(b), in turn, provides that "[i]t shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

The basic elements of a Rule 10b-5 claim are: (i) a material misrepresentation or omission of fact, (ii) scienter, (iii) a connection with the purchase or sale of a security, (iv) transaction and loss causation, and (v) economic loss. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citation omitted). To state a Rule 10b-5 claim, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." *Id*.

In order to establish a prima facie case under Section 20(a), a plaintiff must prove: (i) a primary violation of federal securities laws; and (ii) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "Whether [a defendant] is a controlling person 'is an intensely factual question,' involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994) (citation omitted). A director or CEO "is not automatically liable as a controlling person." *Id*.; *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996).

4

### III. FEDERAL RULE OF CIVIL PROCEDURE 9(b) AND THE PSLRA

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), securities fraud claims must "plead with particularity both falsity and scienter." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). This is the same standard under Federal Rule of Civil Procedure 9(b). With respect to falsity, "the complaint must specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). With respect to scienter, "the complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Daou Sys.*, 411 F.3d at 1015 (citation and internal quotation marks omitted).

## DISCUSSION

### I. PLAINTIFFS' SECTION 10(B) AND RULE 10B-5 CLAIMS

Defendants move to dismiss plaintiffs SAC arguing that (1) plaintiffs have again failed to plead loss causation, (2) plaintiffs cannot impose liability on defendants for misleading statements made by others, (3) plaintiffs have not alleged falsity with sufficient particularity, and (4) plaintiffs have not made any allegations that defendants acted with scienter. Because I again find that plaintiffs have not adequately pleaded loss causation, I do not address defendants' other arguments.

Loss causation, "i.e. a causal connection between the material misrepresentation and the loss" experienced by the plaintiff, is a necessary element of pleading a securities fraud claim under section 10(b) of the Exchange Act. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "Even when deceptive conduct is properly pleaded, a securities fraud complaint must also adequately plead loss causation." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (internal quotation marks omitted). "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which caused the company's stock price to drop and investors to lose money." *Id.* (internal quotation marks

1    omitted). To be corrective, the disclosure must "relate back to the misrepresentation and not to
2    some other negative information about the company." *In re Nuveen Funds/City of Alameda Sec.*
3    *Litig.*, No. 08-cv-4575-SI, 2011 WL 1842819, at *10 (N.D. Cal. May 16, 2011) (internal quotation
4    marks omitted). Federal Rule of Civil Procedure 9(b) requires a plaintiff to state with particularity
5    the elements of a securities fraud claim, including loss causation. *Oregon Pub. Emps. Ret. Fund v.*
6    *Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

7    In my prior Order, I concluded that plaintiffs had not adequately pleaded loss causation in
8    the FAC because they did not (1) sufficiently explain when the "true facts" about CBMG were
9    revealed, or made apparent to the market as they pointed only to the Pump Stopper's opinions and
10   recommendations, (2) identify which portions of the Pump Stopper Report were not already public
11   information, and (3) differentiate the disclosure of paid stock promotion from multiple other
12   negative accusations included in the Pump Stopper Report. Dkt. No. 77 at 6-10. Plaintiffs again
13   failed to adequately address these issues in their SAC.

14   Plaintiffs have not adequately pleaded how the Pump Stopper Report constitutes "true
15   facts" rather than a mere opinion. *Lloyd*, 811 F.3d at 1209 (loss causation is satisfied by pleading
16   "the defendant revealed *the truth* through 'corrective disclosures' which caused the company's
17   stock price to drop and investors to lose money") (internal quotation marks omitted). In the SAC,
18   plaintiffs aim to show that the Pump Stopper Report revealed new facts because it disclosed the
19   full scope and nature of CBMG's paid promotions campaign. Plaintiffs specifically allege that
20   Pump Stopper disclosed "that CBMG had instigated and paid for a promotional campaign,
21   describing, for the first time, the scope of those promotions. Pump Stopper revealed for the first
22   time, in one place, the existence of the barrage of paid promotions, enabling the market to piece
23   together the interrelatedness of the promoters and the process of sanitizing the taint of CBMG's
24   payments." SAC ¶ 110.

25   In claiming that the Pump Stopper Report revealed new information about the "scope" of
26   the CBMG promotion campaign in "one place," Plaintiffs rely heavily on a single paragraph of the
27   Report in which the author compiles and lists public sources regarding various paid promotions
28   for CBMG. This paragraph states:

6

> It's not only Stephen Dunn and his group involved with CBMG though, the See Through Equity shop has been involved in promoting CBMG, as has the comically bad StockNewsNow.com who promoted CBMG also seems to be a paid stock promotion website given their disclaimer about company compensation. Another paid stock promotion firm "Wide World of Stocks!" was also apparently paid to promote CBMG with host Damon Roberts, famous for his extensive infomercial experience. CBMG also paid for the "Life Sciences Report", also mentioned in Richard Pearsons's famous stock promotion research piece, while CBMG also apparently paid StreetWise Reports as well (see disclosure at bottom).

Report at 5 (underlined words indicate hyperlinks to internet sources).

Although this colorful summary compiles several different examples of CBMG promotions, this aggregation does not constitute new information regarding the "scope" of CBMG's campaign–it is simply an individual's summary and comments on publicly available facts. *See Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) ("If every analyst or short-seller's opinion based on already-public information could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst's negative analysis of public filings as a corrective disclosure. That cannot be– nor is it–the law."); *Loos v. Immersion Corp.*, 762 F.3d 880, 889 (9th Cir. 2014) (agreeing with the Eleventh Circuit that causation was not established when the information in a corrective disclosure "had been derived entirely from public filings and other publicly available sources of which the stock market was presumed to be aware") (internal quotation marks and modifications omitted).

This type of aggregation cannot constitute new information because an efficient market "would easily digest" all public information "without the need for [the analyst] to regurgitate it first." *Meyer*, 710 F.3d at 1198 n.9. Because the Pump Stopper Report only collected and opined on already public information, it does not constitute disclosure of "the truth" as required for a corrective disclosure. *Lloyd*, 811 F.3d at 1209.

Plaintiffs point to *In re Maxim Integrated Products, Inc. Securities Litigation*, 639 F. Supp. 2d 1038, 1049 (N.D. Cal. 2009), in support of their argument that new information about the "scope" of fraudulent conduct constitutes new information for the purposes of showing a corrective disclosure. Opposition ("Oppo.") 17 (Dkt. No. 86). *Maxim* is not applicable to the

7

facts here. In *Maxim*, Maxim first announced improper backdating practices affecting financial statements from 2000-2006. *Id.* at 1047-48. A year later, it announced that the problem actually went back to 1997 and gave an estimated range of the restatement in dollars, causing the stock price to fall. *Id.* at 1049-50. The court found that Maxim's second statement constituted a corrective disclosure because the first announcement had not included "the full scope of the truth." *Id.* at 1050. This is entirely different from the facts here where all of the information regarding CBMG's paid promotions was publicly available prior to April 7, 2014 and was simply not carefully compiled and aggregated until the Pump Stopper Report. While this organization may have helped demonstrate the scope of the CBMG stock promotion campaign more effectively to readers, it did not reveal any new fact like the second disclosure in *Maxim*.

Because plaintiffs cannot identify any new information in the Pump Stopper Report, they instead argue that, although CBMG's promotional activities were public, they were not "on the market" because they could not be appreciated by the average investor. Oppo. 18. In support, plaintiffs point to *In re Gilead Sciences Security Litigation*, 536 F.3d 1049, 1053 (9th Cir. 2008), in which the Ninth Circuit concluded that a company's disclosure of its improper drug labeling was a corrective disclosure even though the same information has been disclosed three months earlier by the Food and Drug Administration and was already well known to prescribing physicians. The Ninth Circuit explained "[i]t is not unreasonable that physicians–the targets of the off-label marketing–would respond to the Warning Letter while the public failed to appreciate its significance." *Id.* at 1058.

Plaintiffs argue that similarly here, the public could not appreciate the significance of CBMG's promotional campaign until an expert, or "stock analyst, with research experience" took the time to "scour the internet" and uncover the relevant information about CBMG. Oppo. 19. This comparison does not hold up. In *In re Gilead* the Ninth Circuit held that the public could not appreciate the significance of the Warning Letter because of its technical and medical substance. 536. F.3d 1053. Here, plaintiffs do not allege that the public would struggle to appreciate the substance of the CBMG promotional activities. Rather, they allege that it would be difficult for any one individual to track down and compile this information without "research experience."

8

Oppo. 19.

Under an efficient market theory, it is not necessary for any specific individual to track down every piece of information on every stock. One presumes that all public information is incorporated into the market price no matter how far flung it may be. *Basic Inc.*, 485 U.S. at 246 (1988). Plaintiffs have not alleged that the substance of CBMG's promotional activities would have been difficult to process or understand by the average investor. In fact, the Pump Stopper suggests to readers "I recommend you read the extensive research below and form your own opinions" suggesting that any investor would reach the author's same conclusions if they were to review the compiled materials. Report at 5.

Plaintiffs also argue that information regarding CBMG's promotional activities was not incorporated into the market price because it was only available from non-company sources rather than the company's own public filings. Oppo. 20. Plaintiffs note that this distinguishes this case from *Meyer* because here the Pump Stopper had to review "non-company sources" to reveal the "scope and magnitude of fraud, unknowable to the average investor." *Id.* This argument fails--it is irrelevant if the public information at issue comes directly from the company or from non-company sources; all public information will be incorporated into stock prices in an efficient market. *See Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) ("[T]he market price of shares traded on well-developed markets reflects all publicly available information."). Plaintiffs are also incorrect on this point as the analyst in *Meyer* relied on public information from numerous non-company sources, including county property appraisers' sales lists which the court specifically noted the market "would easily digest" without the analysts "regurgitation." *Meyer*, 710 F.3d at 1198 n.9. Plaintiffs have failed to point to any non-public information in the Pump Stopper Report and have failed to explain why this public information would not be factored into market price.

Additionally, plaintiffs do not adequately differentiate the "disclosure" of the paid stock promotion campaign from the multiple other negative accusations contained within the Pump Stopper Report. "[L]oss causation is not adequately pled unless a plaintiff alleges that the market learned of and reacted to the practices the plaintiff contends are fraudulent, as opposed to merely

reports of the defendant's [poor behavior] generally." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010). Many of the Pump Stopper's accusations are quite serious and unrelated to plaintiffs' claims regarding the undisclosed paid marketing campaign. While the alleged misrepresentations need not be the sole reason for the decline in value, they must be at least a "substantial cause." *In re Daou Sys., Inc.*, 411 F.3d at 1025.

Plaintiffs attempt to address this by noting that "[a]lmost every charge leveled by the Pump Stopper was publicly available long before the report's publication." SAC ¶ 109. Therefore "none of these charges reflected changing market conditions." *Id.* This line of reasoning fails as the promotional campaign materials were also publicly available before the Pump Stopper Report. Plaintiffs attempt to distinguish the promotional campaign information from the other negative information in the Report by noting that the "Pump Stopper revealed for the first time, in one place, the existence of the barrage of paid promotions, enabling the market to piece together the interrelatedness of the promoters and the process of sanitizing the taint of CBMG's payments." But this could be said about any of the information in the Pump Stopper report. One could argue that Pump Stopper generally revealed the full scope of CBMG's various problems by compiling far flung information on the Company's founders and their backgrounds, problematic clinical studies, corporate structure, and lack of financial integrity. Plaintiffs cannot deny that the Pump Stopper Report's discussion of the paid stock campaign encompasses only approximately four out of twenty-five pages of the posting. The report attributes a wide variety of negative conduct to CBMG, including "multiple allegations of dishonesty with many disclosure questions, connections to alleged illegal offshore stem cell clinic [] apparently engaging in illegal activities in China, plus direct partnerships with a convicted fraudster currently serving an 11 year sentence in prison." Report at 6. Plaintiffs offer no plausible explanation why it was Pump Stopper's compilation of information regarding CBMG's promotional activities that substantially caused stock prices to fall and not the compilation of substantially more information regarding CBMG's other questionable practices.

This case shares important similarities with *In re Blue Earth, Inc. Securities Class Action*, No. 14-cv-8263 (C.D. Cal. Jul. 25, 2015). Dkt. No. 89, Ex. H. In *Blue Earth*, the plaintiffs

1  alleged that Blue Earth, Inc. and its officers misrepresented its market potential and that a Pump
2  Stopper Report acted as a corrective disclosure that revealed the falsity of the company's previous
3  misrepresentations. *Id.* at 1. As I noted in my May 20, 2016 Order, the *Blue Earth* court
4  dismissed the plaintiffs' first complaint because the information contained in the Pump Stopper
5  Report was a compilation of publicly available information and because plaintiffs could not show
6  causation as the relevant information in the report was only a small portion of a long negative
7  report on Blue Earth. *Id*. Since then, after reviewing the plaintiffs' second amended complaint,
8  the *Blue Earth* court concluded that plaintiffs had again failed to allege loss causations as they
9  could not show that the Pump Stopper Report revealed new information and did not address the
10  fact that the article contained numerous other negative statements and opinions about Blue Earth.
11  *Id.* at 2.

So too here. Plaintiffs attempt to distinguish this second ruling in *Blue Earth* by noting that in *Blue Earth* plaintiffs did not show that Pump Stopper "revealed the scope or magnitude" of the fraud. They also assert that the *Blue Earth* plaintiffs did not allege that a reasonable investor could not "appreciate the significance" of the promotional practices because they were only available from far flung, non-company sources. As discussed above, neither of these arguments helps plaintiffs. Just as in *Blue Earth*, plaintiffs have failed to demonstrate that the Pump Stopper Report's comments on CBMG's stock promotion practices revealed any new information or were a substantial cause of the stock's decline. Because Rule 9(b)'s heightened pleading standard applies, plaintiffs must plead causation with particularity. Plaintiffs' allegations do not satisfy this standard. As plaintiffs have failed to establish loss causation, plaintiffs' Section 10(b) and Rule 10b-5 claims fail as a matter of law.

**II. SECTION 20(A) OF THE EXCHANGE ACT**

To establish a prima facie case violation of Section 20(a), plaintiffs must prove: (1) a primary violation of federal securities laws and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Here, because plaintiffs have failed to state a claim for primary liability under section 10(b) of the Exchange Act, there can be no secondary liability under section 20(a). *See Zucco*

*Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) ("Section 20(a) claims may be dismissed summarily. . . if a plaintiff fails to adequately plead a primary violation of section 10(b).").

## CONCLUSION

At the hearing on August 17, 2016, plaintiffs' counsel stated that he did not want further leave to amend the complaint if I dismissed it again. Because plaintiffs have not adequately pleaded loss causation in the SAC, defendants' motion to dismiss is GRANTED without leave to amend, and the case is DISMISSED. It appears that plaintiffs will not be able to cure the defects in their causation allegations and leave to amend would be futile. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009).

**IT IS SO ORDERED**.

Dated: September 2, 2016



WILLIAM H. ORRICK
United States District Judge